# EXHIBIT 39

# Deposition of Jeffrey Eiser

**A400B45**
**JEFF EISER   MARCH 1, 2010**

```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3      BRENDA SUE SMITH, Deceased
        by Suetta Smith, Personal
 4      Representative of the Estate
        of Brenda Sue Smith, Deceased,

 5
                    Plaintiff,
 6
        v.                           Case No. 2:09-cv-10648
 7                                   Honorable David M. Lawson

 8      COUNTY OF LENAWEE, SHERIFF
        LAWRENCE RICHARDSON, JR.,
 9      SGT. PAUL DYE, SGT. J. CRAIG,
        OFF WENDY VANDERPOOL; OFF BERNICE
10      BAKER, OFF ADAM ONDROVICK; PAROLE
        AGENT THOMAS MOORE and DR. JEFFREY
11      STICKNEY, MARY NEILL, ERIC WESTGATE,

12                  Defendants.

13                  DEPOSITION of JEFF EISER, taken on behalf

14      of the Defendants, pursuant to FRCVP 30, and pursuant

15      to Re-notice of Taking Deposition, Duces Tecum,

16      commencing at 11:30 a.m., on March 1, 2010, at the

17      Intelligent Office, 9435 Waterstone Boulevard,

18      Cincinnati, Ohio 45249, before Edna M. Hawkins, a

19      Court Reporter and a Notary Public in and for the

20      State of Ohio.

21                              -  -  -

22
        ATKINSON-BAKER, INC.
23      COURT REPORTERS
        (800) 288-3376
24
        www.depo.com
25      FILE: A400B45
```

A400B45
**JEFF EISER   MARCH 1, 2010**

**Page 2**

```
 1  APPEARANCES:
 2
 3       FOR THE PLAINTIFF:
 4       LAW OFFICES OF KENNETH D. FINEGOOD, ESQ.
         BY KENNETH D. FINEGOOD, ESQ.
 5       29566 Northwestern Hwy., Ste., 120
         Southfield, MI 48034
 6
 7       FOR THE DEFENDANTS, LENAWEE COUNTY
         LAWRENCE RICHARDSON, CRAIG VANDERPOOL,
 8       BERNICE BAKER and ADAM ONDROVICK:
 9       JAMES W. BODARY, ESQ.
         SIEMION, HUCKABAY, BODARY, et al.
10       One Towne Square, Suite 1400
         Southfield, Michigan 48076-5068
11
12       FOR THE DEFENDANT, DR. JEFFREY STICKNEY:
13       LAW FIRM OF WILLINGHAM & COTE
         MICHAEL W. STEPHENSON, ESQ.
14       SPECIALLY APPEARING FOR:  DAVID NELSON,
            ESQ.
15       333 Albert Avenue, Suite 500
         East Lansing, Michigan 48823
16
17       FOR THE DEFENDANT, THOMAS MOORE:
18       MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
         BY: KEVIN R. HIMEBAUGH, ESQ.
19       525 W. Ottawa 4th Floor
         Lansing, Michigan 48913
20
             - - -
21
22
23
24
25
```

**Page 3**

```
 1                I N D E X
 2  WITNESS:  JEFF EISER
 3       EXAMINATIONS                 PAGE
 4       By Mr. Bodary            4, 139
 5       By Mr. Nelson           104, 143
 6       By Mr. Finegood         115, 146
 7       By Mr. Himebaugh            146
 8
 9
10  EXHIBITS
11  DEFENDANTS'
12  A        List of Documents and Materials    5
            Reviewed
13
     F      Report of Jeff Eiser           14
14
     G      List of Attachments            12
15
     H      Letter to Kenneth Finegood     15
16          dated 1/5/10 w/attachment
17   I      Curriculum Vitae of Jeff Eiser 20
18   J      List of Cases where Jeff Eiser 21
            was retained as an expert
19          witness in last 4 years
20
     PLAINTIFF'S
21   K        Policy Number:  4.5.1.1      124
22              - - -
23
24
25
```

**Page 4**

```
 1              JEFF EISER
 2  of lawful age, a witness herein, being first duly
 3  sworn, as hereinafter certified, was examined and
 4  testified as follows:
 5              EXAMINATION
 6  BY MR. BODARY:
 7          This deposition is taking pursuant to
 8      Notice, under the Federal Rules for all
 9      uses allowed.
10      Q.   Your name is Jeff Eiser; is that
11  correct?
12      A.   Yes, sir.
13      Q.   What's your business, your office
14  address?
15      A.   My office address is 12122 Huntergreen
16  Drive, all one word, Cincinnati, Ohio, 45211.
17      Q.   What's your date of birth?
18      A.   Is September 7th, 1958.
19      Q.   Is that your home address on
20  Huntington Green?
21      A.   Huntergreen, yes, it is.
22      Q.   All right.  You don't have an office
23  in an office building?
24      A.   No, I do not.
25      Q.   When you bill for activities, such as
```

**Page 5**

```
 1  this case, do you have a company or corporation that
 2  receives the payment?
 3      A.   No, I do not; it's a sole
 4  proprietorship.
 5      Q.   That's an assumed name?
 6      A.   No, sir.
 7      Q.   It's just your name?
 8      A.   It's just my name.
 9      Q.   The Notice for your deposition which
10  has been rescheduled a few times, requested seven
11  different items, the first of which was all materials
12  that were provided for you to review in the case.
13  Have you brought those with you?
14      A.   Yes, I have.
15          (Xerographic Document, one page,
            headed, Appendix A, with attachment,
16          was marked for identification Exhibit
            A.)
17      Q.   We received an Appendix A with a
18  written report and I've had this marked as Exhibit
19  letter A, of today's date, that this document, you've
20  seen as of December 8th, 2009.  Is that a complete
21  list as of that date?
22      A.   Yes, I believe it is.
23          (Witness reviewing document.)
24      Q.   All right.  Have you received or
25  looked at any other materials?
```

ATKINSON-BAKER, INC.

(800) 288-3376

**A400B45**
**JEFF EISER   MARCH 1, 2010**

Page 6

1    A.  I have received other materials since
2    the issuance of my report, yes.
3        Q.  Have you brought those with you?
4    A.  Yes, I have.
5        Q.  What are they?
6    A.  Copies of depositions.
7        Q.  And which, which depositions?
8    A.  Eric Westgate, Wendy Vanderpool,
9    Dennis Steenrod, Lawrence Richardson, Mary Neill,
10   Thomas Moore, Paul Dye, Bonita Mason.
11       Q.  And did you read all of those?
12   A.  I have not. I just received these this
13   week.
14       Q.  So which ones did you read?
15   A.  I have not reviewed these depositions
16   yet.
17       Q.  Have you received any summary of any
18   of the testimony in those depositions?
19   A.  No, I have not.
20       Q.  You understood this was the date and
21   time set for you to give testimony under oath
22   regarding your opinions in this matter; is that true?
23   A.  Yes, that's true.
24       Q.  All right.  Do you take the process of
25   reviewing correctional records and medical records

Page 7

1    seriously?
2    A.  Absolutely.
3        Q.  It's a weighty matter for you to be
4    critical of someone, depriving another of Civil
5    Rights; you'd agree?
6    A.  Yes.
7        Q.  You don't take the assignment lightly?
8    A.  I do not.
9        Q.  You, therefore, make a thorough,
10   careful and thorough review of the materials that can
11   touch upon your opinions; is that true?
12   A.  Yes, it is.
13       Q.  And you did that before you prepared
14   this report of December, 2009; is that correct?
15   A.  Yes, sir.
16       Q.  The Exhibit letter A, identifies 20
17   items, I think by type and admittedly, there are some
18   descriptions of particular items.  Did you look at
19   every one of the 20 items before you prepared the
20   report?
21   A.  Yes, I did.
22       Q.  It appears that you were given a --
23   some transcript of phone calls or a phone call
24   between Paul Dye and Jeff Stickney.  This is item
25   number 5; do you see that?

Page 8

1    A.  Yes sir.
2        Q.  You also were given; weren't you, the
3    actual tape-recording of the phone call between Paul
4    Dye, listed as 20B?
5    A.  Yes, sir.
6        Q.  Did you listen to the tape?
7    A.  Yes, I did.
8        Q.  Did you notice any mistakes in the
9    transcription?
10   A.  I did not.
11       Q.  Did you ask for these depositions or
12   were they just sent to you by the plaintiff's lawyer?
13   A.  I did not ask; they were sent to me by
14   plaintiff's lawyer.
15       Q.  Had you asked for any materials that
16   you think you needed to see before you prepared your
17   report in this case in December of 2009?
18   A.  I don't recall of our conversations.
19   The documents that I received were the ones that I
20   asked for and that were submitted.  I don't remember
21   exactly what I -- our verbal conversations of what I
22   asked for.
23       Q.  I'm not sure I needed the verbal
24   conversation.  Let me do this:  Is this the first
25   case you've looked at at the request of Ken Finegood?

Page 9

1    A.  Yes.
2        Q.  Do you know how he found you?
3    A.  Honestly, I never asked him.
4        Q.  Do you advertise your service as an
5    expert in correctional cases?
6    A.  I am listed on The Americans for
7    Effective Law Enforcement site and also on Juris Pro.
8        Q.  Repeat the first, Americans for --
9    A.  Americans for Effective Law
10   Enforcement, AELE.org.
11       Q.  And the second one?
12   A.  Is Juris Pro.com.
13       Q.  Juris Pro sounds like a website?
14   A.  Yes, it is.
15       Q.  And that lists forensic experts that
16   lawyers can contact?
17   A.  Yes, it does.
18       Q.  In addition to being -- First of all,
19   did you volunteer to be listed with these two
20   locations?
21   A.  The ELE asked me.  It is a volunteer;
22   it's a nonprofit organization.  The Juris Pro is
23   something that I had heard about through attorneys
24   and upon retirement, I looked at different services
25   and selected that one as being one that I felt

A400B45
**JEFF EISER   MARCH 1, 2010**

1  comfortable with.
2      Q.  And when you receive a case from Juris
3  Pro dot com, is there some fee paid there?
4      A.  No, there is not.
5      Q.  Did you pay to be listed?
6      A.  Yes, I do.
7      Q.  So let me go back to the inquire here
8  of materials.  There are 20 items with subdivisions
9  and descriptions here, listed in Exhibit A.  Did you
10  ask for these or were they just sent by the lawyer?
11      A.  Again, I don't remember exactly.  Some
12  things I asked about, talked about; some things were
13  sent and I received a binder with most of the
14  documents in there.  I did ask for some, such as the
15  policies and documents, but most of it was sent by
16  the attorney to me.
17      Q.  Okay.  Other than the policies that
18  are listed here, under 17, is there anything else on
19  the Exhibit that you remember you asked for,
20  specifically, rather than the lawyer volunteering?
21      A.  I think I asked for the request for
22  admissions, interrogatories, Complaint, those are
23  things I would have asked for, the investigative
24  report, something I will always ask for.
25      Q.  Well, I want to know what you asked

Page 10

1  for on this occasion?
2      A.  I don't recall.  Generally, I would
3  ask for that.
4      Q.  If it wasn't sent to you?
5      A.  Yes.
6      Q.  Well, did the materials come in a
7  one-ring binder?
8      A.  Yes.
9      Q.  And that's the binder you brought here
10  today?
11      A.  Yes, it is.
12      Q.  And that was one mailing?
13      A.  There was one mailing and subsequent
14  small mailings, I believe.
15      Q.  What part of the ring binder has the
16  small mailings?
17      A.  I put `em in a folder.
18      Q.  Okay.  So if we look between, if I
19  may, you've got a ring binder and the ring binder
20  contains materials you were initially sent; is that
21  correct?
22      A.  Yes.
23      Q.  And the front page which I'm going to
24  have marked as Exhibit G, is a list of what's
25  contained in the ring binder?

Page 11

1      A.  Yes.  It's got all the attachments.
2      Q.  Okay.
3      MR. BODARY:  Go off the record.
4      (Xerographic Document, one page,
       headed, "Attachments," was marked for
5      identification Exhibit G.)
6      Having now marked that as Exhibit G, we
7  will need to compare this Exhibit G with those listed
8  on Exhibit A.  We can differentiate between those we
9  received initially that the lawyer choose (sic),
10  those on Exhibit G and those that came through later;
11  is that a fair statement?
12      A.  Again, what I remember, what I recall
13  is that we had a conversation about the case and Mr.
14  Finegood asked me what would I be looking for, what
15  would I look at and I don't remember the exact words,
16  but I always say the same thing, so again, with all
17  the cases that I do --
18      Q.  Is that before he sent you the ring
19  binder?
20      A.  Yes.  We talked before.
21      Q.  Okay.  Well, what I'm trying to get at
22  is this list that's marked we've marked Exhibit G is
23  what you first received in one mailing and if we
24  compare it with Appendix A, now marked Exhibit A,
25  that the additional items', now in your Manila folder

Page 12

1  that you received in other mailings; is that true?
2      A.  Could be, yes.
3      Q.  And did you take notes in the course
4  of reviewing?
5      A.  What I do is I take electronic notes
6  which then become my report.  I've created a WORD
7  documents, literally, at the beginning, with a title
8  and that's the way I've been doing it for the last 10
9  years and create my report out of those particular
10  notes.
11      Q.  All right.  That WORD documents been
12  edited how many times.
13      A.  Well, every time I would go in, the
14  final, obviously, is the end of my report, but
15  it's been, it's a working document; it's was issued
16  as a report.
17      Q.  Yeah.  I'm trying to get a sense, did
18  you edit it four or five times, two times?
19      A.  Every time I would work on it.
20      Q.  And how many would that be,
21  approximately.
22      A.  You don't want me to guess.
23      Q.  No, estimate.  What's your best
24  approximation of the number.
25      A.  Well, once you create the document,

Page 13

**ATKINSON-BAKER, INC.**

**(800) 288-3376**

4 (Pages 10 to 13)

**A400B45**
**JEFF EISER   MARCH 1, 2010**

**Page 14**

1  you go into it anytime you would have a though or an
2  issue or something you need to write, you put it in.
3  I worked on this case over a period of, you know, I
4  don't know; it was four-to-six or something, so -- I
5  don't keep tract to that.
6        Q.   Yeah, and I didn't suggest you did.
7  I'm just trying to think, you're the one doing it, so
8  is this probably six edits, four edits, 12 edits?
9              MR. FINEGOOD:  If you know.  If you
10        don't know, tell him you don't know.
11       A.   I don't know.
12       Q.   When you save the document, do you
13  save it to a new title?
14       A.   No, the same title over and over.
15  That keeps me organized; that's why I do it.  It's
16  for my own personal choice and it keeps me organized
17  and everything's in one electronic file.
18             (Xerographic Document, nine pages,
             headed, Jeff Eiser, Criminal Justice
19           Consultant and Jail Operations Expert,
             was marked for identification Exhibit
20           F.)
21       Q.   I've had marked as Exhibit F the
22  nine-page document, dated December 8, 2009, and is
23  that the report you just referred to?
24       A.   Yes, it is.
25       Q.   Have you prepared any other report?

**Page 15**

1        A.   No, sir.
2        Q.   Do you have another WORD document in
3  process?
4        A.   I have not started another one.
5        Q.   Okay.  You mentioned it was over a
6  six-week period.  What did you charge for the review
7  and preparation of the report?
8        A.   I can get my documents out --
9        Q.   Did you bring a billing statement with
10  you?
11       A.   Yes, I did.
12       Q.   Per your subpoena.
13       A.   Right.
14             (Xerographic Document, four pages, a
             letter, dated 1/5/10 with attachment,
15           was marked for identification Exhibit
             H.)
16       Q.   And I'm going to hand you back what's
17  been marked as Exhibit H, of today's date, consisting
18  of four pages.  Does that constitute all the billings
19  you've produced up to the present day?
20       A.   On this matter, yes, sir.
21       Q.   Okay.  Now, did you spend additional
22  time beyond what is billed there to prepare for this
23  deposition?
24       A.   I did.  Last evening -- Actually,
25  yesterday, I reviewed the materials once again.

**Page 16**

1        Q.   And how many hours was that?
2        A.   Probably an hour and a half.
3        Q.   And did you meet with counsel?
4        A.   Yes, I did.
5        Q.   And how long was that?
6        A.   We met for probably an hour this
7  morning.
8        Q.   Are you billing for the meeting?
9        A.   I haven't thought about that yet.
10       Q.   Well, what's your routine if you have
11  a meeting with lawyer --
12       A.   Generally, yes.
13       Q.   -- on the day of the deposition, you
14  bill that lawyer?
15       A.   Yes.
16       Q.   And what's your hourly rate for
17  meetings?
18       A.   My hourly for everything is a 150 an
19  hour.
20       Q.   Are you billing for the 1.5 hours of
21  preparation or is that part of your deposition
22  charge?
23       A.   Again, that took place yesterday, so I
24  will assume I will be billing for that.
25       Q.   Um-hum.  Looks like the items on the

**Page 17**

1  notice, in addition to the materials -- Well, let me
2  pause there.  Between Exhibit A which was Addendum A
3  to your report and the depositions that you've just
4  listed for us, do we have all of the materials that
5  were given to you to review that touch upon the facts
6  of this case?
7        A.   You didn't mention the transcripts.
8  These two document I received separately.
9        Q.   But in fact, the transcript of the
10  phone call was, in fact, listed as Exhibit 5 on --
11  I'm sorry -- listed number 5 on Exhibit A.
12       A.   Correct.  I'm sorry.  It wasn't in the
13  original set of documents.  I just answered your
14  question.
15       Q.   Yeah.  So what I was trying to get to
16  is this, sir, if I may:  I appreciate you for
17  bringing out the transcript of the phone call between
18  Paul Dye and Dr. Stickney and between Mary Neill and
19  Dr. Stickney, but actually, those were already
20  identified in Exhibit A; correct, cause you had both
21  of those before you prepared your report?
22       A.   Yes.
23       Q.   My question was trying to make sure
24  that there is no other document that you've looked at
25  that relates to the underlying facts and policies and

**A400B45**
**JEFF EISER   MARCH 1, 2010**

1    procedures that we haven't had identified by your
2    reading the names of the depositions that you,
3    admittedly, have not read and all those items, 20
4    items listed in Exhibit A.
5         A.   I did also receive expert reports
6         Q.   One of those reports -- Well, strike
7    that.  Are those -- Did they include the expert
8    report of Nurse Wilson (sic)?
9         A.   That's in the notebook.
10        Q.   That's in your binder?
11        A.   Yes, in the binder.
12        Q.   So you're saying that -- What date did
13   you receive these other reports?
14             MR. FINEGOOD:  For the record, it's
15   Nurse Wilton.
16             MR. BODARY:  I'm sorry?
17             MR. FINEGOOD:  You said Wilson, I
18   believe.
19             MR. BODARY:  And it's Wilmer?
20             MR. FINEGOOD:  Wilton.
21             MR. BODARY:  Wilton.  Excuse me.
22        A.   The correspondence is dated January
23   29th, 2010, so I received that subsequent to that
24   date.
25        Q.   Did you read `em?

Page 18

1         A.   Yes, I have.
2         Q.   Did you make any notes?
3         A.   No, sir.
4         Q.   The top enclosures appear to be
5    experts of the defendant, but the last one seems to
6    be the report of Joe Goldenson, M.D.?
7         A.   Correct.
8         Q.   Is that the first time you saw this
9    report?
10        A.   Yes, sir.
11        Q.   All right.  The notice also asked you
12   to bring citations of books, journals or papers that
13   you used as research in this matter.
14        A.   I brought my two manuals for the
15   National Health Standards and also the National
16   Corrections Association, my working books.
17        Q.   Are those the ACI and the NCCHC?
18        A.   Yes, they are.  They were in a force
19   at the time of the incident.
20        Q.   The third was any written notes.  You
21   don't have any; everything was done electronically?
22        A.   Yes, sir.
23        Q.   Next was written opinions and that is
24   Exhibit F; is that correct?
25        A.   Correct.

Page 19

1         Q.   Curriculum Vitae.  We were provided a
2    Curriculum Vitae.
3         A.   I did bring an updated one.
4         Q.   Are there any changes, if you know.
5         A.   I think added to -- On the previous
6    one, I did not include the fact that I'm in the
7    process of completing my Master's degree in
8    education.
9              MR. BODARY:  We'll mark that as
10   Exhibit I.
11             (Xerographic Document, three pages,
12             Curriculum Vitae of Jeff Eiser, was
13             marked for identification Exhibit I.)
14        Q.   The next item on the Duces Tecum  was
15   for a list of any cases which you've acted as an
16   expert in a trial or deposition.  Is this list
17   updated from that which was attached?
18        A.   Yes.
19        Q.   There are two new cases that you've
20   reviewed; is that correct?
21        A.   I believe there was -- I had to
22   compare it to the other list because I try to keep a
23   current --
24        Q.   I'm going to show you what I have
25   marked as Exhibit B which was the list initially
     produced and you which two cases now listed above the

Page 20

1    Brenda Smith case; don't you?
2         A.   Yes.
3         Q.   So if we can take this and we'll mark
4    this as Exhibit J.  That is a list of all cases --
5             (Xerographic Document, three pages,
6             headed, "List of Cases Where Jeff
7             Eiser Was Retained as an Expert
8             Witness in Last 4 Years," was marked
9             for identification Exhibit J.)
10   Exhibit J, that is a list all the cases in which
11   you've been retained as an expert in the last four
12   years?
13        A.   Yes, sir.
14        Q.   It's 29 cases?
15        A.   It's 30.
16        Q.   This list does not designate in which
17   cases you've given depositions and which you have
18   not; does it?
19        A.   No.
20        Q.   It doesn't designate in which you've
21   given trial testimony?
22        A.   No, it does not.
23        Q.   Could you put a mark next to all the
24   cases in which you've given trial testimony or a star
25   if you would.
     A.   There's only been, I believe, two
     cases that have ever gone to trial.

Page 21

**ATKINSON-BAKER, INC.**

A400B45
**JEFF EISER   MARCH 1, 2010**

1    Q.  Put stars next to them, if you would.
2        A.  It's, actually, been a while -- or,
3    actually, this is for the last four years.
4        Q.  And the appearance was before that?
5        A.  Yes.  I've been working as an expert
6    since 1994.
7        Q.  So the two cases you testified in are
8    not on this list; is that correct?
9        A.  The one -- It must have been more than
10   four year ago.
11       Q.  I'm sorry?
12       A.  It must have been more than four years
13   ago.
14       Q.  All right.  Are you able to circle all
15   the cases in which you gave depositions?
16       A.  I can attempt.  Most of them.
17       Q.  I tell you what, I'm going to have you
18   do that exercise when we're done with the deposition,
19   so we can use our time with the court reporter more
20   effectively.
21           Have you ever, previously reviewed a
22   case involving a Michigan jail or lockup?
23       A.  Michigan, no, sir; I don't believe so.
24       Q.  Have you ever inspected or surveyed a
25   jail in Michigan?

Page 22

1    Q.  And the Bureau of Adult Detention has
2    a list of all the jails?
3        A.  Yes, it does.
4        Q.  How many of the jails in Ohio are
5    accredited by NCCH (sic)?
6        A.  I only know -- I only know of the one
7    that I was administrator of was accredited by NCCHC.
8    I know of the jail in Licking County.
9        Q.  Lickum?
10       A.  Licking.
11       Q.  Licking.
12       A.  Licking County.  Again, I'm not sure
13   of the other ones.
14       Q.  What you're giving me is Hamilton
15   County is one you know was NCCH accredited and the
16   other you know of is Licking County?
17       A.  There are other jails, but I can't
18   recall which ones they are.
19       Q.  The number of certified jails is under
20   10 percent by NCCH in the state of Ohio; isn't it?
21       A.  I only know -- I've never looked at
22   that information up.
23       Q.  Have you looked at jails in Ohio that
24   aren't NCCH certified?
25       A.  Have I looked at jails?

Page 24

1    A.  No, I have not.
2    Q.  You've never been to the old Lenawee
3    County Jail; have you?
4        A.  No, I have not.
5    Q.  You've never been to the new Lenawee
6    County Jail?
7        A.  No, I have not.
8    Q.  How many jails and local lockups are
9    there in the state of Ohio?
10       A.  There are 88 counties in which 80-- I
11   think the 85 now have, actually, 84, 85 actually,
12   have jails.
13       Q.  Lockups?
14       A.  Except for the big counties of
15   Cuyahoga, I believe, is the only one that has
16   multiple lockups, Cleveland.  Most of the counties
17   don't have lockups anywhere in Ohio.
18       Q.  And how many are there in Cuyahoga?
19       A.  At last count, I think there was eight
20   or 10 different municipal jails in that county.
21       Q.  What is the best source for statistics
22   on the number of county jails and lockups?
23       A.  There is an agency in Ohio called the
24   Bureau of Adult Detention which is in charge of the
25   inspection and supervision of all the jails in Ohio.

Page 23

1    Q.  Yeah.
2    A.  In what context?
3    Q.  Well, let me understand, first of all,
4    you've looked at lawsuits, involving county jails,
5    but have you also inspected jails?
6        A.  I have toured and done my own
7    evaluation of jails, analysis of jails, yes.
8        Q.  All right.  Have you toured and
9    evaluated jails in Ohio that weren't NCCH accredited?
10       A.  Yes, I have.
11       Q.  How many?
12       A.  I believe Butler County.  I'm sure
13   they're -- I've never asked `em, so I'm, again --
14       Q.  Have you looked at them -- Aren't you
15   looking at policies?
16       A.  Depending on the issue, yes.
17       Q.  So can you tell me how many you have
18   looked at that weren't NCCH accredited?
19       A.  I've never -- I've looked at numerous
20   jails. I can't consciously say how many because I
21   never made that a conscious thought to do that.
22       Q.  Was Hamilton County always NCCH
23   accredited?
24       A.  We have been NCCH accredited since the
25   mid-1980's, I think, when we first opened up the

Page 25

**ATKINSON-BAKER, INC.**

**(800) 288-3376**

7 (Pages 22 to 25)

A400B45
### JEFF EISER   MARCH 1, 2010

1  Justice Center.
2      Q.  And I understood -- First of all,
3  what's the size of Lenawee County Jail?
4      A.  My mind just went blank.  It's in the
5  hundreds of inmates.
6      Q.  Are you saying you did know and you
7  forgot?
8      A.  I'm guessing around 300 inmates.
9      Q.  And Hamilton County, how many inmates
10 did it have?
11     A.  We have four different facilities.
12     Q.  The total licensed number of
13 correctional beds in the four facilities?
14     A.  We had an average population of about
15 2300.
16     Q.  Two thousand three hundred?
17     A.  Yes.
18     Q.  The annual budget at Hamilton is
19 $40,000,000?
20     A.  Correct.  The last annual budget was
21 approximately $40,000,000.
22     Q.  And what of that budget was spent on
23 inmate health care?
24     A.  Operationally, I believe somewhere
25 around 9,000,000.

Page 26

1  treatment center for those going through alcohol and
2  drug treatment.  The fourth was called the Turning
3  Point facility which was 60 beds.
4      Q.  I'm sorry.  Could you go back.  Was it
5  called Reading Road?
6      A.  Reading Road.  It's spelled like
7  reading, but it's pronounced redding.
8      Q.  Okay.  Go ahead.
9      A.  And it's called the Turning Point
10 facility which was a 60-bed -- Again, extensive
11 treatment program for those undergoing court-ordered
12 treatment for drug and alcohol or domestic violence.
13     Q.  So two of the four facilities seem to
14 have been dedicated to the substance individuals; is
15 that fair to say?
16     A.  We used two of the facilities to house
17 people that are going through treatment, correct.
18     Q.  So you mentioned that the Justice
19 Center was an intake facility, but in the intake
20 facility do they transfer those inmates with alcohol
21 -- that need alcohol and drug treatment over the
22 Reading or the Turning Point?
23     A.  No.  What happens is they -- each
24 inmate will come in and be classified.  Those that
25 are court-ordered, after they've gone through the

Page 28

1      Q.  Describe briefly for me, by size, and
2  facility by type if they differentiate the four
3  facilities in Hamilton County?
4      A.  The first, the largest of the
5  facilities is -- is called the Hamilton County
6  Justice Center.  It had a capacity of 1280 beds.  It
7  was the intake center, a full-service jail.  It
8  housed the medical units, juvenile, maximum security
9  cells.  The second facility was the Queensgate
10 Correctional Facility.
11     Q.  Is Queensgate, it's like location?
12     A.  Queensgate is on Linn Street, it was.
13     Q.  All right.
14     A.  One of the last things I did before I
15 retired was we closed that facility due to budget.
16 It was 822 beds.
17     Q.  They had a medical clinic?
18     A.  They have a -- They have on-site
19 medical care, yes, an office.
20     Q.  It's not a medical clinic; it's an
21 office for what, a nurse?
22     A.  A nurse 24 hours a day, yes.
23     Q.  All right, go ahead.
24     A.  We have -- The third facility is
25 called the Reading Road facility.  It's 150-bed

Page 27

1  court process, they may be ordered to go through a
2  DUI or an extensive alcohol treatment program would
3  be housed at those facilities.
4      Q.  Okay.  At the Justice Center is there
5  a infirmary?
6      A.  Yes, there is.
7      Q.  How many beds?
8      A.  I believe we had six beds for females
9  and around 28, 30 beds for males.
10     Q.  And how was the infirmary staffed?
11     A.  It was staffed by security --
12     Q.  Professionals, medical professionals.
13     A.  Around-the-clock an RN on each shift,
14 along with LPNs to assist.
15     Q.  Is there a physician presence in the
16 infirmary?
17     A.  Monday through Friday the physician
18 was onsite at least, I believe, four hours a day.
19     Q.  Did that physician spend time at any
20 of the other four facilities?
21     A.  He would visit Queensgate when it was
22 open and do sick call at Queensgate, in the
23 afternoons.
24     Q.  What's the, if you know, the
25 population of Hamilton County?

Page 29

**ATKINSON-BAKER, INC.**

**(800) 288-3376**

8 (Pages 26 to 29)

**Page 30**

1    A.  The last census Hamilton County -- I'm
2  guessing again --
3       Q.  You can make an estimate.
4       A.  -- it was around 450,000 people.
5       Q.  Have you ever reviewed a case or done
6  a tour or an inspection of the Kent County Jail?
7       A.  The Kenton County Jail?
8       Q.  The Kent County Jail, of Kent County
9  Michigan.
10      A.  No, sir.
11      Q.  Or the Ingham County Jail?
12      A.  No, sir.
13      Q.  In Lansing, Michigan?  Do you know
14  whether either of those is certified by any national
15  association?
16      A.  I have no knowledge of that.
17      Q.  Do you know when the NCCH was first
18  founded, what year?
19      A.  I could look in the manual.
20      Q.  Do you know where its headquarters is?
21      A.  Again, I could look in the manual.
22  I've never --
23      Q.  Do you know off-hand?  I'm asking you
24  if you know off-hand?
25      A.  No.

**Page 31**

1       Q.  You've never been to the NCCH
2  headquarters?
3       A.  No.  They always came to us.
4       Q.  All right.  They are a private,
5  nonprofit organization, is that what you understand?
6       A.  They're a national commission, yes.
7       Q.  All right.  It has the word,
8  commission, in it, but it was not commissioned by any
9  statute or legislature; was it?
10      A.  Again, I have no personal knowledge of
11  that.
12      Q.  All right.  There was no regulation of
13  any state or in the federal government that created
14  that commission, the national commission?
15      A.  Again, I have no personal knowledge of
16  that, no.
17      Q.  As far as you know, it's a private
18  organization that organized itself and called itself
19  the national commission?
20      A.  Again, I have no personal knowledge of
21  those facts.
22      Q.  All right.  What does it cost to be
23  accredited by the NCCH?
24      A.  I don't recall the actual cost.
25      Q.  What's your estimate of it; do you

**Page 32**

1  know?
2       A.  It was in the thousands of dollars.
3       Q.  Ten thousand?
4       A.  ACA is probably 10,000.  NCC (sic)
5  wasn't as expensive.  I can't remember the exact
6  cost.
7       Q.  Okay.  Is, first, the ACC also
8  accredits jails?
9       A.  ACA?
10      Q.  ACA; I'm sorry.
11      A.  Yes, it does.
12      Q.  And do you know how many they have
13  accredited in the state of Ohio?
14      A.  I have no knowledge.
15      Q.  Do you know how many they have
16  accredited in the United States?
17      A.  I have no knowledge.
18      Q.  The ACA has mandatory standards; is
19  that true?
20      A.  The ACA has standards they categorize
21  as mandatory, yes.
22      Q.  What do they call the other standards?
23  Are they called non-mandatory or elective?
24      A.  Recommended, I believe.
25      Q.  Okay.  And in order to be accredited

**Page 33**

1  by ACA, what percentage of the recommended standards
2  to you have to meet?
3       A.  Ninety percent.
4       Q.  NCCH has essential, but not mandatory;
5  is that correct?
6       A.  That's what they use, the word,
7  essential, yes.
8       Q.  And is there, in the state of Ohio, a
9  requirement that any jail be certified or accredited?
10      A.  There's no requirement; no, sir.
11      Q.  Do you know of any state that requires
12  accreditation?
13      A.  No, I don't.
14      Q.  Do you know how many states this
15  national commission actually accredits jails in?
16      A.  Again, I've never asked that question
17  or --
18      Q.  You don't know if it's 50 states or 45
19  states or how many states?
20      A.  I have no knowledge of that.
21      Q.  In addition to the ACA and the NCCHC,
22  there are other entities that have standards; are
23  there not for correctional medicine -- or
24  correctional institutions?
25      A.  There are some health care

**Page 34**

1 organizations, yes, I believe.
2     **Q. And what are they?**
3     A. Again, I don't deal personally with
4 those since I'm not a medical person. I'm a jail
5 operations person.
6     **Q. You ever see the standards from other**
7 **national organizations? You said they were health**
8 **organizations?**
9     A. Medical and health organizations, yes.
10     **Q. Well, do you know of the American Jail**
11 **Association?**
12     A. Yes.
13     **Q. Is that a membership organization?**
14     A. Yes, I'm a member.
15     **Q. Okay. It does not accredit jails?**
16     A. No.
17     **Q. Does it have standards?**
18     A. It has standards for individual
19 employees; it has standards for administrative,
20 certified jail managers, certified corrections
21 officers.
22     **Q. Is there any requirement in the state**
23 **of Ohio for a certification of correctional officers?**
24     A. Ohio does have a certification
25 requirement under the Ohio Administrative Code.

**Page 35**

1     **Q. Does Michigan**
2     A. I'm not, I'm not aware. I'm not an
3 expert on Michigan law.
4     **Q. And as you sit here reviewing this**
5 **case in Michigan, you don't know whether the State**
6 **requires certification for correctional officers?**
7     A. I did not inquire.
8     **Q. Is there a -- any administrative rules**
9 **in the state of Michigan for jails or lockups?**
10     A. I believe, in conversation, yes there
11 are administrative rules.
12     **Q. In conversation with whom?**
13     A. With counsel.
14     **Q. And did you ask for those?**
15     A. No, I did not.
16     **Q. Okay. Are you familiar with the ASA**
17 **-- I'm sorry -- the ASA, American Security**
18 **Association?**
19     A. I've never heard of them in my 29
20 years of corrections.
21     **Q. Yeah, you've heard of it. Do you know**
22 **if public health also accredits come facilities?**
23     A. Again, that would be a medical --
24     **Q. Accreditation?**
25     A. -- accreditation, not -- I'm a

**Page 36**

1 operations person.
2     **Q. I represent in this lawsuit eight**
3 **individuals and the County of Lenawee and I am going**
4 **to ask the questions relative to two types of**
5 **criticisms you've raised or you've stated in this**
6 **report of December 8, 2009. You, in fact, offered an**
7 **opinion, didn't you, that correctional staff was**
8 **deliberately indifferent in its handling of the**
9 **Brenda Smith case; is that your opinion?**
10     A. Yes, I did.
11     **Q. And by, "staff," you meant**
12 **correctional officers and sergeants; is that correct?**
13     A. Yes.
14     **Q. So why don't you tell me, from your**
15 **careful and thorough review of the records in this**
16 **case, what it was that Mary Neill did or didn't do**
17 **that you claim was deliberately indifferent.**
18     MR. HIMBAUGH: Let me just object for
19 the record of him giving -- expressing
20 opinions at all on deliberate indifference,
21 but go ahead and you can answer to that --
22     MR. BODARY: Yeah. I reserve on that
23 objection, too, but that can be addressed
24 elsewhere. My asking the question doesn't
25 make it objectionable.

**Page 37**

1     MR. FINEGOOD: You're reserving an
2 objection to your own question. I've never
3 heard of that before.
4     MR. HIMBAUGH: Well, I object.
5     MR. BODARY: Actually, it is. It's
6 allowed. My asking the question doesn't
7 waive what (sic), otherwise, otherwise it
8 is an objectable opinion.
9     MR. FINEGOOD: So you're objecting to
10 your own question.
11     MR. BODARY: Yeah.
12     MR. FINEGOOD: Okay. The record
13 should reflect.
14     MR. BODARY: Yeah.
15     A. I'm trying to get all the people in
16 the situation so when I alluded to and included the
17 staff, my intent in this particular situation was a
18 condition of a particular inmate deteriorated (sic)
19 -- or deteriorated throughout the evening. There was
20 no update or no action taken based upon the new
21 information as the condition deteriorated. I believe
22 I mentioned Mary Neill, specifically. She did
23 contact the doctor.
24     **Q. She did contact the doctor?**
25     A. She contacted Dr. Stickney on 4/27/09

A400B45
**JEFF EISER   MARCH 1, 2010**

1  and I described in detail, but after that, over the
2  next two days, she failed to follow up on anything as
3  the individual inmate deteriorated.  That's the only
4  comment I have.
5      **Q.  Well, in fact, you offered the**
6  **opinion, if you look at page 2 -- I'm in the bottom**
7  **paragraph, fourth line down, that jail staff observed**
8  **Ms. Smith begin to exhibit obvious signs of alcohol**
9  **withdrawal on the afternoon of April 29, 2007; is**
10 **that your opinion?**
11     A.  That the overview of the case, a
12 statement of the facts as I understood 'em.
13     **Q.  Now, when was Mary Neill there to see**
14 **anything on the afternoon of April 29th?**
15     A.  Okay.  I'm not sure if Mary Neill was
16 working on that particular day.
17     **Q.  What is it if she was working that she**
18 **saw?**
19     A.  Again, I'm talking about the
20 corrections staff that was supervising the inmate on
21 that day.  I don't recall exactly who those
22 individuals were.
23     **Q.  Yeah.  I want you to assume Mary Neill**
24 **was there that afternoon.  What evidence do you have**
25 **that there was a deterioration that she observed?**

Page 38

1     A.  Again, the behaviors illustrated by
2  the particular inmate in the cell was so obvious to
3  me, the layperson, or any layperson, that her
4  condition was deteriorating.  Their responsibility
5  was to observe her condition and her being a
6  supervisor, I'm assuming that she would also be
7  involved in that process.  You're saying if she
8  worked that day; I'm not sure if Mary Neill was
9  working on the --
10     **Q.  So when you wrote this report after a**
11 **careful and thorough review, you gave the opinion**
12 **that she was deliberately indifferent even when you**
13 **didn't know whether she worked that day; is that a**
14 **fair statement?**
15     A.  Again, I didn't say her, specifically,
16 in my opinions.  I stated the staff that was involved
17 with her supervision in the cell as her condition
18 deteriorated, the staff that saw her.
19     **Q.  So you told me you didn't reference**
20 **her particularly.  Why don't you look at page 6, on**
21 **November 2, "Did defendants act in a culpable state**
22 **of mind?"  Third paragraph, "Sgt. Mary Neal contacted**
23 **Dr. Jeffrey Stickney on April 27, `07 and described**
24 **in detail the medical condition and behavior of Mrs.**
25 **Smith, but she failed to follow-up as her condition**

Page 39

1  deteriorated over the next two days."  So you did, in
2  **fact -- You were, in fact, critical of her?**
3      A.  Well, based upon my review, I received
4  no other information that she actually took any other
5  action as a supervisor, so --
6      **Q.  But you said, "over two days."  In**
7  **fact, your opinion is that alcohol withdrawal**
8  **exhibited signs, obvious signs on the afternoon of**
9  **the 29th.  That's on the second page of your letter;**
10 **isn't it?  She began to exhibit obvious signs of**
11 **alcohol withdrawal on the afternoon of the 29th?**
12     A.  Correct, she got worse.  When she came
13 in, Mary Neill had enough information to know that
14 she was an alcoholic.  She had some issues in the
15 intake process.  She called for assistance, called
16 for some direction.  She continued to deteriorate
17 then over the next two days.
18     **Q.  Well, but you can't tell me which**
19 **deterioration Sgt. Neill saw on the afternoon of the**
20 **29th; can you?**
21     A.  I have no information.
22     **Q.  In fact, in the discussion of your**
23 **page 3, third paragraph, middle, you say, "The**
24 **ignoring or failing to take corrective action for an**
25 **inmate's serious medical condition would amount to**

Page 40

1  'deliverate indifference' to the health and safety of
2  **the inmate."  Do you see that?**
3      A.  Yes, I do.
4      **Q.  So ignoring or failing to take**
5  **corrective action; is that right?**
6      A.  Correct.
7      **Q.  When Mary Neill called Dr. Stickney**
8  **was she ignoring the inmate?**
9      A.  At that time, no.
10     **Q.  Did she fail to take corrective**
11 **action?**
12     A.  She called the doctor, but my comment
13 was that you alluded to was that I could find nothing
14 in the record that she followed up after that point.
15     **Q.  Right.  And you haven't read the**
16 **depositions of Wendy Vanderpool, the intake officer**
17 **or Intake Officer Adam Ondrovick, as to when this**
18 **patient got worse?**
19     A.  Again, no, I have not.
20     **Q.  All right.  You're not a medical**
21 **doctor --**
22     A.  No, I'm not.
23     **Q.  Have you ever taken classes in regard**
24 **to alcohol withdrawal syndromes or delirium tremens?**
25     A.  I have received training over the

Page 41

**Page 42**

1  years numerous times on those conditions.
2      Q.  Now, from that training, do you
3  understand that a deterioration to DT's could happen
4  suddenly?
5      A.  It could happen -- It depends on the
6  individual patient.
7      Q.  Changes from patient-to-patient?
8      A.  Yes, it does.
9      Q.  All right.  Hallucinations in the
10  spectrum of withdrawal symptoms into delirium
11  tremens, hallucinations can be transient?
12      A.  Again, it changes from
13  patient-to-patient.
14      Q.  Yeah, but once hallucinations occur,
15  they don't have to continue; they can be
16  intermittent?
17      A.  Again, I'm not an expert on that, but
18  based upon the training --
19      Q.  So you don't know whether or not --
20  Sorry.  I interrupted you.  Based upon the -- Go
21  ahead.
22      A.  What we're trained to look for is what
23  the individuals can suffer when they're going through
24  alcoholic or chemical withdrawal.
25      Q.  All right.  Now, did Mary Neill write

**Page 43**

1  pass-on reports on this inmate at the end of every
2  shift?
3      A.  I believe there were some pass -- I
4  don't remember who, there were some pass-on notes
5  made from supervisor-to-supervisor about the
6  condition.  I remember the one, specifically, by Sgt.
7  Dye, I think.
8      Q.  Now, I'm directing your attention
9  right now to Mary Neill, so when you say she failed
10  to follow up, are you saying she didn't write a
11  pass-on report at the end of her shift?
12      A.  No.
13      Q.  Preparing a pass-on report that
14  indicates that an inmate is having alcohol DT's and
15  communicating that to the next shift is not ignoring
16  the problem; is it?
17      A.  No.
18      Q.  In fact, it's taking action; isn't it?
19      A.  It is taking action on what you know
20  at that time.
21      Q.  Paul Dye -- Well, first of all, were
22  you aware that Mary Neill gave medications to this
23  inmate, the specific Benzodiazepine or Librium that
24  had been prescribed for her by Dr. Stickney?
25      A.  I don't recall if she administered it

**Page 44**

1  or not.  I don't recall that.
2      Q.  Well, wouldn't it be important for you
3  to know if Mary Neill was ignoring an inmate whether
4  she actually gave medicine at 10:00 a.m., in the
5  morning on the 28th and 10:00 a.m., on the morning,
6  on the 29th?
7      A.  Again, I said, I don't recall.
8      Q.  Right.  Let's pretend she did.  If she
9  gave the medication as prescribed, those two
10  mornings, is that ignoring the patient or failing to
11  take action?
12      A.  That's taking some action, yes.
13          MR. FINEGOOD:  What about not giving
14      it to her on the night of the -- that she
15      was booked; why don't you ask him that
16      question.
17      Q.  Well, did you check to see if the
18  patient -- if the inmate got Libriuim on the night
19  she as booked?
20      A.  Did I check?
21      Q.  Yeah.
22      A.  There was some indication in the
23  record that she did not receive medication during her
24  time of incarceration --
25      Q.  I'm not -- Your counsel wanted to

**Page 45**

1  interject here which isn't his right, by the way, but
2  I'm gonna do this:  If Mary Neill hadn't called Dr.
3  Stickney, would this inmate have received Librium,
4  the drug to counter withdrawal symptoms?
5      A.  I would assume it would have to be
6  prescribed by a doctor.
7      Q.  And a call had to be made and that was
8  done by Mary Neill; correct?
9      A.  Yes.
10      Q.  And that's not ignoring the problem;
11  that's taking action.
12      A.  That's taking action, right.
13      Q.  Once the doctor sets the plan of
14  treatment, is it appropriate for the correctional
15  officers to follow his orders?
16      A.  Yes, unless circumstances change.
17      Q.  Circumstances changed for Paul Dye on
18  the evening of the 29th and what did he do about it?
19      A.  He did call the doctor on the 29th.
20      Q.  Is that ignoring the condition?
21      A.  Well, the conditions changed, but they
22  also continued to change throughout the evening.
23      Q.  Answer my question.  Is that ignoring
24  the problem?
25          MR. FINEGOOD:  Okay.  The objection is

ATKINSON-BAKER, INC.                    (800) 288-3376

12 (Pages 42 to 45)

1     -- The question is vague.
2          MR. BODARY:  That's a simple question.
3          MR. FINEGOOD:  You have to give him a
4     time element, okay.  Obviously, he's
5     telling you that situations change over
6     time, so why don't you be more specific.
7     At 9:18?
8          MR. BODARY:  I was plenty specific.
9          Q.  Was just calling the doctor on the
10    29th ignoring the condition?
11         A.  It depends, again, on when it was done
12    and what information you had at that point in time,
13    how long it went on.
14         Q.  Are you aware of anything that Sgt.
15    Dye did before the call to Dr. Stickney to protect
16    this inmate?
17         A.  I know the staff had moved her to the
18    observation cell.
19         Q.  What staff moved her?
20         A.  The supervisory staff.
21         Q.  Yeah.  Was that Paul Dye?
22         A.  I can't recall who --
23         Q.  You listened to his phone call, didn't
24    you, to Dr. Stickney?
25         A.  Yes.

Page 46

1          Q.  All right.  And in the phone call he
2     indicated he moved -- it took three people to do it
3     and he moved her?
4          A.  I don't recall those words, but --
5          Q.  Assume that he's the one who moved her
6     and he moved her to protect her from injuring
7     herself, was that ignoring the patient?
8          A.  No.
9          Q.  Is that being proactive to protect her
10    from injury?
11         A.  That's being reactive to what he sees.
12    Proactive is different than reactive.
13         Q.  All right.  Was Mary Neill's phone
14    call to the doctor to get medication proactive?
15         A.  It was reactive to what she saw.
16         Q.  What did she see?
17         A.  She saw an individual when she came in
18    that had some issue and history with alcohol, but she
19    --
20         Q.  But -- I'm sorry, go ahead.
21         A.  She had some concerns.
22         Q.  All right.  So acting on the concern
23    and getting medication before obvious signs of
24    withdrawal was being proactive; isn't that true?
25         A.  Again, I would call that and consider

Page 47

1     that to be reactive to what information she saw, but
2     yes.  The purpose of giving medicine is to prevent
3     something, so the doctor was being proactive.
4          Q.  Well, the correctional officers don't
5     know the dosing of Librium; do they?
6          A.  No, I would assume not.
7          Q.  In fact, you wouldn't want
8     correctional officers including, sergeants to make
9     decisions to alter the medications as ordered by the
10    doctor; would you?
11         A.  Of course not.
12         Q.  Well, Paul Dye then, did Paul Dye
13    recognize that this inmate was having withdrawal
14    symptoms from alcohol?
15         A.  If I recall correctly, he was very
16    descriptive in what he saw and told the doctor.
17         Q.  Did he make note of that condition on
18    his pass-out report, the first shift that he served?
19         A.  I believe so, yes --
20         Q.  And the second shift that he served?
21         A.  I don't recall the second one.
22         MR. FINEGOOD:  What date are you
23    talking about?
24         A.  What date you talking about?
25         Q.  Well, I want you to -- Do you know

Page 48

1     what hours that Sgt. Dye worked?
2          A.  He was in the evening hours --
3          Q.  Let's assume it's 7:00 p.m., 7:00 p.m.
4     to 7:00 in the morning, so the night of the 28th and
5     29th, but the night of the 29th to the 30th, I want
6     you to assume he worked from 7:00 p.m. until 3:00
7     a.m.  I'm sorry; that's wrong.  He's actually there
8     `til 7:00 a.m., on the 29th, but the night of the
9     29th to the 30th, he's from 7:00 p.m. to 3:00 a.m.
10    Is that the first you've been aware that those were
11    his hours?
12         A.  I did not see any hours schedules or
13    staffing.
14         Q.  Right.  So did Paul Dye write a
15    pass-on report that referenced alcohol withdrawal or
16    DT's for this inmate on each of the shifts as they,
17    as they ended and went to a morning shift?
18         A.  I recall one.  I don't remember --
19         Q.  Well, if he is ignoring the inmate,
20    wouldn't it be important whether he wrote and
21    communicated to the next shift whether or not he
22    believed there were DT's?
23         A.  I didn't say he was ignoring the
24    inmate.
25         Q.  No.  I'm asking.  So wouldn't you look

Page 49

1 to see if he made the report on each of the ends of
2 the shift?
3         A.  I didn't say he was ignoring the
4 inmate and didn't make those particular --
5         Q.  What you said was you saw that he
6 wrote it once.
7         A.  What I recall was -- I recall one
8 entry.
9         Q.  Are you saying that's the only entry
10 made?
11        A.  Again, I can't say that because I
12 don't recall.
13        Q.  Are you familiar with incident reports
14 at that jail, what their used for?  There's a term,
15 incident report; do you know what it is as it applies
16 to this jail?
17        A.  Every jail has a term they call
18 incident or a reporting mechanism of some kind.
19        Q.  Some incidences are not medical.
20 There can be safety and security issues within a jail
21 that don't relate to medical conditions; correct?
22        A.  Correct.
23        Q.  Would you know what the regular
24 process was for printed copies of incident reports,
25 who they go to at the Lenawee County Jail, in 2007?

Page 50

1         A.  I know they -- the policy requires
2 them to complete them and be descriptive in what they
3 write and -- I don't remember the whole policy.  I
4 remember reading the particular requirements for the
5 documentation of those incidents.
6         Q.  You would be aware that Paul Dye made
7 two incident reports related to her medical
8 conditions, Brenda Sue Smith's?
9         A.  I recall seeing the computer generated
10 document, I believe.
11        Q.  Do you know whether or not that goes
12 to the next sergeant, that report?
13        A.  It should be with correctional staff
14 --
15        Q.  And if it was, that's not a procedure
16 that's deliberately indifferent; is it?
17        A.  Again, my --
18            MR. FINEGOOD:  Assumes facts not in
19        evidence.
20        A.  I'm not familiar with what their
21 system, if it's a computer-based system, whether they
22 print `em out and hand `em out, I'm not aware of
23 those mechanism and I wasn't aware at that time.
24        Q.  So is it your understanding that Paul
25 Dye saw a change in this inmate that caused him to

Page 51

1 call Dr. Stickney?
2         A.  I would assume yes, based upon his
3 description I guess he had concerns about the inmate.
4         Q.  Is making a call to Dr. Stickney when
5 he observed the change ignoring the inmate's
6 condition?
7         A.  I don't know when he made the call,
8 how long he observed or what time period he observed
9 before he made the call or what happened after he
10 made -- Again, I know he made the call and described
11 her condition.
12        Q.  All right.  Well, you've never been
13 given a copy of the phone bill from the doctor's
14 office as to when the call was made?
15        A.  No.
16        Q.  Okay.  You listened to Paul Dye's
17 voice in his conversation with Dr. Stickney?
18        A.  Yes.
19        Q.  And Paul Dye reported, did he not,
20 that the inmate was having bad withdrawal?
21        A.  Bad or severe or something, he said.
22        Q.  Really bad hallucinations; do you
23 remember that; that she was kind of violent, trying
24 to get out of her cell.
25        A.  Yes.

Page 52

1         Q.  That she was very agitated?
2         A.  Yes.
3         Q.  That she hadn't eaten lunch or dinner?
4         A.  Yes --
5         Q.  And that she was banking on the wall?
6         A.  Yes.
7         Q.  All right.  And was that ignoring the
8 condition of the patient -- or the inmate?
9         A.  No.  Again, that was sharing
10 information with the doctor that he observed.
11        Q.  Well, in fact, that's taking
12 corrective action; isn't it?  He was talking to the
13 doctor that prescribed the medication.
14        A.  That's taking an incident report --
15        Q.  All right.  And that's not deliberate
16 indifference?
17        A.  Again, my concerns were after the fact
18 of when she started to deteriorate and how she was
19 treated by the staff or ignored by the staff.
20        Q.  She had deteriorated according to Sgt.
21 Dye's opinion when he made the phone call; do you
22 understand that?
23        A.  Again, I don't know that for a fact.
24 You're saying that, but again, he saw enough to
25 concern him to call the doctor.

Page 53

A400B45
**JEFF EISER   MARCH 1, 2010**

---

Page 54

1    Q.  Why is it you claim or how can you
2  claim there was some further deterioration?
3    A.  Again, based upon what I reviewed and
4  --
5    Q.  Well, what was it that showed you it
6  deteriorated after Dye's conversation?
7    A.  There were other descriptives by
8  correction officers, about the behavior of her --
9    Q.  Which correction officer?
10   A.  I thought it was Wendy Vanderpool.
11   Q.  Okay.  And you haven't read the
12  deposition testimony of Nurse -- or Officer
13  Vanderpool?
14   A.  No.
15   Q.  Are you aware that Vanderpool said
16  there was no real change in the inmate's condition
17  from when Paul Dye called until 3:00 o'clock, when
18  Paul Dye was off?
19   A.  I haven't reviewed his deposition.
20   Q.  If that's true, then Paul Dye did not
21  fail to act during further deterioration?
22       MR. FINEGOOD:  I'm going to place an
23       objection.  It assumes facts not in
24       evidence
25   A.  And again, based upon the surveillance

Page 54

---

Page 55

1  videos that we also viewed, I believe, of the
2  behaviors in the cell, the individual acting out and
3  the individual doing those kind of activities, to a
4  trained -- I mean to an experienced correctional
5  person, it was deteriorating, I felt.
6    Q.  Well, you're not talking about a video
7  that starts at 7:00 o'clock the next morning.  The
8  video you're talking about is 7:00 a.m, on the
9  morning of the 30th, but I wasn't asking about that.
10   A.  Okay.
11   Q.  My question to you was if Wendy
12  Vanderpool, the intake officer closest to that cell,
13  one look contact through the video camera, said that
14  this inmate's condition didn't worsen between the
15  time Paul Dye called and when Paul Dye went off shift
16  at 3:00 o'clock.  If that's true, then Paul Dye
17  wasn't deliberately indifferent and didn't ignore
18  this inmate --
19       MR. FINEGOOD:  Object.  Assumes facts
20       --
21   A.  Exactly.  Again, I only based my
22  opinion upon what I perceived as being the facts at
23  that time.  If you change the facts, I reserve the
24  right to change my opinion, yes.
25   Q.  Yeah.  But you never saw a video from

Page 55

---

Page 56

1  3:00 o'clock in the morning?
2    A.  I can't remember.  The video,
3  obviously, was damaged also after -- I didn't view it
4  again.  I couldn't view it again.
5    Q.  You viewed it the first time?
6    A.  Correct.
7    Q.  In its entirety, before you prepared
8  your report?
9    A.  Yes.  That was a while ago, yes.
10   Q.  So I'm going to show you that part of
11  the report that started at the bottom of page 2.  I'm
12  looking at the very last part of the sentence.  The
13  jail records indicate that, "Her condition continued
14  to deteriorate throughout the evening and it was
15  noted that the video observation of the cell ceased
16  at 09 COLON 19 hours, military time; right.  Is that
17  what it says?
18   A.  Yes.
19   Q.  All right.  So you, after watching
20  this video, said that the video ceased at 9:19 in the
21  morning?
22   A.  There's something where there wasn't
23  video from, like, 9:19 `til 9:50 or something.  There
24  was --
25   Q.  You watched the video.  Are claiming

Page 56

---

Page 57

1  there wasn't an image from 9:19?  Let me deal with
2  this first of all.  Are you sure that's the case --
3       MR. FINEGOOD:  Objection --
4       MR. BODARY:  I'm going to withdraw the
5       question.  I'm withdrawing the question.
6    Q.  Are you sure that's the case or did
7  you, looking at the timeline on the death
8  investigation, look at two numbers there, recording
9  events --
10   A.  The times are messed up, yeah.
11   Q.  Okay.  Let me --
12   A.  It may have been --
13   Q.  All right.  Can I see your copy of the
14  -- Do you have the death investigation handy, sir?
15   A.  Let me look at the table of contents
16  here.  If I can find the page.
17   Q.  On page 11, on the Bates stamp of the
18  investigation, noting that on page 10, it started at
19  7:00 o'clock, there are times given here.  Do you see
20  that there is an entry, 9:19?
21       MR. FINEGOOD:  That's page 12; isn't
22       it?
23   A.  The last movement by Brenda --
24   Q.  Yeah.  And what's the next entry?
25   A.  9:50.

Page 57

---

**A400B45**
**JEFF EISER   MARCH 1, 2010**

1  Q.  So you looked at that and thought that
2  the camera hadn't taken images between 9:19 and 9:50;
3  is that what you did, sir?
4      A.  There's no entry -- no observation of
5  her noted between 9:19 and 9:50, yeah.
6      Q.  So if you look, then, at your report
7  on page 3, in the same paragraph that said the video
8  observation of cell ceased at 9:19, five lines down
9  it says, "The video surveillance was initiated again
10  by jail staff at 9:50 hours."
11      A.  I think I had that question and I even
12  discussed with counsel about that particular time
13  frame and, for some reason -- Again, I don't recall
14  exactly -- there wasn't --
15      Q.  There wasn't what?
16      A.  There wasn't a video record during
17  that time period.
18      Q.  So your memory is that when you looked
19  at the video, there was no image or is it possible
20  you just looked at those two entries and decided that
21  --
22      A.  No.
23      Q.  -- it had stopped and been restarted?
24      A.  No.  For some reason, I believe there
25  was some missing time there, where the machine didn't

Page 58

1  work.
2      Q.  So did you think they weren't
3  observing her during that time?
4      A.  The video, I said.
5      Q.  No.  I'm asking you.
6      A.  The staff was there.
7      Q.  Are you saying that the camera wasn't
8  showing the inmate in that time frame?
9      A.  That was my mental note.
10      Q.  So when you came to an opinion where
11  someone ignored here, you were of the belief that
12  there was some 31 minutes where there was no camera
13  operating in the cell; is that right?
14      A.  Correct.
15      Q.  Do you know that you can't turn the
16  camera off in that system?
17      A.  Again, I have no knowledge of how the
18  system works.
19      Q.  Well, if that's the case, that would
20  be news to you; is that right?  If that's the case,
21  that the camera can't be turned off, it operated the
22  whole time, that would be news to you?
23      A.  For some reason, I have a mental note
24  that there was some video and we have discussed that.
25      Q.  You and the lawyer talked about it?

Page 59

1      A.  Correct.
2      Q.  Because you were of the belief they
3  didn't have the camera on?
4      A.  Again, I don't know if the camera was
5  on or not, the recording during that time period.
6      Q.  You said the video surveillance was
7  initiated again.
8      A.  It may have been a bad choice of
9  words.  Again, in my summary, I'm trying to verbalize
10  what my understanding of that was.
11      Q.  Right.  You understand, don't you,
12  under allegations of deprivation of Civil Rights that
13  each officer is only held responsible for what he
14  knew at the time?
15      A.  Correct.
16      Q.  There's no collectiveness of officers;
17  and if one officer knows something on day three, it
18  doesn't mean that the next officer knows that same
19  thing during a shift on day four and you have to look
20  at what facts they know; don't you?
21      A.  You have to look at the process of
22  sharing information, what the policy requires --
23      Q.  So in Dr. Stickney's conversation with
24  Paul Dye, didn't Dr. Stickney indicate the medication
25  was good?

Page 60

1      A.  I believe he did, yes.
2      Q.  That was medication that was
3  prescribed on the 27th, from the call by Mary Neill;
4  correct?
5      A.  Correct.
6      Q.  So there was no change in medication;
7  correct?
8      A.  I don't believe so.
9      Q.  All right.  Do you understand that one
10  of the risks of alcohol withdrawal can be seizures?
11      A.  Yes.
12      Q.  This patient was on anti-seizure
13  medicine; did you know that?
14      A.  I remember reading something about one
15  of the medications she was on in her chart was
16  anti-seizure medication.
17      Q.  Right.  So do you understand that
18  Officer Neil and Officer Dye understood she was
19  getting medications, Librium, to counteract her
20  withdrawal and anti-seizure medications to reduce the
21  risk of seizures?
22      A.  I don't know what Sgt. Neil and Sgt.
23  Dye knew.  You ask a --
24      Q.  Why wouldn't they know what medication
25  she was getting?

Page 61

**ATKINSON-BAKER, INC.**

**(800) 288-3376**

16 (Pages 58 to 61)

A400B45
**JEFF EISER   MARCH 1, 2010**

1   A.  I can't speak for them.
2       **Q.  Were you assuming they didn't know?**
3       A.  I'm assuming they talked to the doctor
4   and that the doctor had told them.
5       **Q.  And don't you remember in the**
6   **conversation that Sgt. Dye told them that she had**
7   **received her anti-seizure medications and the times**
8   **in which she received them?**
9       A.  Again, I don't recall that,
10  specifically.
11      **Q.  Isn't that important for you to know**
12  **whether or not Sgt. Dye is ignoring or taking care of**
13  **the inmate?**
14      A.  His actions absolutely would be --
15      **Q.  And his statements; correct?**
16      A.  Yes.
17      **Q.  Now, observe -- Dr. Stickney**
18  **indicated, did he not, in the phone conversation**
19  **that, hopefully, another day will do her good.  Do**
20  **you recall that statement?**
21      A.  I recall a statement like that, yes.
22      **Q.  So, in fact, Dr. Stickney, in the**
23  **phone call said the medications were good and that,**
24  **hopefully, another day would do her some good and he**
25  **said to keep her safe and monitor her; is that your**

Page 62

1   recollection?
2       A.  Yes.
3       **Q.  Putting her in a padded cell kept her**
4   **safe from self injury; didn't it?**
5       A.  Putting her in an observation cell
6   was, yes.
7       **Q.  Was an appropriate step?**
8       A.  Appropriate step.
9       **Q.  It was not ignoring her; it was taking**
10  **care of her?**
11      A.  Yeah, right.
12      **Q.  So what happened between that phone**
13  **call at 9:14 p.m. and 3:00 o'clock in the morning,**
14  **when Paul Dye left?  What other information did he**
15  **have that you claim shows that he was deliberately**
16  **indifferent?**
17      A.  Again, if the situation deteriorated
18  --
19      **Q.  If.**
20      A.  If.  You gave me a situation and a
21  question.  If it deteriorated, he has a duty to
22  subsequently do something.
23      **Q.  But you're not claiming it did.  You**
24  **don't know if it deteriorated between 9:00 p.m. and**
25  **3:00 a.m. in the morning; do you?**

Page 63

1       MR. FINEGOOD:  I object to the form of
2   the question.  First of all, you're
3   assuming that it didn't deteriorate --
4       MR. BODARY:  I have testimony to that
5   effect.  This gentleman has offered the
6   opinion that he was deliberately
7   indifferent because of the deterioration.
8       **Q.  So I'm asking, you've now said, "if,"**
9   **but you can't show me that it did in that time**
10  **interval; can you?**
11      A.  I can only base my opinion about what
12  I thought and what I knew at that time.
13      **Q.  All right.  And what you were doing is**
14  **you were looking at the video and what she was doing**
15  **in the morning in terms of her activities; is that**
16  **what I understood you to say a few questions ago?**
17      A.  Well, it's a combination of the
18  observations and the information from all the parties
19  and him being the supervisor, he should have been
20  aware of what the person on observation in a
21  observation cell was doing.
22      **Q.  He should have been aware, whether or**
23  **not he knows.**
24      A.  He should be aware -- If you put
25  somebody on observation, you should be aware of the

Page 64

1   condition, routinely.
2       **Q.  How many floors to the jail at**
3   **Lenawee?  How many floors are there in that jail?**
4       A.  I've never been to Lenawee County
5   jail.
6       **Q.  Right.  Does the sergeant, Paul Dye,**
7   **have responsibilities on a floor, other than the**
8   **holding floor?**
9       A.  Again, I don't know how many sergeants
10  are on duty at that time.  I know he was involved
11  with this particular inmate.
12      **Q.  And by the way, Hamilton County, how**
13  **many employees do you have there or had there when**
14  **you last worked?**
15      A.  We had approximately 600 employees,
16  422 of which were correctional officers.
17      **Q.  Who were the others?**
18      A.  Correctional supervisors, support
19  staff, clerical staff, classification staff, data
20  entry staff, personnel positions, administration.
21      **Q.  How many correctional officers were**
22  **employed at Lenawee?**
23      A.  I was not given that information.
24      **Q.  How many sergeants?**
25      A.  I was not given that information.

Page 65

**ATKINSON-BAKER, INC.**

**(800) 288-3376**

17 (Pages 62 to 65)

## A400B45
## JEFF EISER   MARCH 1, 2010

1 　　　Q.  All right.  Again, I represent eight
2 people in this litigation.  I've taken you through
3 Mary Dye and -- Mary Neill and Paul Dye and assuming
4 that Paul Dye was -- I'm sorry.  I've tried to elicit
5 from you your opinions, but now, I want to go to Adam
6 Ondrovick.  What was Adam Ondrovick's role in this
7 case?
8 　　　A.  Again, that particular name, I have
9 not read the deposition, so I'm not --
10 　　　Q.  Did you read the records to look for
11 the names of the defendants?
12 　　　A.  Yes.  I don't recall.
13 　　　Q.  So as you sit here and as you prepared
14 your report, you were not thinking that Adam
15 Ondrovick, specifically, Adam Ondrovick, had ignored
16 or not taken care of this inmate?
17 　　　A.  I don't recall that name; no, sir.
18 　　　Q.  You don't know what he did or what his
19 job description was at this point?
20 　　　A.  No.
21 　　　Q.  At your facility do the intake -- are
22 the intake officers the entry level?
23 　　　A.  Intake officers are the first officers
24 that the inmate meet when he enters the facility.
25 　　　Q.  By job description, in your location,

Page 66

1 tell me what it was that James Craig did that ignored
2 or didn't take care of this inmate.
3 　　　MR. FINEGOOD:  It assumes facts not in
4 evidence.
5 　　　MR. BODARY:  You got the objection.
6 　　　MR. FINEGOOD:  Objection is --
7 　　　A.  I have no opinion on James Craig that
8 particular night.
9 　　　Q.  It's different to look at an inmate,
10 who's having withdrawal without knowledge of what the
11 treatment plan is and looking at an inmate who's
12 under treatment; isn't it?
13 　　　A.  I'm not sure what you're asking.
14 　　　Q.  If you're a correctional officer and
15 you've been told the medication is good and another
16 day in the jail may do her some good and you see the
17 inmate having withdrawal symptoms, shouldn't the
18 correctional officer follow the directions of the
19 doctor that ordered that?
20 　　　A.  You have to follow directions, but you
21 also to have services (sic) that change constantly.
22 You can't just stay and follow military order without
23 some discretion.  You always have discretion to look
24 at the situation and adjust as it changes.
25 　　　Q.  Right.  But what you're talking about,

Page 68

1 are intake officers not to have physical contacts
2 with inmates -- physical contact with inmates?
3 　　　A.  No, just the opposite.  They pat `em
4 down and bring `em in.
5 　　　Q.  All right.  I want you to assume that
6 James Craig was a sergeant and that James Craig was
7 aware that this inmate was suffering DT's and that
8 the doctor had been spoken to the previous night, 10
9 hours ago and that the medications was to be
10 continued and she was to be observed.  What was it
11 that Sgt. Craig did that you claim ignored this
12 patient's condition?
13 　　　MR. FINEGOOD:  I'm going to place an
14 　　　objection.  The question assumes facts not
15 　　　in evidence.  There's no evidence that
16 　　　James Craig ever received that information
17 　　　because there was no information in the
18 　　　pass-on book from Eric Westgate to James
19 　　　Craig.
20 　　　Q.  Now, going back to my question, sir, I
21 want you to assume that James Craig became the
22 sergeant in charge, the officer in charge at 7:00
23 a.m., in the morning, on the 3th and that he was
24 aware the doctor had been called, that this patient
25 was on medication and she was to be observed.  You

Page 67

1 discretion is a judgment call; isn't that correct?
2 　　　A.  It's a duty to adjust.
3 　　　Q.  Excuse me.  Discretion refers to
4 judgment; it's discretionary.  You can do something
5 or you can do something else; correct.
6 　　　A.  You have to have information to make
7 those judgments, yes.
8 　　　Q.  But that's what they are?  That's what
9 they are is judgments; correct?
10 　　　A.  Absolutely.
11 　　　Q.  And so an officer who believes that an
12 inmate has not had food, who writes a written
13 incident report and puts it in the nurse's box for
14 her to see the next day, that's a judgment that he
15 made of the way to communicate that problem to the
16 nurse; correct?
17 　　　A.  It's a decision he made, yes.
18 　　　Q.  But it's also discretionary.  He could
19 have done something else; he decided to do it that
20 way; correct?
21 　　　A.  Well, it's discretionary unless the
22 policy requires him to do it.  There may have been a
23 policy or procedure that requires him, again, to do
24 that particular function.
25 　　　Q.  You can't write a policy or protocol

Page 69

**ATKINSON-BAKER, INC.**

1  for every event; can you?
2      A.  No.
3      Q.  When you reviewed the policies -- Let
4  me go back to that issue.  But if, in fact, he
5  elected to put an incident report in the nurse's box,
6  knowing she would see that incident report and the
7  inmate, that's a discretionary judgment by that
8  officer to communicate in that fashion; correct?
9      A.  Again, I don't know if it's
10 discretionary or if it was required of him to do it
11 that way, but he did do it.
12     Q.  Yeah.
13     A.  Okay.  I know he did it.  I can't
14 answer the other part `cause I don't know what the
15 requirements are.
16     Q.  Right.  Bernice Baker.  Bernice Baker
17 is another one of my clients.  Do you know what role
18 she had in this case?
19     A.  I knew she was an intake person.
20     Q.  Um-hum.
21     A.  The intake officer.
22     Q.  She was an intake officer.  It was her
23 first day of employment on April 30th; did you know
24 that?
25     A.  No, I did not.

Page 70

1      Q.  What is it you claim she did that
2  ignored this inmate?
3      A.  Again, I don't recall Bernice Baker
4  being in direct observation responsibility for the
5  inmate.  She processed her into the facility, I
6  guess, on her first day --
7      Q.  I don't want you to guess.  I want you
8  to assume that Bernice Baker did not work on the day
9  she was booked in on the 27th, but Bernice Baker came
10 to report the first day of her work at 7:00 o'clock,
11 on the 30th of April; that she'd never worked in law
12 enforcement or in correctional facilities prior to
13 that moment, 7:00 a.m., on April 30th, and that there
14 was another intake officer there, already doing the
15 duties of an intake officer; all right.  You got me
16 so far?
17     A.  Uh-huh.
18     Q.  And that she was asked to watch the
19 screen to see that the inmate didn't hurt herself on
20 the video that morning while she was in that holding
21 cell.  Is that deliberate indifference?
22     A.  That would be, obviously, unusual or
23 obviously dangerous to the inmate.  Yes, she needs to
24 do something about it.
25     Q.  She's in a padded cell; correct?  The

Page 71

1  inmate's in a padded cell?
2      A.  I don't know if it was a padded cell
3  or not; it was an observation cell.  I don't know if
4  it was a padded cell.
5      Q.  So you didn't know that it was padded?
6      A.  I don't know it was padded.
7      Q.  All right.  So you didn't know that
8  there was no bunk in the cell or no commode in the
9  cell which she could fall or hurt herself on?  You
10 didn't know --
11     A.  Well, through the video.
12     Q.  So you did observe it through the
13 video, but you forgot?
14     A.  Again, the padded issue --
15     Q.  A person, the first day on the job, as
16 an intake officer, who has been told that this is
17 someone going through DT's, in a padded cell, would
18 not, necessarily, have the knowledge of the
19 seriousness of the condition; would they?
20     A.  Well, if they can put somebody in that
21 responsibility, you have an obligation to make sure
22 they're trained or what they're looking for and
23 what's normal and what's not normal.  It's for the
24 correctional officers to figure out, the obvious,
25 yes, but what is normal and what's not normal and

Page 72

1  then take action.
2      Q.  In the first half hour when she's
3  there with another person acting as intake officer
4  she's supposed to know this; is that your position?
5      MR. FINEGOOD:  The organization --
6      A.  I don't know what -- She took the
7  responsibility of a corrections officer.  I'm not
8  sure what they told her her job was, what she's
9  supposed to do, but again, if she sees something that
10 is not normal or abnormal she should, at least, ask
11 the question, pass the information on to somebody.
12     Q.  How does she know what's abnormal --
13 normal or abnormal for someone going through
14 withdrawal?
15     A.  Again, the padded cell.  Again, the
16 jail put her in that position.  I'm assuming they
17 would give her some orientation or some training.
18     Q.  This is before her orientation, so she
19 hadn't yet met with the sergeant to talk about
20 orientation to the unit.  How is she going to know.
21     A.  Well, again, anything would be obvious
22 to a layperson, I think she would need to respond to.
23 Someone --
24     Q.  Well, that's why I asked you the
25 question.  If it's just a stranger to the

Page 73

ATKINSON-BAKER, INC.                    (800) 288-3376
19 (Pages 70 to 73)

1  circumstance that looked at it and didn't know this
2  person was on medication, two types of medications
3  and didn't know that the doctor, within 12 hours
4  prior to that had said she's on good medication, just
5  keep her. That's a different circumstance; isn't it,
6  and the correctional officer is there, in the setting
7  in which they've been medically managing this inmate
8  and watching her. Those are different circumstances;
9  aren't they?
10      A.  Again, you base your opinion based
11  upon the circumstances that exist at that time and
12  whatever she saw, she had an obligation to, at least,
13  observe and make some -- You mentioned discretion
14  before -- make some decision based upon that.
15      Q.  But she's -- First of all, if Bernice
16  Baker, who had never worked in a health care
17  circumstance or in correctional institutions before
18  did not know what could happen with alcohol
19  withdrawal or what the potential risk of DT's is on
20  the first day of employment, she's not chargeable
21  with ignoring a serious -- a known serious medical
22  condition; is she?
23      MR. FINEGOOD:  I'm going to object.
24      It assumes facts not in evidence --
25      A.  Again, I'm not sure what she knew,

Page 74

1  what she didn't knew (sic), but as a --
2      Q.  I'm asking you to assume that she did
3  not know.
4      A.  That the jail administrator put
5  somebody in that position is a mistake.
6      Q.  What position?
7      A.  The position to be observing somebody,
8  who may be going through a medical condition or a
9  medical deterioration --
10      Q.  Are you of the opinion -- I'm sorry.
11  Go ahead.
12      A.  -- and no direction as to what to do.
13      Q.  All right.  Well, she was told to
14  observe and report what she saw, but you're claiming
15  that even though she hasn't had a minute's
16  orientation at this jail that she could be
17  deliberately indifferent to a known serious medical
18  condition?  You're not claiming that; are you?
19      A.  I'm claiming the fact that she had a
20  duty to say something or describe exactly what they
21  told her to do.
22      Q.  All right.  What is it that Eric
23  Westgate did or didn't do that you claim is
24  deliberate indifference or ignoring the
25  circumstances?

Page 75

1      A.  Again, I haven't read Mr. Westgate's
2  deposition.
3      Q.  All right.  Well, do you understand
4  that it's important to get the facts right when
5  reviewing the matter because if you get the facts
6  right, your opinions could be wrong -- or if you get
7  the facts wrong, your opinions can be wrong?
8      A.  Opinions are based upon the facts that
9  you have at the time, absolutely.
10      Q.  Right.  And if you have inaccurate
11  facts, it may cause you to come to an improper
12  conclusion?
13      A.  Yes, and if the facts and
14  circumstances change and information changes, it can
15  change your opinion.
16      Q.  All right.  I want to show you that on
17  the overview of your case, where you said that in the
18  phone conversation with Sgt. Dye, quote, "Dr.
19  Stickney stated the nurse --
20      MR. FINEGOOD:  What are we referring
21  to?
22      MR. BODARY:  Page 2, Overview of the
23  Case, Exhibit F.
24      MR. FINEGOOD:  Okay, hold on.
25      Q.  In which you say, QUOTE, Dr. Stickney

Page 76

1  stated...the nurse would follow up in the morning
2  PERIOD, END QUOTE.  Where'd you get that?
3      A.  I believe he said, if I remember his
4  conversation about have the nurse -- what was the
5  name -- Bonita, I think it was, Mason or somebody --
6  follow up.
7      Q.  He didn't say morning; did he?  He
8  didn't say morning; did he?
9      A.  I believe he said tomorrow.
10      Q.  Well, tomorrow is not morning; is it?
11      A.  Well, it could be in the morning.
12  Again, I only got -- I can pull the transcript out,
13  but I don't remember the exact words.
14      Q.  Well, you have the transcript here.
15  I'm contesting the accuracy of the transcript, but
16  the word, morning, doesn't appear in it, sir.  Why
17  did you put morning down there?
18      A.  That was my interpretation of it when
19  I read it.
20      Q.  Well, that's unfair if that's not the
21  case; is it?  If that's not what he said, follow up
22  in the morning, that's unfair; isn't it, to those
23  that communicated?
24      A.  I'd be happy to look at that again.
25      Q.  All right.  And you'd be wrong if it

Page 77

A400B45
**JEFF EISER   MARCH 1, 2010**

1   didn't say morning; correct?
2        A.  It would not be accurate; correct.
3            MR. FINEGOOD:  What if he testified in
4   his deposition that he seen him in the
5   a.m., would that be okay, Jim?
6            MR. BODARY:  Is there some rule in the
7   Federal Rules that I missed somewhere that
8   you're allowed to ask me questions and I
9   respond because his correction was not
10  that.
11       Q.  But we'll let that -- You asked to see
12  the transcript.  You asked to see the deposition of
13  Dr. Stickney.
14       A.  I believe I'm going to read all the
15  depositions that are available.
16       Q.  Why am I taking your deposition today,
17  under oath, if you've not finished your review?
18           MR. FINEGOOD:  Stickney's deposition
19  has not been transcribed yet.
20           MR. BODARY:  Excuse me, sir.  I'm
21  asking this witness --
22       Q.  First of all, you charge a thousand
23  dollars a day for trial; is that right?
24       A.  Yes.
25       Q.  And a trial can take the entire day?

Page 78

1        A.  Correct.
2        Q.  You charge $1200 for depositions,
3   regardless of whether they take a full day; is that
4   right?
5        A.  Correct.
6        Q.  And you're charging not $200 an hour,
7   like you do for other functions here, but a flat fee
8   of $1200 for the day for depositions --
9        A.  Correct.
10       Q.  -- whether it takes three hours,
11  three-and-a-half or two hours; correct?
12       A.  Correct.
13       Q.  And before you prepared the report in
14  this case, you, as you told me, made a careful and
15  thorough review to be certain that you got the facts
16  correct; is that true?
17       A.  True.
18       Q.  And you're telling me that you're not
19  finished with your review in this case?
20       A.  I've gotten additional materials since
21  I issued my report.  There's a deadline I had to meet
22  for counsel and then there's materials that came
23  after that that I have not reviewed.
24       Q.  What day this past week did you get
25  these transcripts?

Page 79

1        A.  This morning.
2        Q.  So Mr. Finegood brought them today?
3        A.  Correct.
4        Q.  You know your deposition was scheduled
5   for other dates.  Other dates were discussed for your
6   deposition in the month of February.
7        A.  I remember giving dates I was
8   available and I was hoping this was the date.
9            MR. FINEGOOD:  Just for the record,
10          it's clear you scheduled this deposition
11          for today's date.  It was not rescheduled
12          at anybody's --
13          MR. BODARY:  Actually, that's not
14          true.  I gave notice and you then contacted
15          me, we moved this to March 1st.  I may
16          stand corrected.  I don't want to waste the
17          time on this transcript.  Let's go, sir.
18       Q.  You, in page 4 of your report, make
19  reference to an ACA standard, a mandatory standard
20  and it's the second one quoted here that I'm making
21  reference to, "Inmates who need health care beyond
22  the resources available in the facility, as
23  determined by the responsible physician, are
24  transferred --" I'm skipping a few words -- "to a
25  facility where such care is on-call or available 24

Page 80

1   hours a day;" do you see that?
2        A.  Yes sir.
3        Q.  The responsible physician in this case
4   is Jeffrey Stickney; is that correct?
5        A.  He was the physician for the jail;
6   correct.
7        Q.  Down below, in this same page, you
8   refer to an essential standard of the NCCH, and I'm
9   looking at the last sentence there, "In deciding the
10  level of symptoms that can be managed safely at the
11  facility, the responsible physician must take into
12  account the level of medical supervision that is
13  available at all times."
14       A.  Correct.
15       Q.  And that responsible physician is who?
16       A.  Again it depends.
17       Q.  In this case, sir.
18       A.  In the county jail, the jail physician
19  doctor is Dr. Stickney.
20       Q.  If a jail is not accredited by the
21  NCCH, and many jails are not, why is it fair to apply
22  those standards to that jail?
23       A.  The NCCHC standards are a set of
24  guidelines and standards for the entire corrections
25  industry -- You don't have --

Page 81

**ATKINSON-BAKER, INC.**                    **(800) 288-3376**

21 (Pages 78 to 81)

**A400B45**
**JEFF EISER   MARCH 1, 2010**

Page 82

1   Q.  Did --
2       MR. FINEGOOD:  Excuse me.  Are you
3   going to let him answer?
4       MR. BODARY:  Sure.
5   A.  You don't have to be accredited.  What
6   they are designed to do, ACA and the NCCHC, is you
7   get a set of benchmarks for acceptable,
8   constitutional corrections operations.
9   Q.  And far as you know, no state requires
10  that it makes those mandatory for any jail inside a
11  state?
12  A.  No, standards have always been
13  recommended.
14  Q.  It's voluntary?
15  A.  Yes.
16  Q.  So though the institution uses the
17  words, mandatory or essential, in fact, there is
18  state requirement that they're mandatory?
19  A.  Correct.
20  Q.  Is it your experience that the larger,
21  more sophisticated jail systems are accredited by ACA
22  or NCCH?
23  A.  Actually, my experience is it's a lot
24  easier for the smaller facility to be accredited than
25  the larger ones.  The larger ones take a lot more

Page 83

1   effort and a lot more cost because of the volume of
2   their operation.  The smaller jail is actually easier
3   to be accredited by those because there's less to
4   accredit.
5   Q.  Do you know what the budget was for
6   health care was at Lenawee County in 2004, 2005,
7   2006?
8   A.  No, sir; I was not given that
9   information.
10  Q.  Yeah.  Do you know whether they
11  exceeded the budget in giving health care, for
12  outside services, obviously, transport out of the --
13  treatment outside?
14  A.  I wouldn't know any of that, sir.
15  Q.  All right.  Did Hamilton County ever
16  exceed its budgets by a hundred percent for inmate
17  care in any given year?
18  A.  Not that I recall.
19  Q.  That's a substantial increase; isn't
20  it, over the budgeted item, hundred percent.
21  A.  The amount of -- The budget has
22  nothing to do with the administration of health care
23  to inmates.
24  Q.  So the -- Now, let me understand that.
25  First of all, inmates are not Constitutionally

Page 84

1   guaranteed to get treatment for bunyons or hang nails
2   or minor medical problems; isn't that true?
3   A.  The Constitutional guarantee is that
4   there's adequate medical care and you have to take
5   care of the serious medical needs.
6   Q.  All right, and that's not a serious
7   medical need; is it?
8   A.  What isn't?
9   Q.  A bunyon or a hang nail.
10  A.  Again, I'm not a doctor.  I can't tell
11  what that may be a condition of or a symptom of to
12  say if it's serious or not.  I'm not a medical
13  person.
14  Q.  All right.  Do you know what the
15  incidence of is of withdrawals going to seizure in a
16  patient who's receiving treatment?  Do you know what
17  the incidence is, what percentage of patients that
18  have alcohol withdrawal go to seizure who are,
19  actually, treated?
20  A.  Again, through my training, I heard
21  those numbers, but I can't recall exactly what the
22  percentage is.
23  Q.  Do you know what the incidence of
24  death is as a complication of untreated alcohol
25  withdrawal?

Page 85

1   A.  I know in the corrections environment
2   or the corrections industry it's a very real problem
3   and I don't know the numbers; I don't know the
4   percentage; I can't recall those.
5   Q.  Do you know the difference when
6   treatment occurs?
7   A.  There's a difference, but I don't know
8   what that difference --
9   Q.  Do you know if it's significant?
10  A.  Again, I don't know the numbers, so I
11  don't know if they were significant or not.
12  Q.  So you don't know that the serious
13  risk of death from withdrawal or DT's is so reduced
14  by proper treatment that it's no longer a serious
15  risk?
16  A.  Again, I'm a corrections operations
17  person, not a medical person.  My job is to make sure
18  those people get to the medical positions so they can
19  be evaluated -- medical facility.
20  Q.  In this case, Sgt. Neill, within 16
21  minutes of this inmate being booked, got the
22  information regarding the patient to a medical
23  director; isn't that true?
24  A.  She called the medical --
25  Q.  Correct, and he gave the treatment

**Page 86**

1    plan?
2        A.  At that point, yes.
3        Q.  He defined the need?
4        A.  What they knew at that time.
5        Q.  Yes.  And then when Paul Dye thought
6    things had changed, he called the doctor again;
7    correct?
8        A.  Didn't he call the doctor on the phone
9    --
10        Q.  And the doctor, again, defined what
11    the treatment plan was.
12        A.  At that point, yes.
13        Q.  All right.  And if correctional
14    officers understood the call had been made and the
15    treatment was the same, same medication, same
16    observation, how were they deliberately indifferent?
17        A.  Again, you said the same observation;
18    the observations had changed from the first call to
19    the second call.
20        Q.  But now, I'm asking you how do you
21    know there was any change from the second call?  You
22    don't really know.  All you know is what you saw in
23    the video, but you don't know if that was a change;
24    do you?
25        MR. FINEGOOD:  I'm going to object to

**Page 87**

1        the form of the question.  You just asked
2        five questions in the space of one.
3        MR. BODARY:  No.
4        MR. FINEGOOD:  Yes, you did and you're
5        arguing with the witness, okay, so why
6        don't you ask one question at a time and
7        maybe he can answer it.
8        Q.  I have one question pending to you,
9    sir.  You don't know if there was a change, you don't
10    know if there was a change from the call at 9:00 a.m.
11    to what you see on the video in the morning; do you?
12        A.  9:00 a.m.?
13        Q.  9:00 p.m., when the call was made to
14    the doctor, excuse me.
15        A.  Again, the information I have reviewed
16    indicated there was a deterioration of her condition
17    overnight.
18        Q.  Who used the word, deterioration?  You
19    did --
20        A.  I did.
21        Q.  -- in your report.  Where is that
22    anywhere in this record, deterioration?
23        A.  That's my analysis.
24        Q.  Your assumption?
25        A.  Yes.

**Page 88**

1        Q.  And not only is it making the
2    assumption that there was a deterioration, but the
3    same officer saw it was a deterioration; that is,
4    that the officer who saw symptoms -- Let's take
5    Bernice Baker, when she looks at the video camera at
6    7:30 or 8:00 o'clock in the morning, how was she to
7    know whether or not that's a change if it's the first
8    time she saw this inmate?
9        MR. FINEGOOD:  Objection to the form
10        of the question.
11        A.  Again, we talked about this before,
12    but the obligation of putting her in the role of
13    being the observer --
14        Q.  I'm not asking about the supervisor.
15        MR. FINEGOOD:  Excuse me.  Let him
16        answer the question, please; it's common
17        courtesy.
18        MR. BODARY:  It is common courtesy.
19        Q.  Go ahead.
20        A.  First, it's the responsibility of the
21    appointing authority to make sure they give her the
22    information they (sic) need to do that job and what's
23    normal and what's not, according to her and record
24    that, and also if it's an obvious change in behavior
25    that anyone would notice during that time period.

**Page 89**

1        Q.  Excuse me.  I'm asking about Bernice
2    Baker, not the person that put her there.  How is it
3    she knows it's a change.  It could have been the same
4    condition three or four hours ago; how does she know?
5    Can you answer?
6        A.  At this point, with the information I
7    have, no.
8        Q.  Okay.  Well, in fact, you can't record
9    a change or act on a change if you don't know it's a
10    change; can you?
11        A.  True.  If you don't know it's a change
12    --
13        Q.  You can't ignore a change if you don't
14    know it's a change; can you?
15        A.  Hypothetically, yes, it's true.
16        Q.  Would you defer to medical experts as
17    to whether or not the medications given to this
18    inmate were of the proper type?
19        A.  Yes.  I would have no expertise in
20    that area.
21        Q.  And would you also defer to medical
22    experts relative to the dosage that was given of this
23    particular medication?
24        A.  Yes, sir; I'm no medical expert.
25        MR. FINEGOOD:  Wait a second.  I

Page 90

1    object to the question.  The question is
2    vague.  Which experts are you talking
3    about, the experts that you've retained,
4    Dr. Stickney or the experts that the
5    plaintiff has retained.  There's many
6    experts whose dosaging opinions may be
7    inquired about right now.  The question is
8    vague.
9           MR. BODARY:  To quote you, you have
10   your objection.
11          **Q.  Now, sir, on page 8 of your letter or
12   report, you began, I believe, to summarize some of
13   the opinions you reached in the course of this
14   letter.  In fact, you put in bold letters at the end,
15   "In this case, Brenda Smith was denied access to
16   adequate medical care at the time it was most
17   critical for (her) treatment (and) life-threatening
18   alcohol withdrawal symptoms;" do you see that?**
19          A.  Yes, sir.
20          **Q.  The same sentence starts two
21   paragraphs up with the words, "Brenda Smith was
22   denied adequate medical care after jail officials
23   received actual knowledge of (serious) of her serious
24   medical conditions."**
25          MR. FINEGOOD:  I'm sorry.  You lost

Page 91

1    me.  Where are you --
2           MR. BODARY:  It's in the middle of the
3    third paragraph on the bottom, on page 8.
4           **Q.  You know what, I don't need to do
5    that.  I'm trying to conclude this question, whatever
6    this question is.  Let me do it this way:  In the
7    paragraph above, you said, starting with the words,
8    "Based on my experience," "Based on my experience,
9    training and education Lenawee County and Sheriff
10   Lawrence Richardson...knew to a moral certainty the
11   need for...training their jail staff in the
12   recognition of serious health risks;" do you see that
13   sentence?**
14          A.  Yes, I do.
15          **Q.  Okay.  Which correctional officer, of
16   the seven officers I represent, did not recognize
17   this patient's condition as alcohol withdrawal with
18   DT's; which one, sir?**
19          A.  In the ones I have not reviewed the
20   depositions of I can't answer for.  The new person
21   coming in, I really -- she had no training at all at
22   that particular time and this is in the context of
23   training they received.  I don't know exactly what
24   they knew, but there is no evidence of training on
25   those topics for any of the staff.

Page 92

1           **Q.  I didn't ask about the training.  What
2    I asked for is identify which officer didn't
3    recognize the serious condition.**
4           A.  Again, I'm not aware --
5           **Q.  Mary Neill did; she recognized the
6    condition and made the call; didn't she?**
7           A.  I said that; correct.
8           **Q.  Yeah.  Paul Dye did.  He characterized
9    it as DT's.**
10          A.  Correct.
11          **Q.  All right.  So in terms of recognition
12   of the condition, the lack of training didn't impede
13   either of them from knowing what this was; correct?**
14          A.  Again, the deterioration of the
15   condition was the more important element of that.
16          **Q.  I'm reading your letter that
17   Richardson knew to a moral certainty the need for
18   training the jail staff in the recognition of serious
19   health risks, so you're, apparently, not referring to
20   withdrawal, but a deterioration, overall health --**
21          A.  In the corrections industry, it is a
22   absolutely fundamental thing that we do to train our
23   staff in the recognition of serious health risks.
24          **Q.  Right.  Now, here's my question to
25   you:  Who was it, which one of these officers, tell**

Page 93

1    me which, Ondrovick, Neill, Paul Dye, Bernice Baker,
2    Eric Westgate, Jim Craig?  Which of those people
3    didn't make note or know that this patient was going
4    through DT's?
5           A.  Again, the issue is not they didn't
6    know, but --
7           **Q.  My question is --**
8           MR. FINEGOOD:  Excuse me.  Let him
9    answer.
10          MR. BODARY:  He's answering the issue.
11   I want an answer to my question.
12          MR. FINEGOOD:  No, no.  He's answering
13   your question,  You may not like it.
14          MR. BODARY:  I'll take the response.
15          MR. FINEGOOD:  You have to take it,
16   okay?
17          MR. BODARY:  I'll take the response.
18   I tried to focus him on the question.
19          MR. FINEGOOD:  Well, okay.  He doesn't
20   need focusing.
21          A.  Again, I think we agreed to the fact
22   that they knew that this lady was having DT's and
23   troubles and the issue I keep talking about concerns
24   as she has deteriorated -- is the word I used -- what
25   was their action at that point.

Page 94

1    Q.  Well, Paul Dye's action, you
2  understand, was to call Dr. Stickney a second time;
3  correct?
4    A.  Correct.
5    Q.  And Dr. Stickney made no change;
6  correct?
7    A.  Correct.
8    Q.  And he said, hopefully another day
9  will do her some good; correct?
10   A.  In essence.
11   Q.  If there was no further deterioration
12 from that time until the time of her arrest or no
13 determination that was perceivable because the person
14 only saw them (sic) for a limited section of hours,
15 then they didn't fail to recognize a deterioration;
16 did they?
17   A.  There was no new evidence, but if
18 there is new evidence, they have to act.
19   Q.  Right.  And you don't know whether
20 there was because you're just looking at the video as
21 you saw it between 7:00 and 9:00 o'clock or 10:00
22 o'clock?
23   A.  And the information the verbal -- how
24 she acted, the description of her behavior by the
25 individual officers that offered medical.

Page 95

1    Q.  The next sentence says, "They were put
2  on notice by their own Jail Commander and they had
3  settled previous lawsuits where the lack of adequate
4  medical care and failure to train were issues;" is
5  that your statement?
6    A.  That's in my letter.
7    Q.  So that was your statement, not
8  somebody else's; correct?
9    A.  Correct.
10   Q.  All right.  What other suits had they
11 settled before April 3th of 2007?
12   A.  I'm not sure when the suits were
13 settled.
14   Q.  You don't know when the suits were
15 filed.
16   A.  I don't have the dates of --
17   Q.  So why are you making the statement
18 that they had settled previous lawsuits before April
19 30th of 2007?
20   A.  What page are you reading?
21   Q.  We're on page 8, sir, the same
22 paragraph where you said, "...knew to a moral
23 certainty...."  The very next sentence says, "They
24 were put on notice by their own Jail Commander and
25 they had settled previous lawsuits where the lack of

Page 96

1  adequate medical care and failure to train were
2  issues."  Where do you have that?  You can't tell me
3  when the suits were filed.
4    MR. FINEGOOD:  It's a question --
5    Okay.  It's a compound question --
6    MR. BODARY:  I'll withdraw the last.
7    I'll withdraw the last.
8    Q.  Where are you getting, sir?
9    MR. FINEGOOD:  Getting what?  That
10 they were put on notice by Jail Commander
11 Steenrod's memo?
12   MR. BODARY:  Previous lawsuits.
13   Q.  They settled previous lawsuits.  Where
14 do you get that?
15   A.  There is information in the review
16 concerning two other cases --
17   Q.  So plaintiff's lawyer told you about
18 two other cases?
19   A.  No.  It was something in the
20 discipline of a particular officer, I think it was,
21 Dye.
22   Q.  What do you know about those cases?
23 Do you know anything about the Florez case?
24   A.  Not a lot, other than the fact that
25 the disciplinary documents that Sgt. Dye supposed

Page 97

1  --
2    Q.  But you don't know if there was any
3  deliberate indifference involved in that case?
4    A.  The issues dealt with medical care.
5    Q.  Answer my question.  You don't know --
6    A.  No, I do not, right.
7    Q.  Do you know the name of the other
8  case?
9    A.  It dealt with -- It was appendicitis
10 or something or --
11   Q.  Do you know when that suit was filed?
12   A.  I believe before this suit, but I
13 don't remember.
14   Q.  Before April of 2007.
15   A.  Again, I don't recall the dates.
16   Q.  So why did you put this in this
17 letter, sir?
18   A.  When I was drafting this, it was in my
19 particular mind that there was previous lawsuits that
20 I had read about the disciplinary action, concerning
21 --
22   Q.  And you don't know any of the
23 particulars of what the correctional officers did or
24 what interplay there was with any nurse or any doctor
25 in those cases; do you, sir?

## A400B45
## JEFF EISER   MARCH 1, 2010

1  A.  No, I do not.
2     Q.  All right.  Having NCCH procedures
3  does not guarantee there will be no deliberate
4  indifference; true?
5     A.  True.
6     Q.  All right.  If you don't have the
7  standards, but the officer's act, by referring
8  medical problems to treaters, the absence of the
9  standard did not cause any wrong to the inmate; isn't
10 that true?
11    A.  It's not so much the standard; it's
12 having policies and directions for your staff.
13    Q.  I'm asking a specific question now.
14 The absence of the particular writing -- The presence
15 of the writing doesn't guarantee you won't be
16 deliberately indifferent?
17    A.  True.  In terms of the writing, no.
18    Q.  Present of the standard does not
19 guarantee there won't be deliberate indifference;
20 does it?
21    A.  The presence of the standard is --
22    Q.  It doesn't guarantee there will not be
23 deliberate indifference by a correctional officer?
24    MR. FINEGOOD:  Objection.  It's
25 irrelevant.

Page 98

1  here's the thing --
2     MR. FINEGOOD:  Hold on, I object to
3  the form of the question `cause it's not a
4  question.  It is a statement and it's vague
5  as to which particular guidelines or
6  standards you're referring to?
7     MR. BODARY:  I'm just asking in the
8  inverse and he won't acknowledge it.
9     Q.  The mere presence of the writing
10 doesn't guarantee the right procedure, but the right
11 procedure in the absence of a particular protocol,
12 let's say, of the absence of the protocol will not
13 affect that inmate if the procedure avoided
14 deliberate indifference; isn't that true?
15    MR. FINEGOOD:  Objection.  It's not
16 intelligible.
17    A.  I didn't hear what you said.  All I
18 know is that the standards require facilities to have
19 policies, procedures that govern the behavior of
20 their staff.  A jail is a quasi-paramilitary
21 operation that needs -- staff needs to know exactly
22 what to do, especially when medical staff are not
23 there 24 hours a day.
24    Q.  In the state of Ohio, are these
25 standards if you violate them negligently, does that

Page 100

1     A.  I'm not sure what you're -- The
2  presence of the standard -- that there actually is a
3  standard?
4     Q.  Yeah.  An NCCH standard relative to a
5  given issue does not guarantee that an officer is
6  going to avoid being deliberately indifferent?
7     A.  The purpose of the standard is to give
8  them guidance to develop policy, procedures and
9  training to avoid possible liability, but no, it
10 doesn't guarantee anything, no.
11    Q.  And the absence of the writing will
12 not impair someone's Civil Rights if the officers, in
13 fact, do procedures that refer serious medical
14 conditions for medical evaluation and treatment?
15    A.  Again, I'm not sure what you're
16 asking.
17    Q.  If there's no deliberate indifference
18 by the officer because they refer for medical
19 management and follow the doctor's orders, then the
20 absence of the standard or the absence of training
21 didn't impact the Civil Rights of that inmate; did
22 it?
23    A.  Again, I'm not sure if you're asking a
24 question or making a statement.
25    Q.  I'm asking a question.  But, see,

Page 99

1  give rise to liability in Ohio?
2     A.  Which standards you talking about?
3     Q.  NCCH standards.
4     MR. FINEGOOD:  Excuse me.  Calls for a
5  legal conclusion.
6     A.  Again the standards are recommended
7  guidelines for rated -- for the guidance of
8  departments to develop policies and procedures and
9  training so that their staff can again, hopefully,
10 avoid liability.
11    Q.  I'm asking you, do you know whether or
12 not the State of Ohio allows a recovery to an inmate
13 when there is violation of the standard, not proof of
14 deliberate indifference, but violation of the
15 standard?
16    A.  The standard, again, is not law.
17    Q.  Right.  So in Ohio, that doesn't
18 count?
19    A.  That doesn't count in any state
20 though, I believe.
21    Q.  Now, answers to requests to admit by
22 the County mistakenly indicated there were no
23 protocols on alcohol withdrawal from this
24 development, and they're going to be amended.  There
25 are no written guidelines or policies for

Page 101

**A400B45**
**JEFF EISER   MARCH 1, 2010**

1  correctional officers, but it develops that Nurse
2  Bonnie Mason and Jeffrey Stickney had protocols for a
3  number of difference types of problems.
4      I want you to assume the following
5  issues: ear infections, migraine headaches,
6  tonsillitis, sinus infection, chest pain, alcohol
7  withdrawal, hypertension, diabetes, seizure
8  disorders.
9      Now, you've offered an opinion in this
10  case that you were shocked or astounded that there
11  were no protocols. In this setup at Lenawee County,
12  where there was part-time nursing coverage, 24-hour
13  physician coverage, the fact that a nursing protocol
14  was known only to the nurse, is that significant?
15      MR. FINEGOOD: Well, first of all, I'm
16      going to place an objection to the extent
17      that any answers to requests to admit are
18      in any way incorrect based on some record
19      that has been developed for the simple
20      reason there are no standards. It's been
21      admitted that if there were standards,
22      there is no -- excuse me -- written
23      documentation. In fact, they've been lost
24      and that will be the subject of a skelation
25      (sic) motion in its own right.

Page 102

1      MR. BODARY: So what's your objection?
2      MR. FINEGOOD: The objection is it's
3      irrelevant and it's without --
4      MR. BODARY: This deposition is not
5      necessarily to be read to a jury and I'm
6      going to a point here that I'm inviting
7      problems, and my problem is this:
8      Q. That have you seen other jails in
9  which there are nursing protocols that address
10  nursing issues about how you approach alcohol
11  withdrawal?
12      A. There are, and there should be nursing
13  protocols. In addition to the facility's policies
14  and procedures, directing the authority of the
15  medical staff to do certain things and what the staff
16  does when medical is not there.
17      Q. I want you to point me to which of the
18  listed policies that you reviewed for Lenawee County,
19  and they're listed here under 17a through x. The
20  first two, really, probably don't apply, but whether
21  you think any of these policies, as written, deprive
22  -- were deliberately indifferent to serious medical
23  needs of the inmates.
24      A. Again, the policies, as I remember
25  them, were bare minimum, but yet you could probably

Page 103

1  call them adequate documents, but some issues were
2  not covered. That means the staff in that kind of
3  facility needed direction on it.
4      Q. So it's what was missing, not that any
5  one of these policies is deliberately indifferent to
6  care?
7      A. Correct.
8      MR. BODARY: That's all the questions
9      I have sir.
10      MR. NELSON: I have a few questions.
11      EXAMINATION
12  BY MR. NELSON:
13      As I mentioned, my name is Dave
14      Nelson. I'm here on behalf of Dr.
15      Stickney. I will try not to repeat the
16      questions that have been asked; I hope not
17      to do that, but if I accidentally go over a
18      few of them already asked, I apologize.
19      Q. All right. You have no formal medical
20  education; correct?
21      A. No, sir.
22      Q. All right. And you -- Do you have any
23  certifications that you had to take courses or take
24  tests to become certified in anything?
25      A. In the field of corrections?

Page 104

1      Q. Yeah.
2      A. Ironically, I was actually the guy who
3  wrote the curricula for the test for the State of
4  Ohio to become certified as a jail administrator and
5  supervisor, et cetera, so I was the guy that wrote
6  those for the security operations side of the jails
7  in Ohio.
8      Q. Now, I noticed on your C.V., it
9  indicates your a jail operations expert. At least,
10  that's the title you give yourself. Is there any
11  certification in jail operations, like a test you can
12  take to become certified in jail operations?
13      A. There are certifications to the
14  American Jail Association. You can be a certified
15  corrections administrator, I think, and I assisted in
16  developing that program also. I didn't, actually,
17  take the test myself; I wrote the test and also a
18  certified corrections officer, I think, now, but
19  there's nothing in our industry that would make you a
20  certified operations person.
21      Q. Okay. So you're not certified by any
22  of those bodies in corrections or anything?
23      A. There is no certification for that,
24  what you're asking.
25      Q. So the answer is no, that you're not.

Page 105

**ATKINSON-BAKER, INC.**

**(800) 288-3376**

27 (Pages 102 to 105)

1    **I mean if there's no certifications --**
2    A.  Nothing exists, exactly, that -- It's
3    unique; it's a unique position.
4    **Q.  Have you written any publications in**
5    **any peer review journals or anything like that**
6    **regarding alcohol withdrawal or DT's?**
7    A.  No, I have not.
8    **Q.  Have you given any presentations to**
9    **any -- well, just given any presentations regarding**
10   **alcohol withdrawal or DT's?**
11   A.  No, I have not.
12   **Q.  Could you describe for me, I guess,**
13   **what your -- the breakup of your professional time is**
14   **today, whether -- give you an example, whether the**
15   **majority of it is testifying or forensic work as an**
16   **expert witness or -- and break that down into the**
17   **percentage of time that you go to facilities and**
18   **investigate them, that's just merely part of your**
19   **work in promulgating standards and things of that**
20   **nature.**
21   A.  My retirement work, you mean.  I
22   retired back in February, full time, February, 2009,
23   full time and since then I started this expert
24   witness career as a hobby.  I also go to school full
25   time now to finish my Master's degree, so I'm a

Page 106

1    professional student also.  And also I teach
2    elementary school as part of my education degree and,
3    so probably, percentage-wise, this activity takes up
4    one-third of what I consider to be my work life at
5    this point.
6    **Q.  So boil it down.  Since you retired in**
7    **February, 2009, apart from being a student, really,**
8    **the majority of your time is spent as an expert**
9    **witness?**
10   A.  And as a teacher.
11   **Q.  Do you hold any professional licenses**
12   **at all?**
13   A.  No, sir.
14   **Q.  When did you start reviewing cases as**
15   **an expert, what year, if you recall?**
16   A.  I started back in 1994.  I was
17   requested by an attorney to start and that was my
18   first case.
19   **Q.  Since 1994, how many -- on how many**
20   **occasions would you say you've given depositions?**
21   **You can estimate.**
22   A.  Over the last how many years is that,
23   16 years or something?
24   **Q.  Yeah.**
25   A.  I'm gonna say I probably been in 30,

Page 107

1    40 depositions, not just those -- I also give
2    depositions as my professional responsibility.  I was
3    the guy that Hamilton County used to represent them
4    in litigation or employee litigation or whatever it
5    may be, so I've been in -- I'm guessing 40, maybe.
6    **Q.  And that's what you estimate over --**
7    **since 1994, 40 depositions?**
8    A.  Forty, something like that.
9    **Q.  How many times have you testified at**
10   **trial; do you recall since you've been --**
11   A.  I think two of the cases actually made
12   it to trial.  Ninety-nine percent seem to be settled
13   before, which I had nothing to do with, obviously.
14   **Q.  And of the cases that you've acted as**
15   **an expert witness in how many times or what would the**
16   **breakup be between plaintiffs work and defense work?**
17   A.  I just did the math on that.  Sixty
18   percent of my cases have been defense and 40 percent
19   have been plaintiff.
20   **Q.  Have you ever been subject to**
21   **litigation yourself?  Have you ever been sued?**
22   A.  No.
23   **Q.  Not ever as a party, dealing with any**
24   **of the issues in Hamilton County?  You've never been**
25   **named in a lawsuit?**

Page 108

1    A.  Actually, I believe I was named one
2    time in a pro se lawsuit by an inmate many years ago
3    because he found my card on the floor of the jail and
4    he could spell my name and he, actually, went to
5    State prison and passed away before he could file a
6    lawsuit because I was noticed of that from the post
7    office (sic).  And I forget, it was something
8    completely out -- It didn't have access to science
9    fiction, television or something really off the wall
10   type of stuff.  I remember that.
11   **Q.  All right.  Now, you mentioned**
12   **throughout the course of this deposition that you --**
13   **and you testified you have no formal medical**
14   **education and I'm assuming that you will not be**
15   **rendering any testimony that will be critical of Dr.**
16   **Stickney as to his -- what -- the treatment he**
17   **rendered?**
18   A.  Correct.  I'm not a medical expert.
19   **Q.  All right.  So you will defer the**
20   **opinions in that regard to a medical expert?**
21   A.  Yes, sir.
22   **Q.  You testified that the NCCH standards**
23   **-- in your terms you called them guidelines and**
24   **standards; correct?**
25   A.  Correct.

Page 109

**A400B45**
**JEFF EISER   MARCH 1, 2010**

1    Q.  Now, you would agree that a guideline
2  is just that.  It's something that can be followed,
3  but it doesn't have to be followed.
4    A.  Correct.  It's what our industry uses,
5  the corrections industry.
6    Q.  Okay.  And you also used the term
7  benchmark which is another way of saying guidelines,
8  something that can be followed or it doesn't have to
9  be.  It depends on the judgment and the circumstances
10  as to whether or not you use that guideline; correct?
11    A.  Correct.
12    Q.  All right.  Now, you would agree that
13  if there are policies and procedures that are in
14  place regarding the handling of, let's say, alcohol
15  withdrawal or DT's -- Strike that.  I'm sorry.  If
16  there were no policies in place regarding alcohol
17  withdrawal or DT's, the absence of those policies
18  does not necessarily mean that an untoward result
19  would happen.
20    MR. FINEGOOD:  Objection to form.  Do
21  you understand the question?
22    Q.  If you were to assume that there were
23  no policies or directives in place regarding alcohol
24  withdrawal or DT's, that fact, alone, does not imply
25  that there is any type of deliberate indifference

Page 110

1  involved?
2    A.  No.
3    Q.  That's correct, right?
4    A.  Correct.
5    Q.  And I just want to make sure we
6  covered the bases.  As I just stated earlier, you're
7  not going to be testifying as to the appropriate dose
8  of Librium; correct?
9    A.  No, sir.
10    Q.  And as you have no medical training or
11  experience in that -- experience in treating or
12  diagnosing DT's or alcohol withdrawal since you're
13  not a medical doctor; correct?
14    A.  Correct.
15    Q.  Have you, yourself, ever created
16  protocols or procedures regarding DT's or alcohol
17  withdrawal?
18    A.  I have, in cooperation with my medical
19  staff, created policies for training for the
20  corrections staff in terms of what to do, the actions
21  of the officers, the response of the officers and
22  cooperation with the nursing staff, who report their
23  observations.
24    Q.  All right.  Now, would those be -- are
25  they published anywhere or just among your own staff

Page 111

1  at the Hamilton County correctional facility?
2    A.  They would have been in the procedures
3  and policies of the Hamilton County Sheriff's Office
4  -- Correction, Division.
5    Q.  But you, yourself, have not published
6  any such protocols or procedures or standards as
7  contained in the NCCH or any of those other
8  guidelines?
9    A.  No, sir.
10    Q.  Who is, in your county, in Hamilton
11  County, who is the Director of Operations there
12  currently?
13    A.  The Sheriff runs the jail.
14    Q.  All right.  Who is the Deputy
15  Director, if you have one?
16    A.  The Chief Deputy is Shaun Donovan.
17    MR. BODARY:  How do you spell his --
18  Spell the last.
19    THE WITNESS:  D-O-N-O-V-A-N.
20    MR. BODARY:  Thanks.
21    Q.  Who is the Medical Director at the
22  Hamilton County Jail?
23    A.  I'm not sure since I've been gone.
24    Q.  Now, do you have -- Is it just one
25  Medical Director that you have or is there a group of

Page 112

1  physicians that kind of oversee the jail?  How is
2  that working?
3    A.  When I was there, it was a contract
4  medical service.  The contract companies we dealt
5  with were CMS, Correctional Medical Services and also
6  NAF Care.  I'm not sure what they have now.
7    Q.  So when was the last date that you
8  actually worked or had involvement with the Hamilton
9  County Jail?
10    A.  My last day was in February of 2009.
11  I don't know which day it was.  I, actually, retired
12  in 2006 and worked two more years at the request of
13  the Sheriff and my last position was to, as I said
14  before, close the jail.  So it would have been about
15  February.  I'm guessing the end of February, 2009.
16    Q.  I think we went over this briefly, but
17  I just want to make sure.  In your report, in your
18  criticisms, you note the failure of Lenawee County
19  Jail, Sheriff Lawrence Richardson and jail
20  administration to have a policy, procedure or
21  protocol....  Who would you include in that as all
22  the individual who failed to take that action that
23  you include in that paragraph?
24    MR. FINEGOOD:  Where are you reading,
25  what paragraph, please.

Page 113

**ATKINSON-BAKER, INC.**

A400B45
**JEFF EISER   MARCH 1, 2010**

Page 114

```
 1          MR. NELSON:  Page 1, paragraph 1, it's
 2  stated on his report that, "The failure of Lenawee
 3  County Jail, Sheriff Lawrence Richardson and jail
 4  administration have a policy, procedure or protocol
 5  to...."  What were you referring to when you talked
 6  about jail administration?
 7          A.  Anyone that would have the authority
 8  to create policy, procedure for any issue in the
 9  administration of the jail and each jail's different,
10  the structure of the jail.
11          Q.  All right.  And do you know who those
12  individuals would be at Lenawee County Jail?
13          A.  The jail administrator.
14          Q.  Which is who?
15          A.  Mr. Steenrod, I believe, at that point
16  in time.
17          Q.  And is that all that you would include
18  under that heading as far as your knowledge goes with
19  regard to Lenawee County Jail?
20          A.  There is also the under Sheriff, I
21  believe, is not named here, who had some -- Ms.
22  Dodson, I think.  Ms. Dodson, I think her name was at
23  that time.
24          Q.  So under the term, jail
25  administration, you'd be referring to the
```

Page 115

```
 1  administrator, Dennis Steenrod and Gail Dodson?
 2          A.  Correct.
 3          Q.  All right.
 4          MR. NELSON:  I don't have any further
 5  questions.
 6          MR. HIMBAUGH:  I do not have any
 7  questions.
 8          MR. FINEGOOD:  Well, I have some
 9  questions.
10          EXAMINATION
11  BY MR. FINEGOOD:
12          Q.  First of all, you've been retired now
13  for, you said most recently, since February of last
14  year; is that correct?
15          A.  Correct.  I retired, retired.  I
16  retired in 2006, but I was asked to stay on.  They
17  call it double dipping, I guess, for two years.
18          Q.  So what position did you actually
19  retire from?  What was your last position?
20          A.  The Deputy Director of Corrections.
21          Q.  And as Deputy Director of Corrections
22  for Hamilton County, can you just give us a brief
23  overview of what your responsibilities were?
24          A.  The Deputy Director was responsible
25  for the operation of four different facilities,
```

Page 116

```
 1  600-plus staff, $40 million budget and direct
 2  responsibility and answering to the Director of
 3  Corrections, who was a appointed, political appointee
 4  and then to the Sheriff.  I was the top operational
 5  person who operated the jail and was involved with be
 6  it personnel, be it security, training, working with
 7  the medical contracts, with food service contracts,
 8  doing all the administrative functions that it takes
 9  to run an operation that size.
10          Q.  And how long did you function in that
11  capacity?
12          A.  I started -- Actually, I was the
13  Operations Commander back in 1990.  The Deputy
14  Director retired and they didn't replace him; they
15  just gave me both jobs, so I got double-jobbed for
16  the last, about the last 10 years.  So I've been
17  doing Deputy Director for probably nine or 10 years,
18  along with Operations Commander.
19          Q.  I'm sorry.  You said 1990?
20          A.  1990 is when I was moved to Operations
21  Commander which was an administrative position in
22  charge of all the security in the operations.  And
23  then the Deputy Director retired a few years after
24  that, so they eliminated my position and just gave me
25  both jobs, so I did both jobs --
```

Page 117

```
 1          Q.  So then what do you do --
 2          A.  -- the remainder of my career.
 3          Q.  Close to 20 years?
 4          A.  Nineteen years or something I was
 5  administrative.
 6          Q.  And how long have you been in law
 7  enforcement, if you will, altogether, as a career?
 8          A.  Since May 22nd, 1980.
 9          Q.  Thirty years.
10          A.  Almost thirty years.
11          Q.  And what is your educational
12  background?
13          A.  I have a Bachelor of Science in the
14  University of Dayton, graduated 1980, in criminal
15  justice.
16          Q.  And you're presently enrolled in a
17  Master's program?
18          A.  Yes.  I need my thesis and a couple
19  more classes in the spring.  I'm getting my Master's
20  in educational administration, at Dayton University,
21  here in Cincinnati.
22          Q.  I'm sorry, in business administration?
23          A.  Educational administration.
24          Q.  Education, okay.  So Hamilton County
25  corrections or the Hamilton County Jail, if you will,
```

1    how would you characterize that in terms of relative
2    size, perhaps, in comparison to your understanding of
3    Lenawee County.
4        A.  It's a large urban corrections system.
5    Lenawee County, obviously, around -- I'm guessing
6    again -- about 300 beds or so, is larger.  It's still
7    a full-service jail.  They do the same functions.
8    The one thing I've experienced in my career is that
9    it really doesn't matter what the size of the
10    facility is; the operations, the conditions, the
11    responsibilities are the same, just on different
12    magnitudes, you know, but the basic operations and
13    what you need to do is the same.
14        Q.  What about relative procedures, if you
15    will, relative to the difference, if any, between,
16    let's say, a jail and a state correctional facility,
17    if you will, or a prison, as it might relate to
18    intake procedures; would there be any?
19        MR. BODARY:  Object.  Lack of
20       foundation.
21        A.  Absolutely.  A jail deals with people
22    coming off the street.  They could be in any
23    condition, under the influence of anything.  While a
24    prison receives people and inmates from jails, so
25    hopefully, everything functions a lot different.

      Page 118

1    Their function is they take `em in, interview `em and
2    place `em in a security-level facility, but they've
3    already been screened for medical or have been
4    treated for medical and all the other conditions, be
5    it mental health, be it alcohol or drug withdrawal,
6    those are all -- have been taken care of by the jail
7    and when they reach the prison, the intake process is
8    a little bit different.  The jail's really are the
9    ones who do all the work of the entry or other parts
10    within the system.
11        Q.  Now, you made reference to several
12    organizations anyways.  I think one of them was the
13    American Correctional Association?
14        A.  Yes, sir.
15        Q.  What is the American Correctional
16    Association?
17        A.  The American Correctional Association
18    was an organization started many years ago to promote
19    the professionalism of corrections operations.  It
20    governs adult prisons, juvenile facilities, community
21    corrections and also detention facilities, and also
22    develops standards based upon committees of
23    attorneys, professionals in the field that will be
24    the benchmarks or the standards for the industry.
25        Q.  Is it something -- Would you

      Page 119

1    characterize the American Correctional Association as
2    something of a paternal organization, something where
3    people get together, like a loyal order of moose or
4    anything like that?
5        A.  No, no.  It's a professional
6    association of corrections people.  Again, the
7    purpose of it is professionalizing this particular
8    industry over the last 20, 30 years.
9        Q.  Now, what about a reference was made
10    -- Oh, and I think it looks like from your
11    performance-based standards for adult and local
12    detention facilities, from the American Corrections
13    Association that it was founded in 1870.  Is that
14    what that appears?
15        MR. BODARY:  The document is a hearsay
16       document.  This isn't direct witness
17       testimony.  Object, foundation.
18        MR. FINEGOOD:  Fine.  All right.
19        Q.  You made reference to the National
20    Commission on Correctional Health Care Standards and
21    although there was several questions on that subject,
22    I don't know that, so you were asked directly your
23    understanding of what that organization actually is.
24    Can you tell us what that is?
25        A.  Again, it's a professional

      Page 120

1    organization that was designed and developed to
2    professionalize health care delivery inside of jails,
3    prisons, lockups and juvenile institutions.
4        Q.  And what are -- Do they publish
5    standards relative to correctional health care and --
6    for the jails?
7        A.  Yes, they do.
8        Q.  And you have a copy of them here with
9    you today as one of the publications that you relied
10    upon in the formation of your opinions in this case;
11    is that correct?
12        A.  Yes.  Those are the documents that
13    would have been in effect during the time frame of
14    the particular incident.
15        Q.  Now, can you tell us is it your
16    understanding that the National Commission on
17    Correction and Health Care Standards does have some
18    health care standards as it relates to alcohol
19    withdrawal or delirium tremens?
20        MR. BODARY:  That's an inappropriate
21       use of literature, so I'll object on that
22       basis.
23        Q.  You can answer.
24        A.  Yes.  I included some of those in my
25    report.

      Page 121

**Page 122**

1    Q.  Okay.  Now, I'd like you to assume
2  that Dr. Stickney has testified that he's never heard
3  of the National Commission of Correctional Health
4  Care Standards, although he's been affiliated with
5  the Lenawee County Jail for approximately 10 years as
6  its Medical Director and nor has he ever possessed a
7  copy of any of the correctional and health care
8  standards, published by that organization.  What is
9  that -- What relevance would that have to you as
10  someone who is rendering opinions with respect to the
11  Lenawee County Jail health care services as it
12  existed in April of 2007 and as it might related to
13  Brenda Smith, in particular?
14    MR. NELSON:  Object to form and
15  foundation.
16    MR. BODARY:  Object.
17    A.  Again, that's a national set of
18  standards that the corrections industry uses.
19  Anybody who works in this business I'm assuming,
20  would have a knowledge, at least a base knowledge of
21  those particular standards that is the gold standard
22  for corrections and medical care inside of
23  corrections in this country.
24    Q.  Well, why would it be important to
25  have standards relating to alcohol withdrawal or

**Page 123**

1  delirium tremens in a jail setting anyways?
2    MR. BODARY:  It's inappropriate use of
3  literature.
4    MR. FINEGOOD:  The objection is fine.
5    Q.  Go ahead.
6    A.  Because jails deal with that issue
7  more than any other type of -- part of criminal
8  justice deal with that issue, probably on a daily
9  basis inside of jails.  Small, medium, large doesn't
10  matter, that issue is a prevalent issue for all jails
11  of all sizes and it's becoming more so, not just
12  alcohol, but also drugs.
13    Q.  Is it common knowledge in the
14  correctional community that inmates can die of
15  alcohol withdrawal or delirium tremens if not
16  assessed and managed appropriately?
17    MR. NELSON:  Object to foundation.
18    MR. BODARY:  I'll object to form, too.
19    A.  Based upon my training and experience,
20  it's a topic that is trained tirelessly inside the
21  corrections administration circles.  It's a, what you
22  call a hot topic, I guess, within the industry that
23  we all have been trained and exposed to information
24  on.
25    Q.  How important is it to have nursing,

**Page 124**

1  on-site nursing on the weekends or health-trained
2  correctional officers or custodial staff in a jail
3  setting?
4    MR. BODARY:  Object as compound,
5  without foundation.
6    A.  From an operational viewpoint, it's
7  vital to have your staff trained in how to recognize
8  medical emergencies and describe those behaviors to
9  the medical people.  Having those medical available
10  is also important some way.  To have them on-site is
11  preferable.  Obviously, they can actually observe or
12  make decisions that that person can be transported to
13  the medical facility for observation by a medical
14  person.
15    Q.  Now, with respect to the policies of
16  the Lenawee County Jail as it relates to the role and
17  function of the medical doctor or physician, I'd like
18  to show you what we'll call -- Whatever the next
19  exhibit number is.
20    (Xerographic Document, one page,
21    headed, Policy Number 4.5.1.1, was
22    marked for identification Exhibit K.)
23  And I'm going to show you what we'll mark as Exhibit
24  K and reference 4.5.1.1 and ask you, first of all,
25  does it appear as though it is the description of the
physician's duty to develop and supervise emergency

**Page 125**

1  care protocols used by the jail staff?
2    A.  Yes, it does say that.
3    Q.  Okay.  And I'd like you to assume that
4  the evidence -- I'd like you to assume that Dr.
5  Stickney has testified that he cannot recall any
6  protocols or standing orders or guidelines of any
7  kind relative to the assessment of risk of alcohol
8  withdrawal or the management of symptoms associated
9  with alcohol withdrawal in the Lenawee County Jail
10  for the 10 years that he's been its Medical Director.
11  Assuming that to be his testimony, do you believe
12  that that is consistent with the policy of the
13  Lenawee County Jail as it might relate to the
14  function of the Medical Director or physician to
15  develop policies with respect to emergencies of
16  inmates?
17    MR. NELSON:  Object to foundation.
18    MR. BODARY:  Yeah, I join, foundation
19  and form.
20    A.  Well, one of his duties is to develop
21  and supervise emergency care protocols used by staff,
22  so I'm assuming that that includes giving them the
23  information they need to do (sic), again, just as the
24  officer, to observe and to defer to get the person to
25  where they need to go medically.

A400B45
## JEFF EISER   MARCH 1, 2010

1      Q.   If Dr. Stickney has testified that he
2  did not develop any such policies or procedures
3  because he was working under the assumption that
4  health care -- excuse me -- that correctional
5  officers or the custodial staff had zero medical
6  training and that they wouldn't understand any such
7  guidelines or protocols as it might relate to alcohol
8  withdrawal or delirium tremens, how would that -- how
9  would you view that in terms of an opinion relative
10 to the deliberate indifference to the health care
11 needs of inmates at the Lenawee County Jail?
12          MR. NELSON:  Object to form and
13      foundation.
14          MR. BODARY:  I'll join.
15      A.   Again, first of all, there's no
16 nursing staff.  Somebody has to be there to monitor
17 them.  The nursing staff does not provide that kind
18 of -- The nursing staff was some role in that to be
19 able to connect that inmate with the health care
20 system.  It's an inadequate health care system if
21 there is no connection there that they can get health
22 care.  So if there is no protocol, there is no
23 requirement for the officer to do something, even if
24 it is to transport the person to here and there is no
25 nurse on staff to refer -- to do that function, then

Page 126

1  there's a hole there and, again, the inmate's access
2  to medical care, obviously, would be affected.
3      Q.   I'd like you to assume -- Well, strike
4  that.  You were aware, based on your review of this
5  case, that Paul Dye called Dr. Stickney, at about
6  9:13, on April -- I mean Sunday night, April 29th,
7  2007, and as he continued his shift until 3:00 a.m.,
8  Monday morning, April 30th and that he did advise the
9  physician at that time that Brenda Smith was
10 agitated; that she was hallucinating; that she hadn't
11 had her day or evening meal; that she was calling
12 them names and appeared to be experiencing alcohol
13 withdrawal, would it be your expectation that Paul
14 Dye would do anything else throughout his shift and
15 particularly at the end of his shift with respect to
16 Dr. Stickney, as it might relate to Brenda Smith:
17 calling him back, calling the ER, doing anything
18 based on your understanding of what Brenda Smith's
19 condition was in that period of time.
20          MR. BODARY:  Should plaintiff offer
21      this transcript, rather than defendants,
22      the leading form of that question is
23      inappropriate and will be objected to.
24      Q.  You can answer.
25      A.   Again, if he should notice changes in

Page 127

1  the behavior and changes in the condition of the
2  individual inmate, then he would have an obligation
3  to do something about that.  I don't know, if the
4  doctor gives you a medication -- for example, I can
5  use myself as an example -- that's not working and I
6  deteriorate, I need to go back for further medical
7  evaluation to be safe, because it's his obligation
8  that those changes and deteriorating (sic), as I
9  stated before, then his obligation would be to do
10 something, take some action, some notice to get that
11 person medical care.
12      Q.   You indicated that you were aware of
13 what a briefing checklist or a pass-on book was, at
14 least in terms of a general way of conveying
15 information from one shift to another; is that
16 correct?
17      A.   Correct.  Different jails call it
18 different things, supervisor pass book, pass-on book.
19 It's referred to, but yes, that mechanism.
20      Q.   And I'd like you to -- I'd like to
21 show you -- Excuse me.  I'd like for you to -- Strike
22 that.
23          Do you recall the substance of the
24 phone call between Paul Dye and Dr. Stickney, at
25 least, as it relates to Dr. Stickney's desire or

Page 128

1  request in one form or another for Brenda Smith to be
2  seen by the jail nurse, Bonnie, Bonnie Mason on
3  Monday, the following day; do you recall that
4  reference in the telephone conversation between Paul
5  Dye and Dr. Stickney?
6      A.   About having Bonnie follow up, Bonnie
7  Mason follow up?
8      Q.  Yes.
9      A.  Yes.
10     Q.   Now, I'd like you to take a look at
11 what was previously marked as Exhibit 3 in the Dotson
12 deposition and I'd like you to assume, first of all
13 that what you're looking at is a briefing checklist
14 from the night platoon of April 29th, 2007, written
15 in the hand of Paul Dye and ask you, first of all,
16 does it appear as though there is any reference to
17 Dr. Stickney's request that Bonnie Mason be seen --
18 Bonnie Mason see Brenda Smith at all?
19          MR. BODARY:  I'm going to object to
20      the lack of form and foundation as it
21      misstates the communication of the phone
22      call.
23      A.   There's nothing on here about
24 notifying or having the nurse follow up.
25      Q.   It does, indeed, make reference the

Page 129

**A400B45**
**JEFF EISER   MARCH 1, 2010**

1  fact and I'm, QUOTING, Dr. Stickney was called. END
2  QUOTE; correct?
3      A.   Correct.
4      Q.   Is there any reference in this note in
5  the pass-on book to suggest what Dr. Stickney said
6  with respect to Brenda Smith or her health condition?
7      A.   No.
8      Q.   Now, I'd like you to assume that
9  during the night of April 29th throughout the night
10  and morning of April 30th that Brenda Smith's
11  condition was observed by Wendy Vanderpool, as an
12  intake officer stationed directly across or in close
13  proximity to the observation room or cell that Brenda
14  Smith was occupying, and that she generated a note
15  which reflected the activities and actions of Brenda
16  Smith throughout the evening, including and I'm
17  quoting, "that she was trying to get out of the door.
18  She was working hard through the night trying to keep
19  the wall up and getting her family and friends to
20  help her and getting upset because they didn't work
21  as hard as her." And further that, and I'm quoting,
22  "Her friends and family was just outside and wanted
23  to go see them, her being covered in sweat from
24  working so hard," and her missing her -- I'm sorry --
25  and having her breakfast passed to her, but her

Page 130

1  simply messing with it; that she was down in the
2  middle of the floor playing quietly with puppies
3  and she had -- she laid head on the edge of the bed
4  and was quiet for the most part."
5      Question to you, Mr. Eiser, is would
6  these be symptoms or -- that would be so obvious to
7  even a layperson that medical, a medical provider
8  would be needed under these circumstances?
9      MR. BODARY:  I have to object first
10  because the document in question is
11  hearsay.  It may be a party admission as to
12  one individual; it's not an admission as to
13  others.  Secondly, you're asking for an
14  opinion here that's not part of his
15  expertise.  If he's an expert, he's allowed
16  to make comment.  This is an opinion
17  that's, allegedly, for lay individuals and
18  it doesn't include the hypothetical that
19  applies here.  This patient was on two
20  medications and being managed by a
21  physician at the time.  With those
22  objections, you can take an answer.
23      Q.   You can answer the question.
24      A.   In my experience, these are behaviors
25  that would lead the correctional to note the

Page 131

1  behaviors and then based on the training or education
2  refer the individual for some, either medical mental
3  health, at least, observation or assessment.
4      Q.   Well, assuming that she was under --
5  she was engaging in misconduct at 3:00 o'clock in the
6  morning, what would your expectation be with respect
7  to Paul Dye and what he should or should not have
8  done relative to Brenda Smith's health care?
9      MR. BODARY:  Objection.  Contains an
10  assumption that's not borne out by the
11  facts and assumes knowledge of Paul Dye to
12  those incidents which is not, again, a fact
13  in evidence.  Object to foundation.
14      Q.   You can answer.
15      A.   Based on my experience and training, I
16  would attempt to get this person seen by somebody of
17  the medical -- with medical mental health background
18  just to ensure her safety.  I mean those correction
19  officers are not there to treat, but yet to observe
20  behavior and contact and share information with
21  someone that has that expertise could make a
22  qualified assessment.
23      Q.   I'd like you to assume that Eric
24  Westgate took over for Paul Dye at 3:00 a.m. on April
25  30th and continued in his role as Jail Shift

Page 132

1  Commander `til approximately 8:00 a.m., when Sgt.
2  Craig took over as Shift Commander.  I'd like you to
3  assume further that Eric Westgate never put any
4  information in the pass-on book relative to Brenda
5  Smith at all, let along her condition and/or the need
6  for medical follow up.
7      The question to you is of what
8  significance would that be, the failure to put in any
9  information in the pass-on book by Eric Westgate?
10      MR. BODARY:  Object to form and
11  stating facts not in evidence and lack of
12  foundation.
13      A.   Again, assuming the situation that you
14  describe, the supervisor has an obligation to at
15  least note that information and also document it and
16  then pass it on to those it would be needed to be
17  reviewed by to ensure the continuity of observation,
18  medical care is performed.
19      Q.   Your report makes reference to the
20  fact that Parole Officer Thomas Moore interacted with
21  Brenda Smith when he arrived at the jail, at
22  approximately 9:20 a.m., April 30th of 2007.  My
23  question to you, is assuming that he was told by an
24  untrained, medically untrained corrections officer
25  and/or intake officer that she was incoherent and out

Page 133

**Page 134**

1    of it and that he made an observation that she was
2    face down in the cell, moaning loudly and that he
3    made this observation for a period of time and was
4    informed by Wendy Vanderpool that she was in no state
5    to be transferred by van anywhere, can you tell me
6    what duty, if any, that Parole Officer Thomas Moore
7    would have had to Brenda Smith under the conditions
8    and facts existing at that time?
9        MR. HIMEBAUGH:  Object to lack of
10       foundation, seeks a legal conclusion.
11       Q.  You can answer.
12       A.  I can answer from the point of a jail
13   operations person.  Ironically, he she was placed in
14   there on parole and even when she's in there, the
15   parole department will -- but if anybody in the
16   criminal justice system, an officer, sees something
17   like that, I would expect them, at least, to share
18   that information with a person in supervision, that
19   they saw that just to make sure before they left that
20   -- My expectation would be that they would share that
21   information with somebody in supervision just to
22   ensure, again, the continuity of medical care was
23   being noticed.
24       Q.  And by supervision, are you referring
25   to jail supervision?

**Page 135**

1        A.  At this point, yes.
2        Q.  Now, with respect to jail -- Well,
3    strike that.  I'd like to show you a document
4    previously marked as Deposition Exhibit 6, from
5    Steenrod and indicate for the record that those are
6    policies of the Michigan Department of Corrections as
7    it relates to medical emergencies and the need to
8    respond to emergencies within a window of time.  I
9    think it's referencing within four minutes.
10       My question to you is, first of all,
11   would those Michigan Department of Corrections
12   policies have relevance in this case as it may relate
13   to the parole officer's duties as it relates to
14   medical emergencies and his observations of them
15   relative to a parole detainee in the county jail, as
16   opposed to the prison system.
17       MR. HIMEBAUGH:  Objection, foundation
18       because he doesn't know the interaction
19       between him and those in the jail.
20       Q.  Again, I am not an expert and
21   knowledgeable about how the Michigan Department of
22   Corrections works.  This policy states -- The policy,
23   itself, talks about an -- the standard that I alluded
24   to about response time.  Generally, their expectation
25   is for officers in any criminal justice agency that

**Page 136**

1    when you see something like that, you take, at least,
2    some action, go and notify and make sure the
3    situation is under control then you can tend to the
4    situation.  I think in this context, the parole
5    officer, like I stated before, being an officer in
6    criminal justice has some responsibility, at least,
7    to ensure that the individual is getting proper
8    medical care based upon what he saw.
9        Q.  Does it appear as though the DOC
10   policy that you're -- that's referenced here is in
11   any way consistent or otherwise to the standards set
12   forth in the adult local detention facilities,
13   promulgated by the American Corrections Association,
14   in particular 4d-24 as it relates to correctional and
15   health care personnel, relating to emergency medical
16   situations?
17       A.  Are you talking about the same format
18   and response time, so I'm assuming that it was
19   modeled after the American Corrections Association
20   standards.  In fact, the NCH standards are listed
21   right above, in the box, so I'm not sure if they're
22   basing those on those things.
23       Q.  You said earlier it was ironic that
24   she was held on a -- her status at the Lenawee County
25   Jail was one as a parole violator, if you will.  What

**Page 137**

1    did you mean by that?
2        A.  Well, it's different in every state,
3    but in Ohio, the State Parole inmates are technically
4    State prisoners and I'm not sure what the setup is in
5    the state of Michigan in terms of that, whether they
6    actually a state prisoner which the State would then
7    have to pay for housing, so there's some obligation
8    to pay for and supervise and be accountable for that
9    inmate.
10       Q.  Now, as far as the Lenawee County is
11   concerned, you were aware that Dennis Steenrod, Jail
12   Commander, had authored a memo in April -- on Apri
13   2nd of 2007, addressing the health care services of
14   the Lenawee County Jail and concluding that health
15   care provided to inmates was, indeed, inadequate; you
16   were aware of that fact?
17       A.  Yes, I read that.
18       MR. BODARY:  Object to the form of the
19       question.
20       Q.  Well, would the fact that Jail
21   Commander Steenrod had authored such a memo on April
22   7, 2007, establish the county and their Sheriff's
23   knowledge of the inadequacies of the jail health care
24   at the Lenawee County Jail?
25       MR. BODARY:  Object.  Lack of

**Page 138**

1    foundation.
2        A.  As a former jail administrator, he's
3    probably the best person to be in a position to
4    notify the Sheriff of the condition of the medical
5    care given to the inmates of his jail, but yes, he'd
6    be the best person to do that and he did that.
7        **Q.  What about the fact that the jail did**
8    **nothing to address -- to make any immediate changes**
9    **with respect to the inadequacies outlined by**
10   **Administrator Steenrod for a period of over -- well**
11   **up to 60 days when the new health care provider took**
12   **effect on June 1st, 2007?**
13       MR. BODARY:  Obviously -- I'm sorry.
14   Go ahead.
15       **Q.  What is your opinion in that regard?**
16       MR. BODARY:  That's a broad question,
17   not limited to his expertise, not relevant
18   to the communication that pertains --
19   misrepresents the facts.
20       **Q.  Go ahead.  You can answer.**
21       A.  They did take the action, I guess,
22   pursuing a medical contract, but that doesn't help
23   the inmates if they come in the next day and the day
24   after and the day after within a 60-day period, so
25   again, my recommendation, my opinion would be the

**Page 139**

1    specifics that led to Mr. Steenrod saying that the
2    data that was published at its base needs to be
3    analyzed immediately and then an action needs to be
4    developed right away to be able to address those
5    specific inadequacies and not just to say it, but
6    once you analyze it and you have the data which I'm
7    assuming he did by making those statements, then a
8    procedure should have been addressed at that point by
9    the administration and the Sheriff to address those
10   inadequacies, not waiting 60 days, but immediately.
11       MR. FINEGOOD:  All right.  I have no
12   further questions.  Thank you.
13       RE-EXAMINATION
14   BY MR. BODARY:
15       **Q.  Mr. Eiser, based on the report that**
16   **you prepared, marked Exhibit F in your testimony**
17   **today, have you told us all the criticisms you expect**
18   **to offer at the time of trial?**
19       A.  Yes, sir.
20       **Q.  You don't expect to add anything new?**
21       A.  Unless, again, addition information is
22   -- but I don't expect to, no.
23       **Q.  And if the inadequacy -- First of all,**
24   **a jail, county jails often -- and it has to respond**
25   **to a Board of Commissioners relative to staffing and**

**Page 140**

1    staffing expenses?
2        A.  Yes, sir.
3        **Q.  If the inadequacy is nursing hours and**
4    **the means of correcting the number of nursing hours**
5    **is a contract with an independent health contractor,**
6    **like you had in Hamilton County, it requires action**
7    **of the Board of Commissioners to do that; doesn't it?**
8        A.  Again, I'm not sure of the policies of
9    the jurisdiction.  In our case, alluding to my
10   facility, we would take immediate action and again,
11   the contract, itself, is important as to what you can
12   and cannot do, so the knowledge of the contract you
13   have with that particular agency -- If you have no
14   contract at that point, some step needs to be taken.
15       **Q.  If you have a contract?**
16       A.  If you have a contract, then you look
17   in the contract and see what has -- the remedies
18   within the contract are not immediately step outside
19   the contract and approach immediately for solutions.
20       **Q.  And it takes some time; does it not,**
21   **for a new contracting entity to set up its -- for an**
22   **entity to go into a jail?  Do you know what the lag**
23   **time is for when you talk and negotiate with these**
24   **contractors as to when they go into the jail?**
25       MR. FINEGOOD:  Objection to the form

**Page 141**

1    of the question.  Go ahead.
2        A.  As an operational person, yes, I know
3    about the time, but it does not -- the lack of funds
4    and the lack of money never, ever will compromise the
5    medical care you can give to inmates, but if you know
6    a problem, you need to deal with it immediately.
7        **Q.  If the problem is as perceived that**
8    **more nursing time could be acquired for the same or a**
9    **little more money, but it requires action of the**
10   **Board of Commissioners, not an independent act.**
11   **Well, first of all, let me do this:  You said what**
12   **you would do in Ohio.  You don't know what the**
13   **processes are in Lenawee County; do you?**
14       A.  I just alluded to that.  I don't know
15   what your commissioner process is.
16       **Q.  Right.**
17       A.  I'm not aware of that.
18       **Q.  So you don't know what the Sheriff**
19   **could have done besides signing the contract in order**
20   **to increase the number of nursing hours at the jail;**
21   **do you?**
22       A.  Well, nursing was one of many of the
23   different issues --
24       **Q.  So my question as to nursing, you**
25   **don't know what he had to do?**

1    A.  I have no knowledge of that; right.
2        Q.  And you don't know what he had to do
3    in order to get an X-ray machine in there; do you?
4        MR. FINEGOOD:  Objection.  Irrelevant.
5    A.  I'm not aware --
6        Q.  In Lenawee County.
7    A.  -- of Lenawee County procedures; no,
8    sir.
9        Q.  You don't know what he had to do in
10   order to get a physician's presence, physical
11   presence within the jail?  You don't know what the
12   process would have been; do you?
13   A.  If you're talking monetarily, that
14   process, no.  A phone call sometimes will solve these
15   things in my experience.
16       Q.  Well, you have no experience in
17   Lenawee County?
18   A.  I said my experience.
19       Q.  That's Ohio.  I asked you about
20   Lenawee.  So you don't know what could be done; do
21   you?
22   A.  Not exactly, no.
23       MR. BODARY:  I have nothing further.
24       MR. NELSON:  I just have a few
25   follow-up questions.

Page 142

1        RE-EXAMINATION
2    BY MR. NELSON:
3        Q.  Mr. Finegood indicated that Dr.
4    Stickney testified in his deposition that he never
5    heard of the NCCH.  Now, you testified earlier you've
6    never read Dr. Stickney's transcript; correct?
7        MR. FINEGOOD:  No, he hasn't.  It
8    hasn't been transcribed yet.
9        Q.  But you haven't read it?
10   A.  Right.
11       Q.  Even assuming, hypothetically, that
12   was said, not knowing who the NCCH is, does not, by
13   itself, rise to a deliberate indifference; does it?
14   A.  No.
15       Q.  All right.  He also indicated that by
16   showing you an exhibit that there was -- that Dr.
17   Stigney was under contract and had a duty to
18   establish protocols and procedures and things of that
19   nature.  If there was a procedure in place with
20   Bonnie Mason, regarding alcohol withdrawal or DT's,
21   that would not -- that would be appropriate; would it
22   not?
23       MR. FINEGOOD:  Objection.  Objection.
24   It assumes facts not in evidence.  There is
25   no -- There's no documentation and it's

Page 143

1    inappropriate to question him on it.
2        MR. NELSON:  Just as inappropriate to
3    question him about a deposition transcript
4    he hasn't read, but anyway, assuming that
5    there were policies in place with Bonnie
6    Mason, that would satisfy any obligation he
7    may have had under a contract; would it
8    not?
9        MR. FINEGOOD:  Question is vague.
10   A.  Again, I don't know exactly what
11   you're asking.  In terms of protocols and policy, to
12   my understanding did not exist, but yes, if they did
13   exist, you had to look at `em and see if they were
14   adequate for what they're intended to do.
15       Q.  All right.  But the fact remains that
16   if a protocol or a procedure, even if it is somewhat
17   vague or it doesn't necessarily dictate, you know,
18   what procedure is to be carried out, that does not,
19   by itself, rise to deliberate indifference; does it?
20   A.  Say that again.
21       Q.  If there is not a procedure in place,
22   that would not rise to the level of deliberate
23   indifference?
24       MR. FINEGOOD:  Well, the question is
25   vague.  What procedure are you referring

Page 144

1    to?
2    A.  It's a life threatening -- Depends on
3    the issue of the reason for the procedure.
4        Q.  Okay.  It depends on the issues and
5    the facts and circumstances that are involved in
6    every case?
7    A.  Yes.
8        Q.  All right.  And a procedure does not
9    or a protocol does not have to be written to be a
10   procedure or protocol; does it?
11   A.  Again, in this industry, there are,
12   I'm sure, unwritten procedures.  Recommendations in
13   the National standards is that they're written.  It's
14   been that way for decades.
15       Q.  But the fact that a procedure is in
16   place or a protocol is in place that is not written,
17   as long as it, in some way, refers to health care of
18   inmates or something like that, that would be
19   appropriate and it wouldn't be deliberately
20   indifferent.
21   A.  I would never say appropriate because
22   I think it needs to be written and documented so that
23   those people, I could die tomorrow and the guy's
24   going to take over.  You need to have that continuity
25   of information.  So, again, that's something that the

Page 145

**ATKINSON-BAKER, INC.**

**(800) 288-3376**

**A400B45**
**JEFF EISER   MARCH 1, 2010**

Page 146

1 professionalism of corrections has tried to
2 eliminate, unwritten protocols.
3 **Q. So it's a recommendation, but as you**
4 **stated, there's recommendations and --**
5 A. Standards.
6 **Q. -- it's a judgment call as to whether**
7 **you follow that recommendation or not.**
8 A. It's a standard in the industry.
9 **Q. And as I stated, a standard is a**
10 **benchmark or a guideline, not a mandatory dictate?**
11 A. Correct.
12 MR. NELSON: I have nothing further.
13 EXAMINATION
14 BY MR. HIMEBAUGH:
15 **Q. I forget, did you review the**
16 **deposition of Dennis Steenrod and Tom Moore?**
17 A. I have them. I have not read them
18 yet. I got those today.
19 **Q. Okay. You just received those for the**
20 **first time today?**
21 A. Yes, sir.
22 MR. HIMEBAUGH: That's all I have.
23 RE-EXAMINATION
24 MR. FINEGOOD:
25 **Q. Would you expect to take a resolution**

Page 147

1 **of the Board of Commissioners of a county to change**
2 **the hours of a part-time nurse from three days a week**
3 **for 18.5 hours to taking some portion of that to**
4 **perform her duties on weekends?**
5 MR. BODARY: Lack of foundation. He
6 doesn't know on weekends.
7 A. Any situation that came up in my
8 experience that was either life threatening or vital
9 to the operation of the jail, we have a mechanism in
10 Ohio that you go to the County Administrator, who
11 works for the Board of County Commissioners, tell him
12 about that situation and get an immediate audience
13 with the Commissioner or Commissioners, who can make
14 a decision -- But again, it gives some leeway and
15 most counties and governments have that leeway in
16 emergencies to have some type of mechanism in place
17 to have that available to their department heads.
18 **Q. From your review of the documents and**
19 **record in this particular case, did it appear as**
20 **though there was any actions on the part of the jail,**
21 **if you will, the Sheriff, the under-Sheriff and or**
22 **the Jail Commander to immediately rectify the fact**
23 **that there is no on-site nursing available on the**
24 **weekends or for that matter, qualified train --**
25 **excuse me -- health-trained corrections officers**

Page 148

1 **available on weekends at the Lenawee County Jail?**
2 MR. BODARY: There's no foundation for
3 his response. He hasn't read depositions.
4 He's only seen the records of this
5 incarceration. That question lacks
6 foundation.
7 **Q. You can answer.**
8 A. Based on what I have reviewed, I see
9 no action.
10 **Q. Okay.**
11 MR. FINEGOOD: I have nothing further.
12 - - -
13 (At 2:15 o'clock, PM, the deposition was concluded.)
14 - - -

Page 149

1 C E R T I F I C A T E
2 STATE OF OHIO     )
                  ) SS:
3 COUNTY OF HAMILTON)
4 I, Edna M. Hawkins, the undersigned, a duly
5 qualified and commissioned Notary Public within and
6 for the State of Ohio, do hereby certify that before
7 the giving of his aforesaid deposition the said JEFF
8 EISER was sworn to depose the truth, the whole truth
9 and nothing but the truth; that the foregoing is the
10 deposition given at said time and place by the said
11 JEFF EISER; that said deposition was taken in all
12 respects pursuant to agreement and stipulations of
13 counsel hereinbefore set forth; that said deposition
14 was taken by me; that the transcribed deposition was
15 not submitted to the witness for his examination and
16 signature; that I am neither a relative of nor
17 attorney for any of the parties to this cause, nor
18 relative of nor employee of any of their counsel and
19 have no interest whatever in the result of the
20 action.
21 IN WITNESS WHEREOF, I have hereunto set my hand
22 at Cincinnati, Ohio, this 15th day of May, 2010.
23
24
25 My Commission Expires:     Edna M. Hawkins
   September 17, 2012    Notary Public - State of Ohio

# A400B45
# JEFF EISER   MARCH 1, 2010

**A**

**able** 22:14 126:19 139:4
**abnormal** 73:10,12,13
**absence** 98:8,14 99:11 99:20,20 100:11,12 110:17
**absolutely** 7:2 62:14 69:10 76:9 92:22 118:21
**ACA** 32:4,9,10,18,20 33:1,21 80:19 82:6,21
**ACC** 32:7
**acceptable** 82:7
**access** 90:15 109:8 127:1
**accidentally** 104:17
**account** 81:12
**accountable** 137:8
**accredit** 34:15 83:4
**accreditation** 33:12 35:24,25
**accredited** 24:5,7,15 25:9,18,23,24 31:23 32:13,16,25 33:9 81:20 82:5,21,24 83:3
**accredits** 32:8 33:15 35:22
**accuracy** 77:15
**accurate** 78:2
**ACI** 19:17
**acknowledge** 100:8
**acquired** 141:8
**act** 39:21 54:21 89:9 94:18 98:7 141:10
**acted** 20:14 94:24 108:14
**acting** 47:22 55:2 73:3
**action** 37:20 40:5,24 41:5,11 43:18,19 44:11 44:12 45:11,12 53:12 73:1 93:25 94:1 97:20 113:22 128:10 136:2 138:21 139:3 140:6,10 141:9 148:9 149:20
**actions** 62:14 111:20 130:15 147:20
**activities** 4:25 55:3 64:15 130:15
**activity** 107:3
**actual** 8:3 31:24 90:23
**Adam** 1:10 2:8 41:17 66:5,6,14,15
**add** 139:20
**added** 20:5
**Addendum** 17:2
**addition** 9:18 17:1 33:21 103:13 139:21
**additional** 12:25 15:21 79:20
**address** 4:14,15,19 103:9 138:8 139:4,5
**addressed** 36:23 139:8
**addressing** 137:13
**adequate** 84:4 90:16,22 95:3 96:1 104:1 144:14
**adjust** 68:24 69:2
**administered** 43:25
**administration** 65:20 83:22 113:20 114:4,6,9 114:25 117:20,22,23

123:21 139:9
**administrative** 34:19,25 35:8,11 116:8,21 117:5
**administrator** 24:7 75:4 105:4,15 114:13 115:1 138:2,10 147:10
**admission** 131:11,12
**admissions** 10:22
**admit** 101:21 102:17
**admitted** 102:21
**admittedly** 7:17 18:3
**adult** 23:24 24:1 119:20 120:11 136:12
**advertise** 9:4
**advise** 127:8
**AELE.org** 9:10
**affect** 100:13
**affiliated** 122:4
**aforesaid** 149:7
**afternoon** 38:9,14,24 40:8,11,19
**afternoons** 29:23
**age** 4:2
**agency** 23:23 135:25 140:13
**AGENT** 1:10
**agitated** 53:1 127:10
**ago** 22:10,13 56:9 64:16 67:9 89:4 109:2 119:18
**agree** 7:5 110:1,12
**agreed** 93:21
**agreement** 149:12
**ahead** 27:23 28:8 36:21 42:21 47:20 75:11 88:19 123:5 138:14,20 141:1
**al** 2:9
**Albert** 2:15
**alcohol** 28:1,12,20,21 29:2 38:8 40:7,11 41:24 43:14 47:18 48:14 49:15 61:10 74:18 84:18,24 90:18 91:17 101:23 102:6 103:10 106:6,10 110:14,16,23 111:12 111:16 119:5 121:18 122:25 123:12,15 125:7,9 126:7 127:12 143:20
**alcoholic** 40:14 42:24
**allegations** 60:12
**allegedly** 131:17
**allowed** 4:9 37:6 78:8 131:15
**allows** 101:12
**alluded** 37:16 41:13 135:23 141:14
**alluding** 140:9
**alter** 48:9
**altogether** 117:7
**amended** 101:24
**American** 34:10 35:17 105:14 119:13,15,17 120:1,12 136:13,19
**Americans** 9:6,8,9
**amount** 40:25 83:21
**analysis** 25:7 87:23
**analyze** 139:6
**analyzed** 139:3

**and/or** 133:5,25
**annual** 26:18,20
**answer** 36:21 45:23 70:14 82:3 87:7 88:16 89:5 91:20 93:9,11 97:5 105:25 121:23 127:24 131:22,23 132:14 134:11,12 138:20 148:7
**answered** 17:13
**answering** 93:10,12 116:2
**answers** 101:21 102:17
**anti-seizure** 61:12,16,20 62:7
**anybody** 122:19 134:15
**anybody's** 80:12
**anytime** 14:1
**anyway** 144:4
**anyways** 119:12 123:1
**apart** 107:7
**apologize** 104:18
**apparently** 92:19
**appear** 19:4 77:16 124:24 129:16 136:9 147:19
**appearance** 22:4
**APPEARANCES** 2:1
**appeared** 127:12
**APPEARING** 2:14
**appears** 7:22 120:14
**appendicitis** 97:9
**Appendix** 5:15,17 12:24
**applies** 50:15 131:19
**apply** 81:21 103:20
**appointed** 116:3
**appointee** 116:3
**appointing** 88:21
**appreciate** 17:16
**approach** 103:10 140:19
**appropriate** 45:14 63:7,8 111:7 143:21 145:19 145:21
**appropriately** 123:16
**approximately** 13:21 26:21 65:15 122:5 133:1,22
**approximation** 13:24
**Apri** 137:12
**April** 38:9,14 39:23 70:23 71:11,13 95:11,18 97:14 122:12 127:6,6,8 129:14 130:9,10 132:24 133:22 137:12 137:21
**area** 89:20
**arguing** 87:5
**Around-the-clock** 29:13
**arrest** 94:12
**arrived** 133:21
**ASA** 35:16,17
**asked** 8:15,20,22 9:3,21 10:12,19,21,23,25 12:14 19:11 25:13 33:16 71:18 73:24 78:11,12 87:1 92:2 104:16,18 115:16 120:22 142:19
**asking** 30:23 36:24 37:6 49:25 55:9 59:5 64:8

68:13 75:2 78:21 86:20 88:14 89:1 98:13 99:16 99:23,25 100:7 101:11 105:24 131:13 144:11
**assessed** 123:16
**assessment** 125:7 132:3 132:22
**assignment** 7:7
**assist** 29:14
**assistance** 40:15
**assisted** 105:15
**associated** 125:8
**association** 19:16 30:15 34:11 35:18 105:14 119:13,16,17 120:1,6 120:13 136:13,19
**assume** 16:24 38:23 45:5 47:5 48:6 49:3,6 52:2 67:5,21 71:8 75:2 102:4 110:22 122:1 125:3,4 127:3 129:12 130:8 132:23 133:3
**assumed** 5:5
**assumes** 51:18 54:23 55:19 67:14 68:3 74:24 132:11 143:24
**assuming** 39:6 62:2,3 64:3 66:3 73:16 109:14 122:19 125:11,22 132:4 133:13,23 136:18 139:7 143:11 144:4
**assumption** 87:24 88:2 126:3 132:10
**astounded** 102:10
**ATKINSON-BAKER** 1:22
**attached** 20:16
**attachment** 5:15 15:14
**attachments** 3:14 12:1,4
**attempt** 22:16 132:16
**attention** 43:8
**attorney** 2:18 10:16 107:17 149:17
**attorneys** 9:23 119:23
**audience** 147:12
**authored** 137:12,21
**authority** 88:21 103:14 114:7
**available** 78:15 80:8,22 80:25 81:13 124:9 147:17,23 148:1
**Avenue** 2:15
**average** 26:14
**avoid** 99:6,9 101:10
**avoided** 100:13
**aware** 35:2 43:22 46:14 49:10 51:6,22,23 54:15 64:20,22,24,25 67:7,24 92:4 127:4 128:12 137:11,16 141:17 142:5
**a.m** 1:16 44:4,5 49:7,8,9 55:8 63:25 67:23 71:13 78:5 87:10,12 127:7 132:24 133:1,22
**A400B45** 1:25

**B**

**B** 20:24
**Bachelor** 117:13

**back** 10:7 15:16 28:4 67:20 70:4 106:22 107:16 116:13 127:17 128:6
**background** 117:12 132:17
**bad** 52:20,21,22 60:8
**Baker** 1:10 2:8 70:16,16 71:3,8,9 74:16 88:5 89:2 93:1
**banking** 53:5
**bare** 103:25
**base** 64:11 74:10 122:20 139:2
**based** 37:20 40:3 42:18 42:20 52:2 54:3,25 55:21 74:10,14 76:8 91:8,8 102:18 119:22 123:19 127:4,18 132:1 132:15 136:8 139:15 148:8
**bases** 111:6
**basic** 118:12
**basing** 136:22
**basis** 121:22 123:9
**Bates** 57:17
**becoming** 123:11
**bed** 131:3
**beds** 26:3,7,16 28:3 29:7,8,9 118:6
**began** 40:10 90:12
**beginning** 13:7
**behalf** 1:13 104:14
**behavior** 34:24 54:8 88:24 94:24 100:19 128:1 132:20
**behaviors** 39:1 55:2 124:8 131:24 132:1
**belief** 59:11 60:2
**believe** 5:22 11:14 18:18 20:20 21:24 22:23 23:15 25:12 26:24 29:8 29:18 32:24 34:1 35:10 37:21 43:3 48:19 51:10 55:1 58:24 61:1,8 77:3 77:9 78:14 90:12 97:12 101:20 109:1 114:15 114:21 125:11
**believed** 49:22
**believes** 69:11
**benchmark** 117:6 146:10
**benchmarks** 82:7 119:24
**Benzodiazepine** 43:23
**Bernice** 1:9 2:8 70:16,16 71:3,8,9 74:15 88:5 89:1 93:1
**best** 13:23 23:21 138:3,6
**beyond** 15:22 80:21
**big** 23:14
**bill** 4:25 16:14 52:13
**billed** 15:22
**billing** 15:9 16:8,20,24
**billings** 15:18
**binder** 10:13 11:7,9,15 11:19,19,25 12:19 18:10,11
**birth** 4:17
**bit** 119:8
**blank** 26:4
**Board** 139:25 140:7

## A400B45
## JEFF EISER   MARCH 1, 2010

141:10 147:1,11
**Bodary** 2:9,9 3:4 4:6 12:3
18:16,19,21 20:9 36:22
37:5,11,14 46:2,8 57:4
64:4 68:5 76:22 78:6
78:20 80:13 82:4 87:3
88:18 90:9 91:2 93:10
93:14,17 96:6,12 100:7
103:1,4 104:8 112:17
112:20 118:19 120:15
121:20 122:16 123:2
123:18 124:4 125:18
126:14 127:20 129:19
131:9 132:9 133:10
137:18,25 138:13,16
139:14 142:23 147:5
148:2
**bodies** 105:22
**boil** 107:6
**bold** 90:14
**Bonita** 6:10 77:5
**Bonnie** 102:2 129:2,2,6,6
129:17,18 143:20
144:5
**book** 67:18 128:13,18,18
130:5 133:4,9
**booked** 44:15,19 71:9
85:21
**books** 19:12,16
**borne** 132:10
**bottom** 38:6 56:11 91:3
**Boulevard** 1:17
**box** 69:13 70:5 136:21
**break** 106:16
**breakfast** 130:25
**breakup** 106:13 108:16
**Brenda** 1:3,4 21:1 36:9
51:8 57:23 90:15,21
122:13 127:9,16,18
129:1,18 130:6,10,13
130:15 132:8 133:4,21
134:7
**brief** 115:22
**briefing** 128:13 129:13
**briefly** 27:1 113:16
**bring** 15:9 19:12 20:3
67:4
**bringing** 17:17
**broad** 138:16
**brought** 5:13 6:3 11:9
19:14 80:22
**budget** 26:18,20,22
27:15 83:5,11,21 116:1
**budgeted** 83:20
**budgets** 83:16
**building** 4:23
**bunk** 72:8
**bunyon** 84:9
**bunyons** 84:1
**Bureau** 23:24 24:1
**business** 4:13 117:22
122:19
**Butler** 25:12

--- C ---

**C** 149:1,1
**call** 7:23 8:3 17:10,17
29:22 32:22 45:7,19
46:15,23 47:1,14,25
50:17 52:1,4,7,9,10,14

53:21,25 61:3 62:23
63:13 69:1 86:8,14,18
86:19,21 87:10,13 92:6
94:2 104:1 115:17
123:22 124:18 128:17
128:24 129:22 142:14
146:6
**called** 23:23 27:5,25 28:2
28:5,9 31:18 32:23
40:15,15 41:7,12 45:2
54:17 55:15 67:24
85:24 86:6 109:23
127:5 130:1
**calling** 46:9 127:11,17
127:17
**calls** 7:23 101:4
**camera** 55:13 58:2 59:7
59:12,16,21 60:3,4
88:3
**capacity** 27:6 116:11
**card** 109:3
**care** 26:23 27:19 33:25
62:12 63:10 66:16 68:2
74:16 80:21,25 83:6,11
83:17,22 84:4,5 90:16
90:22 95:4 96:1 97:4
104:6 113:6 119:6
120:20 121:2,5,17,18
122:4,7,11,22 125:1,21
126:4,10,19,20,22
127:2 128:11 132:8
133:18 134:22 136:8
136:15 137:13,15,23
138:5,11 141:5 145:17
**career** 106:24 117:2,7
118:8
**careful** 7:10 36:15 39:11
79:14
**carried** 144:18
**case** 1:6 5:1,12 8:17,25
10:2 12:13 14:3 17:6
21:1 22:22 30:5 35:5
36:9,16 38:11 57:2,6
59:19,20 66:7 70:18
76:17,23 77:21 79:14
79:19 81:3,17 85:20
90:15 96:23 97:3,8
102:10 107:18 121:10
127:5 135:12 140:9
145:6 147:19
**cases** 3:18 9:5 12:17
20:14,18,25 21:4,5,8
21:12,15,22,25 22:7,15
96:16,18,22 97:25
107:14 108:11,14,18
**categorize** 32:20
**cause** 17:20 70:14 76:11
98:9 100:3 149:17
**caused** 51:25
**ceased** 56:15,20 58:8
**cell** 39:2,17 46:18 52:24
55:2,12 56:15 58:8
59:13 63:3,5 64:21
71:21,25 72:1,2,3,4,8,9
72:17 73:15 130:13
134:2
**cells** 27:9
**census** 30:1
**center** 26:1 27:6,7 28:1
28:19 29:4

**certain** 79:15 103:15
**certainty** 91:10 92:17
95:23
**certification** 34:23,24
35:6 105:11,23
**certifications** 104:23
105:13 106:1
**certified** 4:3 24:19,24
30:14 33:9 34:20,20
104:24 105:4,12,14,18
105:20,21
**certify** 149:6
**cetera** 105:5
**change** 45:16,22 46:5
51:25 52:5 54:16 55:23
55:23 61:6 68:21 76:14
76:15 86:21,23 87:9,10
88:7,24 89:3,9,9,10,11
89:13,14 94:5 147:1
**changed** 45:17,21 86:6
86:18
**changes** 20:4 42:7,12
68:24 76:14 127:25
128:1,8 138:8
**characterize** 118:1 120:1
**characterized** 92:8
**charge** 15:6 16:22 23:24
67:22,22 78:22 79:2
116:22
**chargeable** 74:20
**charging** 79:6
**chart** 61:15
**check** 44:17,20
**checklist** 128:13 129:13
**chemical** 42:24
**chest** 102:6
**Chief** 112:16
**choice** 14:16 60:8
**choose** 12:9
**Cincinnati** 1:18 4:16
117:21 149:22
**circle** 22:14
**circles** 123:21
**circumstance** 74:1,5,17
**circumstances** 45:16,17
74:8,11 75:25 76:14
110:9 131:8 145:5
**citations** 19:12
**Civil** 7:4 60:12 99:12,21
**claim** 36:17 54:1,2 63:15
67:11 71:1 75:23
**claiming** 56:25 63:23
75:14,18,19
**classes** 41:23 117:19
**classification** 65:19
**classified** 28:24
**clear** 80:10
**clerical** 65:19
**Cleveland** 23:16
**clients** 70:17
**clinic** 27:17,20
**close** 113:14 117:3
130:12
**closed** 27:15
**closest** 55:12
**CMS** 113:5
**Code** 34:25
**collectiveness** 60:16
**COLON** 56:16
**com** 10:3

**combination** 64:17
**come** 11:6 28:24 35:22
76:11 138:23
**comfortable** 10:1
**coming** 91:21 118:22
**Commander** 95:2,24
96:10 116:13,18,21
133:1,2 137:12,21
147:22
**commencing** 1:16
**comment** 38:4 41:12
131:16
**commission** 31:6,8,14
31:14,19 33:15 120:20
121:16 122:3 149:24
**commissioned** 31:8
149:5
**commissioner** 141:15
147:13
**Commissioners** 139:25
140:7 141:10 147:1,11
147:13
**committees** 119:22
**commode** 72:8
**common** 88:16,18
123:13
**communicate** 69:15 70:8
**communicated** 49:21
77:23
**communicating** 43:15
**communication** 129:21
138:18
**community** 119:20
123:14
**companies** 113:4
**company** 5:1
**compare** 12:7,24 20:21
**comparison** 118:2
**Complaint** 10:22
**complete** 5:20 51:2
**completely** 109:8
**completing** 20:7
**complication** 84:24
**compound** 96:5 124:4
**compromise** 141:4
**computer** 51:9
**computer-based** 51:21
**concern** 47:22 53:25
**concerned** 137:11
**concerning** 96:16 97:20
**concerns** 47:21 52:3
53:17 93:23
**conclude** 91:5
**concluded** 148:13
**concluding** 137:14
**conclusion** 76:12 101:5
134:10
**condition** 37:18,21 39:4
39:5,17,24,25 40:25
43:6 45:20 46:10 48:17
52:6,11 53:8 54:16
55:14 56:13 65:1 67:12
72:19 74:22 75:8,18
84:11 87:16 89:4 91:17
92:3,6,12,15 118:23
127:19 128:1 130:6,11
133:5 138:4
**conditions** 42:1 45:21
50:21 51:8 90:24 99:14
118:10 119:4 134:7

**connect** 126:19
**connection** 126:21
**conscious** 25:21
**consciously** 25:20
**consider** 47:25 107:4
**consistent** 125:12
136:11
**consisting** 15:17
**constantly** 68:21
**constitute** 15:18
**constitutional** 82:8 84:3
**Constitutionally** 83:25
**Consultant** 14:19
**contact** 9:16 37:23,24
55:13 67:2 132:20
**contacted** 37:25 39:22
80:14
**contacts** 67:1
**contained** 11:25 112:7
**contains** 11:20 132:9
**contents** 57:15
**contesting** 77:15
**context** 25:2 91:22 136:4
**continue** 42:15
**continued** 40:16 45:22
56:13 67:10 127:7
132:25
**continuity** 133:17 134:22
145:24
**contract** 113:3,4 138:22
140:5,11,12,14,15,16
140:17,18,19 141:19
143:17 144:7
**contracting** 140:21
**contractor** 140:5
**contractors** 140:24
**contracts** 116:7,7
**control** 136:3
**conversation** 8:24 12:13
35:10,12 52:17 54:6
60:23 62:6,18 76:18
77:4 129:4
**conversations** 8:18,21
**conveying** 128:14
**cooperation** 111:18,22
**copies** 6:6 50:24
**copy** 52:13 57:13 121:8
122:7
**corporation** 5:1
**correct** 4:11 7:14 11:21
17:12,20 19:7,24,25
20:19 22:8 26:20 28:17
33:5 36:12 40:12 41:6
45:8 50:21,22 56:6
59:14 60:1,15 61:4,5,7
62:15 69:1,5,9,16,20
70:8 71:25 78:1,2 79:1
79:5,9,11,12,16 80:3
81:4,6,14 82:19 85:25
86:7 92:7,10,13 94:3,4
94:6,7,9 95:8,9 104:7
104:20 109:18,24,25
110:4,10,11 111:3,4,8
111:13,14 115:2,14,15
121:11 128:16,17
130:2,3 143:6 146:11
**corrected** 80:16
**correcting** 140:4
**correction** 54:8,9 78:9
112:4 121:17 132:18

# A400B45
## JEFF EISER   MARCH 1, 2010

**correctional** 6:25 9:5
26:13 27:10 33:23,24
34:23 35:6 36:7,12
45:14 48:4,8 51:13
55:4 65:16,18,21 68:14
68:18 71:12 72:24 74:6
74:17 86:13 91:15
97:23 98:23 102:1
112:1 113:5 118:16
119:13,15,17 120:1,20
121:5 122:3,7 123:14
124:2 126:4 131:25
136:14
**corrections** 19:16 34:20
35:20 38:20 73:7 81:24
82:8 85:1,2,16 92:21
104:25 105:15,18,22
110:5 111:20 115:20
115:21 116:3 117:25
118:4 119:19,21 120:6
120:12 122:18,22,23
123:21 133:24 135:6
135:11,22 136:13,19
146:1 147:25
**corrective** 40:24 41:5,10
53:12
**correctly** 48:15
**correspondence** 18:22
**cost** 31:22,24 32:6 83:1
**COTE** 2:13
**counsel** 16:3 35:13
44:25 58:12 79:22
149:13,18
**count** 23:19 101:18,19
**counter** 45:4
**counteract** 61:19
**counties** 23:10,14,16
147:15
**country** 122:23
**county** 1:8 2:7 23:3,6,20
23:22 24:8,12,15,16
25:4,12,22 26:3,9 27:3
27:5 29:25 30:1,6,7,8,8
30:11 36:3 50:25 65:4
65:12 81:18 83:6,15
91:9 101:22 102:11
103:18 108:3,24 112:1
112:3,10,11,22 113:9
113:18 114:3,12,19
115:22 117:24,25
118:3,5 122:5,11
124:16 125:9,13
126:11 135:15 136:24
137:10,14,22,24
139:24 140:6 141:13
142:6,7,17 147:1,10,11
148:1 149:3
**couple** 117:18
**course** 13:3 48:11 90:13
109:12
**courses** 104:23
**court** 1:1,19,23 22:19
29:1
**courtesy** 88:17,18
**court-ordered** 28:11,25
**coverage** 102:12,13
**covered** 104:2 111:6
130:23
**Craig** 1:9 2:7 67:6,6,11
67:16,19,21 68:1,7

93:2 133:2
**create** 13:9,25 114:8
**created** 13:6 31:13
111:15,19
**criminal** 14:18 117:14
123:7 134:16 135:25
136:6
**critical** 7:4 40:2 90:17
109:15
**criticisms** 36:5 113:18
139:17
**culpable** 39:21
**current** 20:22
**currently** 112:12
**curricula** 105:3
**Curriculum** 31:7 20:1,2
20:11
**custodial** 124:2 126:5
**Cuyahoga** 23:15,18
**C.V** 105:8

---

**D**

**D** 2:4,4 3:1
**daily** 123:8
**damaged** 56:3
**dangerous** 71:23
**data** 65:19 139:2,6
**date** 4:17 5:19,21 6:20
15:17 18:12,24 48:22
48:24 80:8,11 113:7
**dated** 3:16 14:22 15:14
18:22
**dates** 80:5,5,7 95:16
97:15
**Dave** 104:13
**David** 1:7 2:14
**day** 15:19 16:13 27:22
29:18 38:16,21 39:8,13
60:17,19 62:19,24
68:16 69:14 70:23 71:6
71:8,10 72:15 74:20
78:23,25 79:3,8,24
81:1 94:8 100:23
113:10,11 127:11
129:3 138:23,23,24
149:22
**days** 38:2 40:1,6,17
138:11 139:10 147:2
**Dayton** 17:14,20
**deadline** 79:21
**deal** 34:3 57:1 123:6,8
141:6
**dealing** 108:23
**deals** 118:21
**dealt** 97:4,9 113:4
**death** 57:7,14 84:24
85:13
**decades** 145:14
**Deceased** 1:3,4
**December** 5:20 7:14
8:17 14:22 36:6
**decided** 58:20 69:19
**deciding** 81:9
**decision** 69:17 74:14
147:14
**decisions** 48:9 124:12
**dedicated** 28:14
**defendant** 2:12,17 19:5
**defendants** 1:12,14 2:7
3:11 39:21 66:11

127:21
**defense** 108:16,18
**defer** 89:16,21 109:19
125:24
**defined** 86:3,10
**degree** 20:7 106:25
107:2
**deliberate** 36:20 53:15
71:21 75:24 97:3 98:3
98:19,23 99:17 100:14
101:14 110:25 126:10
143:13 144:19,22
**deliberately** 36:8,17
39:12 51:16 55:17
63:15 64:6 75:17 86:16
98:16 99:6 103:22
104:5 145:19
**delirium** 41:24 42:10
121:19 123:1,15 126:8
**deliverate** 41:1
**delivery** 121:2
**denied** 90:15,22
**Dennis** 6:9 115:1 137:11
146:16
**department** 2:18 134:15
135:6,11,21 147:17
**departments** 101:8
**Depending** 25:16
**depends** 42:5 46:11
81:16 110:9 145:2,4
**depose** 149:8
**deposition** 1:13,15 4:7
5:9 15:23 16:13,21
20:15 22:18 54:12,19
66:9 76:2 78:4,12,16
78:18 80:4,6,10 103:4
109:12 129:12 135:4
143:4 144:3 146:16
148:13 149:7,10,11,13
149:14
**depositions** 6:6,7,15,18
8:11 17:3 18:2 21:15
22:15 41:16 78:15 79:2
79:8 91:20 107:20
108:1,2,7 148:3
**deprivation** 60:12
**deprive** 103:21
**depriving** 7:4
**Deputy** 112:14,16 115:20
115:21,24 116:13,17
116:23
**describe** 27:1 75:20
106:12 124:8 133:14
**described** 38:1 39:23
52:10
**description** 52:3 66:19
66:25 94:24 124:24
**descriptions** 7:18 10:9
**descriptive** 48:16 51:2
**descriptives** 54:7
**designate** 21:14,18
**designed** 82:6 121:1
**desire** 128:25
**detail** 38:1 39:24
**detainee** 135:15
**detention** 23:24 24:1
119:21 120:12 136:12
**deteriorate** 40:16 53:18
56:14 64:3 128:6
**deteriorated** 37:19,21

38:3 39:18 40:1 53:20
54:6 63:17,21,24 93:24
**deteriorating** 39:4 55:5
128:8
**deterioration** 38:25
40:19 42:3 54:2,21
64:7 75:9 87:16,18,22
88:2,3 92:14,20 94:11
94:15
**deteriorized** 37:18
**determination** 94:13
**determined** 80:23
**develop** 99:8 101:8
124:25 125:15,20
126:2
**developed** 102:19 121:1
139:4
**developing** 105:16
**development** 101:24
**develops** 102:1 119:22
**diabetes** 102:7
**diagnosing** 111:12
**dictate** 144:17 146:10
**die** 123:14 145:23
**difference** 85:5,7,8 102:3
118:15
**different** 5:11 9:24 23:20
26:11 47:12 68:9 74:5
74:8 114:9 115:25
118:11,25 119:8
128:17,18 137:2
141:23
**differentiate** 12:8 27:2
**dinner** 53:3
**dipping** 115:17
**direct** 71:4 116:1 120:16
**directing** 43:8 103:14
**direction** 40:16 75:12
104:3
**directions** 68:18,20
98:12
**directives** 110:23
**directly** 120:22 130:12
**director** 85:23 112:11,15
112:21,25 115:20,21
115:24 116:2,14,17,23
122:6 125:10,14
**disciplinary** 96:25 97:20
**discipline** 96:20
**discretion** 68:23,23 69:1
69:3 74:13
**discretionary** 69:4,18,21
70:7,10
**discussed** 58:12 59:24
80:5
**discussion** 40:22
**disorders** 102:8
**DISTRICT** 1:1,1
**Division** 1:2 112:4
**DOC** 136:9
**doctor** 37:23,24 41:12,21
45:6,13,19 46:9 47:14
48:3,10,16 53:10,13,25
62:3,4 67:8,24 68:19
74:3 81:19 84:10 86:6
86:8,10 87:14 97:24
111:13 124:17 128:4
**doctor's** 52:13 99:19
**document** 5:15,19,23
12:4 13:15,25 14:12,18

14:22 15:2,14 17:8,24
20:11 21:5 51:10
120:15,16 124:20
131:10 133:15 135:3
**documentation** 51:5
102:23 143:25
**documented** 145:22
**documents** 3:12 8:19
10:14,15 13:7,11 15:8
17:13 96:25 104:1
121:12 147:18
**Dodson** 114:22,22 115:1
**doing** 13:8 14:7 55:3
64:13,14,21 71:14
116:8,17 127:17
**dollars** 32:2 78:23
**domestic** 28:12
**Donovan** 112:16
**door** 130:17
**dosage** 89:22
**dosaging** 90:6
**dose** 111:7
**dosing** 48:5
**dot** 10:3
**Dotson** 129:11
**double** 115:17
**double-jobbed** 116:15
**Dr** 1:10 2:12 17:18,19
37:25 39:23 41:7 43:24
45:2 46:15,24 52:1,4
52:17 60:23,24 62:17
62:22 76:18,25 78:13
81:19 90:4 94:2,5
104:14 109:15 122:2
125:4 126:1 127:5,16
128:24,25 129:5,17
130:1,5 143:3,6,16
**drafting** 97:18
**Drive** 4:16
**drug** 28:2,12,21 45:4
119:5
**drugs** 123:12
**DT's** 42:3 43:14 49:16,22
67:7 72:17 74:19 85:13
91:18 92:9 93:4,22
106:6,10 110:15,17,24
111:12,16 143:20
**Duces** 1:15 20:13
**due** 27:15
**DUI** 29:2
**duly** 4:2 149:4
**duties** 71:15 125:20
135:13 147:4
**duty** 63:21 65:10 69:2
75:20 124:25 134:6
143:17
**Dye** 1:9 6:10 7:24 8:4
17:18 43:7,21 45:17
46:15,21 48:12,12 49:1
49:14 51:6,25 52:19
54:17,18,20 55:15,15
55:16 60:24 61:18,23
62:6,12 63:14 65:6
66:3,3,4 76:18 86:5
92:8 93:1 96:21,25
127:5,14 128:24 129:5
129:15 132:7,11,24
**Dye's** 52:16 53:21 54:6
94:1
**D-O-N-O-V-A-N** 112:19

# A400B45
## JEFF EISER   MARCH 1, 2010

**E**

E 3:1 149:1,1
ear 102:5
earlier 111:6 136:23
143:5
easier 82:24 83:2
East 2:15
EASTERN 1:1
eaten 53:3
edge 131:3
edit 13:18
edited 13:18
edits 14:8,8,8
Edna 1:18 149:4,24
education 20:8 91:9
104:20 107:2 109:14
117:24 132:1
educational 117:11,20
117:23
effect 64:5 121:13
138:12
Effective 9:7,9
effectively 22:20
effort 83:1
eight 23:19 36:2 66:1
Eiser 1:13 3:2,13,17,18
4:1,10 14:18 20:11
21:6 131:5 139:15
149:8,11
either 30:14 92:13 132:2
147:8
ELE 9:21
elected 70:5
elective 32:23
electronic 13:5 14:17
electronically 19:21
element 46:4 92:15
elementary 107:2
elicit 66:4
eliminate 146:2
eliminated 116:24
else's 95:8
em 11:17 18:25 25:13
38:12 51:22,22 67:3,4
119:1,1,2 144:13
emergencies 124:8
125:15 135:7,8,14
emergency 124:25
125:21 136:15
employed 65:22
employee 108:4 149:18
employees 34:19 65:13
65:15
employment 70:23 74:20
enclosures 19:4
ended 49:17
ends 50:1
enforcement 9:7,10
71:12 117:7
engaging 132:5
enrolled 117:16
ensure 132:18 133:17
134:22 136:7
enters 66:24
entire 78:25 81:24
entirety 56:7
entities 33:22
entity 140:21,22
entries 58:20

entry 50:8,9 57:20,24
58:4 65:20 66:22 119:9
environment 85:1
ER 127:17
Eric 1:11 6:8 67:18 75:22
93:2 132:23 133:3,9
especially 100:22
ESQ 2:4,4,9,13,14,18
essence 94:10
essential 33:4,7 81:8
82:17
establish 137:22 143:18
Estate 1:4
estimate 13:23 30:3
31:25 107:21 108:6
et 2:9 105:5
evaluated 25:9 85:19
evaluation 25:7 99:14
128:7
evening 15:24 37:19
46:11,22 49:2 56:14
127:11 130:16
event 70:1
events 57:9
everything's 14:17
evidence 38:24 51:19
54:24 67:15,15 68:4
74:24 91:24 94:17,18
125:4 132:13 133:11
143:24
exact 12:15 32:5 77:13
exactly 8:21 10:11 38:21
55:21 58:14 75:20
84:21 91:23 100:21
106:2 142:22 144:10
examination 4:5 104:11
115:10 146:13 149:15
EXAMINATIONS 3:3
examined 4:3
example 106:14 128:4,5
exceed 83:16
exceeded 83:11
excuse 18:21 69:3 78:20
82:2 87:14 88:15 89:1
93:8 101:4 102:22
126:4 128:21 147:25
exercise 22:18
exhibit 5:16,18 7:16 10:9
10:19 11:24 12:5,6,7,8
12:10,22,24 14:19,21
15:15,17 17:2,10,11,20
18:4 19:24 20:10,12,24
21:4,7,8 38:8 40:10
76:23 124:19,21,22
129:11 135:4 139:16
143:16
exhibited 40:8
EXHIBITS 3:10
exist 74:11 144:12,13
existed 122:12
existing 134:8
exists 106:2
expect 134:17 139:17,20
139:22 146:25
expectation 127:13
132:6 134:20 135:24
expenses 140:1
expensive 32:5
experience 82:20,23
91:8,8 111:11,11

123:19 131:24 132:15
142:15,16,18 147:8
experienced 55:4 118:8
experiencing 127:12
expert 3:18 9:5 14:19
18:5,7 20:15 21:6,9
22:5 35:3 42:17 89:24
105:9 106:16,23 107:8
107:15 108:15 109:18
109:20 131:15 135:20
expertise 89:19 131:15
132:21 138:17
experts 9:15 19:5 89:16
89:22 90:2,3,4,6
Expires 149:24
exposed 123:23
expressing 36:19
extensive 28:10 29:2
extent 102:16

**F**

F 3:13 14:20,21 19:24
76:23 139:16 149:1
face 134:2
facilities 26:11,13 27:3,5
28:13,16 29:3,20 35:22
71:12 100:18 106:17
115:25 119:20,21
120:12 136:12
facility 27:2,9,10,15,24
27:25 28:3,10,19,20
66:21,24 71:5 80:22,25
81:11 82:24 85:19
104:3 112:1 118:10,16
119:2 124:13 140:10
facility's 103:13
fact 17:9,10 20:6 36:6
38:5 40:2,2,7,22 43:18
48:7 53:11,17,23 62:22
70:4 75:19 82:17 89:8
90:14 93:21 96:24
99:13 102:13,23
110:24 130:1 132:12
133:20 136:20 137:16
137:20 138:7 144:15
145:15 147:22
facts 17:5,25 31:21
38:12 51:18 54:23
55:19,22,23 60:20
67:14 68:3 74:24 76:4
76:5,7,8,11,13 79:15
132:11 133:11 134:8
138:19 143:24 145:5
fail 41:10 54:21 94:15
failed 38:2 39:25 43:9
113:22
failing 40:24 41:4 44:10
failure 95:4 96:1 113:18
114:2 133:8
fair 12:11 28:15 39:14
81:21
fall 72:9
familiar 35:16 50:13
51:20
family 130:19,22
far 31:17 71:16 82:9
114:18 137:10
fashion 70:8
February 80:6 106:22,22
107:7 113:10,15,15

115:13
federal 4:8 31:13 78:7
fee 10:3 79:7
felt 9:25 55:5
females 29:8
fiction 109:9
field 104:25 119:23
figure 72:24
file 1:25 14:17 109:5
filed 95:15 96:3 97:11
final 13:14
find 41:13 57:16
fine 120:18 123:4
Finegood 2:4,4 3:6,15
8:25 12:14 14:9 18:14
18:17,20 37:1,9,12
44:13 45:25 46:3 48:22
51:18 54:22 55:19 57:3
57:21 64:1 67:13 68:3
68:6 73:5 74:23 76:20
76:24 78:3,18 80:2,9
82:2 86:25 87:4 88:9
88:15 89:25 90:25 93:8
93:12,15,19 96:4,9
98:24 100:2,15 101:4
102:15 103:2 110:20
113:24 115:8,11
120:18 123:4 139:11
140:25 142:4 143:3,7
143:23 144:9,24
146:24 148:11
finish 106:25
finished 78:17 79:19
FIRM 2:13
first 4:2 5:11 8:24 9:8,18
12:23 19:8 25:3,25
26:2 27:4 30:17 32:7
43:21 48:18 49:10 56:5
57:2 64:2 66:23 70:23
71:6,10 72:15 73:2
74:15,20 78:22 83:25
86:18 88:7,20 102:15
103:20 107:18 115:12
124:23 126:15 129:12
129:15 131:9 135:10
139:23 141:11 146:20
five 13:18 58:8 87:2
flat 79:7
floor 2:19 65:7,8 109:3
131:2
floors 65:2,3
Florez 96:23
focus 93:18
focusing 93:20
folder 11:17 12:25
follow 38:2 43:10 45:15
68:18,20,22 77:1,6,21
99:19 129:6,7,24 133:6
146:7
followed 41:14 110:2,3,8
following 102:4 129:3
follows 4:4
follow-up 39:25 142:25
food 69:12 116:7
force 19:18
foregoing 149:9
forensic 9:15 106:15
forget 109:7 146:15
forgot 26:7 72:13
form 64:1 87:1 88:9

100:3 110:20 122:14
123:18 125:19 126:12
127:22 129:1,20
133:10 137:18 140:25
formal 104:19 109:13
format 136:17
formation 121:10
former 138:2
forth 136:12 149:13
Forty 108:8
found 9:2 109:3
foundation 118:20
120:17 122:15 123:17
124:5 125:17,18
126:13 129:20 132:13
133:12 134:10 135:17
138:1 147:5 148:2,6
founded 30:18 120:18
four 13:18 14:8 15:14,18
21:9 22:3,10,12 26:11
26:13 27:2 28:13 29:18
29:20 60:19 89:4
115:25 135:9
fourth 28:2 38:7
four-to-six 14:4
frame 58:13 59:8 121:13
FRCVP 1:14
Friday 29:17
friends 130:19,22
front 11:23
full 79:3 106:22,23,24
full-service 27:7 118:7
function 69:24 116:10
119:1 124:17 125:14
126:25
functions 79:7 116:8
118:7,25
fundamental 92:22
funds 141:3
further 54:2,21 94:11
115:4 128:6 130:21
133:3 139:12 142:23
146:12 148:11

**G**

G 3:14 11:24 12:5,6,7,10
12:22
Gail 115:1
general 2:18 128:14
Generally 11:2 16:12
135:24
generated 51:9 130:14
gentleman 64:5
getting 47:23 61:19,25
96:8,9 117:19 130:19
130:20 136:7
give 6:21 46:3 73:17
88:21 99:7 101:1
105:10 106:14 108:1
115:22 141:5
given 7:22 8:2 17:5 21:15
21:19,22 52:13 57:19
65:23,25 83:8,17 89:17
89:22 99:5 106:8,9
107:20 138:5 149:10
gives 128:4 147:14
giving 24:14 36:19 44:13
48:2 80:7 83:11 125:22
149:7
go 10:7 12:3 13:13 14:1

**A400B45**
**JEFF EISER   MARCH 1, 2010**

27:23 28:4,8 29:1
36:21 42:20 47:20
50:25 66:5 70:4 75:11
80:17 84:18 88:19
104:17 106:17,24
123:5 125:25 128:6
130:23 136:2 138:14
138:20 140:22,24
141:1 147:10
**goes** 51:11 114:18
**going** 11:23 15:16 20:23
22:17 28:1,17 36:3
42:23 54:22 56:10 57:4
67:13,20 72:17 73:13
73:20 74:23 75:8 78:14
82:3 84:15 86:25 93:3
99:6 101:24 102:16
103:6 111:7 124:22
129:19 145:24
**gold** 122:21
**Goldenson** 19:6
**gonna** 45:2 107:25
**good** 60:25 62:19,23,24
68:15,16 74:4 94:9
**gotten** 79:20
**govern** 100:19
**government** 31:13
**governments** 147:15
**governs** 119:20
**graduated** 117:14
**Green** 4:20
**group** 112:25
**guarantee** 84:3 98:3,15
98:19,22 99:5,10
100:10
**guaranteed** 84:1
**guess** 13:22 52:3 71:6,7
106:12 115:17 123:22
138:21
**guessing** 26:8 30:2
108:5 113:15 118:5
**guidance** 99:8 101:7
**guideline** 110:1,10
146:10
**guidelines** 81:24 100:5
101:7,25 109:23 110:7
112:8 125:6 126:7
**guy** 105:2,5 108:3
**guy's** 145:23

**H**

**H** 3:15 15:15,17
**half** 16:2 73:2
**hallucinating** 127:10
**hallucinations** 42:9,11
42:14 52:22
**Hamilton** 24:14 25:22
26:9,18 27:3,5 29:25
30:1 65:12 83:15 108:3
108:24 112:1,3,10,22
113:8 115:22 117:24
117:25 140:6 149:3
**hand** 15:16 51:22 129:15
149:21
**handling** 36:8 110:14
**handy** 57:14
**hang** 84:1,9
**happen** 42:3,5 74:18
110:19
**happened** 52:9 63:12

**happens** 28:23
**happy** 77:24
**hard** 130:18,21,24
**Hawkins** 1:18 149:4,24
**head** 131:3
**headaches** 102:5
**headed** 5:15 12:4 14:18
21:5 124:20
**heading** 114:18
**headquarters** 30:20 31:2
**heads** 147:17
**health** 19:15 26:23 33:25
34:7,9 35:22 41:1
74:16 80:21 83:6,11,22
91:12 92:19,20,23
119:5 120:20 121:2,5
121:17,18 122:3,7,11
126:4,10,19,20,21
130:6 132:3,8,17
136:15 137:13,14,23
138:11 140:5 145:17
**health-trained** 124:1
147:25
**hear** 100:17
**heard** 9:23 35:19,21 37:3
84:20 122:2 143:5
**hearsay** 120:15 131:11
**held** 60:13 136:24
**help** 130:20 138:22
**hereinafter** 4:3
**hereinbefore** 149:13
**hereunto** 149:21
**HIMBAUGH** 36:18 37:4
115:6
**Himebaugh** 2:18 3:7
134:9 135:17 146:14
146:22
**history** 47:18
**hobby** 106:24
**hold** 76:24 100:2 107:11
**holding** 65:8 71:20
**hole** 127:1
**home** 4:19
**Honestly** 9:3
**Honorable** 1:7
**hope** 104:16
**hopefully** 62:19,24 94:8
101:9 118:25
**hoping** 80:8
**hot** 123:22
**hour** 16:2,6,19 73:2 79:6
**hourly** 16:16,18
**hours** 16:1,20 27:22
29:18 49:1,2,11,12
56:16 58:10 67:9 74:3
79:10,11 81:1 89:4
94:14 100:23 140:3,4
141:20 147:2,3
**house** 28:16
**housed** 27:8 29:3
**housing** 137:7
**HUCKABAY** 2:9
**hundred** 26:16 83:16,20
**hundreds** 26:5
**Huntergreen** 4:15,21
**Huntington** 4:20
**hurt** 71:19 72:9
**Hwy** 2:5
**hypertension** 102:7
**hypothetical** 131:18

**hypothetically** 89:15
143:11

**I**

**identification** 5:16 12:5
14:19 15:15 20:12 21:7
124:21
**identified** 17:20 18:1
**identifies** 7:16
**identify** 92:2
**ignore** 55:17 89:13
**ignored** 53:19 59:11
66:15 67:11 68:1 71:2
**ignoring** 40:24 41:4,8
43:15 44:3,10 45:10,20
45:23 46:10 47:7 49:19
49:23 50:3 52:5 53:7
62:12 63:9 74:21 75:24
**illustrated** 39:1
**image** 57:1 58:19
**images** 58:2
**immediate** 138:8 140:10
147:12
**immediately** 139:3,10
140:18,19 141:6
147:22
**impact** 99:21
**impair** 99:12
**impede** 92:12
**imply** 110:24
**important** 44:2 49:20
62:11 76:4 92:15
122:24 123:25 124:10
140:11
**improper** 76:11
**inaccurate** 76:10
**inadequacies** 137:23
138:9 139:5,10
**inadequacy** 139:23
140:3
**inadequate** 126:20
137:15
**inappropriate** 120:21
123:2 127:23 144:1,2
**incarceration** 44:24
148:5
**incidence** 84:15,17,23
**incidences** 50:19
**incident** 19:19 50:13,15
50:18,24 51:7 53:14
69:13 70:5,6 121:14
**incidents** 51:5 132:12
**include** 18:7 20:6 113:21
113:23 114:17 131:18
**included** 37:16 121:24
**includes** 125:22
**including** 48:8 130:16
**incoherent** 133:25
**incorrect** 102:18
**increase** 83:19 141:20
**independent** 140:5
141:10
**indicate** 56:13 60:24
135:5
**indicated** 47:2 62:18
87:16 101:22 128:12
143:3,15
**indicates** 43:14 105:9
**indication** 44:22
**indifference** 36:20 41:1

53:16 71:21 75:24 97:3
98:4,19,23 99:17
100:14 101:14 110:25
126:10 143:13 144:19
144:23
**indifferent** 36:8,17 39:12
51:16 55:17 63:16 64:7
75:17 86:16 98:16 99:6
103:22 104:5 145:20
**individual** 34:18 38:3
42:6 47:17 55:2,3
94:25 113:22 128:2
131:12 132:2 136:7
**individuals** 28:14 36:3
38:22 42:23 114:12
131:17
**industry** 81:25 85:2
92:21 105:19 110:4,5
119:24 120:8 122:18
123:22 145:11 146:8
**infection** 102:6
**infections** 102:5
**infirmary** 29:5,10,16
**influence** 118:23
**information** 24:22 37:21
40:4,13,21 46:12 48:1
53:10 60:22 63:14
64:18 65:23,25 67:16
67:17 69:6 73:11 76:14
83:9 85:22 87:15 88:22
89:6 94:23 96:15
123:23 125:23 128:15
132:20 133:4,9,15
134:18,21 139:21
145:25
**informed** 134:4
**Ingham** 30:11
**initially** 11:20 12:9 20:24
**initiated** 58:9 60:7
**injuring** 47:6
**injury** 47:10 63:4
**inmate** 26:23 28:24
37:18 38:3,20 39:2
41:2,8 43:1,14,23 44:3
44:18 45:3 46:16 48:13
49:16,19,24 50:4 51:25
52:3,20 53:8 55:18
59:8 62:13 65:11 66:16
66:24 67:7 68:22,25
68:17 69:12 70:7 71:2
71:5,19,23 74:7 83:16
85:21 88:8 89:18 98:9
99:21 100:13 101:12
109:2 126:19 128:2
137:9
**inmates** 26:5,8,9 28:20
67:2,2 80:21 83:23,25
103:23 118:24 123:14
125:16 126:11 137:3
137:15 138:5,23 141:5
145:18
**inmate's** 40:25 52:5
54:16 55:14 72:1 127:1
**inquire** 10:7 35:7
**inquired** 90:7
**inside** 82:10 121:2
122:22 123:9,20
**inspected** 22:24 25:5
**inspection** 23:25 30:6
**institution** 82:16

**institutions** 33:24 74:17
121:3
**intake** 27:7 28:19,19
40:15 41:16,17 55:12
66:21,22,23 67:1 70:19
70:21,22 71:14,15
72:16 73:3 118:18
119:7 130:12 133:25
**Intelligent** 1:17
**intelligible** 100:16
**intended** 144:14
**intent** 37:17
**interacted** 133:20
**interaction** 135:18
**interest** 149:19
**interject** 45:1
**intermittent** 42:16
**interplay** 97:24
**interpretation** 77:18
**interrogatories** 10:22
**interrupted** 42:20
**interval** 64:10
**interview** 119:1
**inverse** 100:8
**investigate** 106:18
**investigation** 57:8,14,18
**investigative** 10:23
**inviting** 103:6
**involved** 39:7,16 65:10
97:3 111:1 116:5 145:5
**involvement** 113:18
**involving** 22:22 25:4
**ironic** 136:23
**Ironically** 105:2 134:13
**irrelevant** 98:25 103:3
142:4
**issuance** 6:2
**issue** 14:2 25:16 47:18
70:4 72:14 93:5,10,23
99:5 114:8 123:6,8,10
123:10 145:3
**issued** 13:15 79:21
**issues** 40:14 50:20 95:4
96:2 97:4 102:5 103:10
104:1 108:24 141:23
145:4
**item** 7:24 20:13 83:20
**items** 5:11 7:17,18,19
10:8 12:25 16:25 18:3
18:4

**J**

**J** 1:9 3:18 21:4,7,8
**jail** 14:19 22:22,25 23:3,6
24:8 26:3 27:7 30:6,7,8
30:11 33:9 34:4,10,20
38:7 50:14,16,17,20,25
56:13 58:10 65:2,3,5
68:16 73:16 75:4,16
81:5,18,18,20,22 82:10
82:21 83:2 90:22 91:11
92:18 95:2,24 96:10
100:20 105:4,9,11,12
105:14 109:3 112:13
112:22 113:1,9,14,19
113:19 114:3,3,6,9,10
114:12,13,19,24 116:5
117:25 118:7,16,21
119:6 122:5,11 123:1
124:2,16 125:1,9,13

## A400B45
## JEFF EISER   MARCH 1, 2010

126:11 129:2 132:25
133:21 134:12,25
135:2,15,19 136:25
137:11,14,20,23,24
138:2,5,7 139:24
140:22,24 141:20
142:11 147:9,20,22
148:1

**jails** 23:8,12,20,22,25
24:2,4,17,19,23,25
25:4,5,7,7,9,20 32:8
33:15 34:15 35:9 81:21
103:8 105:6 118:24
121:2,6 123:6,9,10
128:17 139:24

**jail's** 114:9 119:8

**James** 2:9 67:6,6,16,18
67:21 68:1,7

**January** 18:22

**Jeff** 1:13 3:2,13,17,18
4:1,10 7:24 14:18
20:11 21:5 149:7,11

**Jeffrey** 1:10 2:12 39:23
81:4 102:2

**Jim** 78:5 93:2

**job** 66:19,25 72:15 73:8
85:17 88:22

**jobs** 116:15,25,25

**Joe** 19:6

**join** 125:18 126:14

**journals** 19:12 106:5

**JR** 1:8

**judgment** 69:1,4,14 70:7
110:9 146:6

**judgments** 69:7,9

**June** 138:12

**Juris** 9:7,12,13,22 10:2

**jurisdiction** 140:9

**jury** 103:5

**justice** 14:18 26:1 27:6
28:18 29:4 117:15
123:8 134:16 135:25
136:6

**juvenile** 27:8 119:20
121:3

### K

**K** 3:21 124:21,23
**keep** 14:5 20:21 62:25
74:5 93:23 130:18
**keeps** 14:15,16
**Ken** 8:25
**Kenneth** 2:4,4 3:15
**Kent** 30:6,8,8
**Kenton** 30:7
**kept** 63:3
**KEVIN** 2:18
**kind** 50:18 52:23 55:3
104:2 113:1 125:7
126:17
**knew** 60:14 61:23 64:12
70:19 74:25 75:1 86:4
91:10,24 92:17 93:22
95:22
**know** 9:2 10:25 14:3,4,9
14:10,10,11 20:4 24:6
24:6,8,15,16,21 26:6
29:24 30:13,17,20,23
30:24 31:17 32:1,12,15
33:11,14,18 34:10 35:5

35:21 39:13 40:13
42:19 43:19 44:3 46:17
48:5,25 50:15,23 51:1
51:11 52:7,10 53:23
59:15 60:4,20 61:13,22
61:24 62:2,11 63:24
65:9,10 66:18 70:9,13
70:14,17,23 72:2,3,5,6
72:7,10 73:4,6,12,20
74:1,3,18 75:3 80:4
82:9 83:5,10,14 84:14
84:16,23 85:1,3,3,5,7,9
85:10,11,12 86:21,22
86:22,23 87:9,10 88:7
89:4,9,11,14 91:4,23
93:3,6 94:19 95:14
96:22,23 97:2,5,7,11
97:22 100:18,21
101:11 113:11 114:11
118:12 120:22 128:3
135:18 140:22 141:2,5
141:12,14,18,25 142:2
142:9,11,20 144:10,17
147:6

**knowing** 70:6 92:13
143:12
**knowledge** 30:16 31:10
31:15,20 32:14,17
33:20 59:17 68:10
72:18 90:23 114:18
122:20,20 123:13
132:11 137:23 140:12
142:1
**knowledgeable** 135:21
**known** 74:21 75:17
102:14
**knows** 60:17,18 64:23
89:3

### L

**lack** 92:12 95:3,25
118:19 129:20 133:11
134:9 137:25 141:3,4
147:5
**lacks** 148:5
**lady** 93:22
**lag** 140:22
**laid** 131:3
**Lansing** 2:15,19 30:13
**large** 118:4 123:9
**larger** 82:20,25,25 118:6
**largest** 27:4
**law** 2:4,13 9:7,9 35:3
71:11 101:16 117:6
**lawful** 4:2
**Lawrence** 1:8 2:7 6:9
91:10 113:19 114:3
**Lawson** 1:7
**lawsuit** 36:2 108:25
109:2,6
**lawsuits** 25:4 95:3,18,25
96:12,13 97:19
**lawyer** 8:12,14 10:10,20
12:9 16:11,14 59:25
96:17
**lawyers** 9:16
**lay** 131:17
**layperson** 39:3,3 73:22
131:7
**lead** 131:25

**leading** 127:22
**led** 139:1
**leeway** 147:14,15
**left** 63:14 134:19
**legal** 101:5 134:10
**legislature** 31:9
**Lenawee** 1:8 2:7 23:2,5
26:3 36:3 50:25 65:3,4
65:22 83:6 91:9 102:11
103:18 113:18 114:2
114:12,19 118:3,5
122:5,11 124:16 125:9
125:13 126:11 136:24
137:10,14,24 141:13
142:6,7,17,20 148:1
**letter** 3:15 5:19 7:16
15:14 40:9 90:11,14
92:16 95:6 97:17
**letters** 90:14
**let's** 44:8 49:3 80:17 88:4
100:12 110:14 118:16
**level** 66:22 81:10,12
144:22
**liability** 99:9 101:1,10
**Librium** 44:18
**Librium** 43:23 45:3 48:5
61:19 111:8
**licensed** 26:12
**licenses** 107:11
**Licking** 24:8,10,11,12,16
**Lickum** 24:9
**life** 107:4 145:2 147:8
**life-threatening** 90:17
**lightly** 7:7
**limited** 94:14 138:17
**line** 38:7
**lines** 58:8
**Linn** 27:12
**list** 3:12,14,18 5:21 11:24
12:22 20:14,15,21,24
21:4,5,8,14 22:8 24:2
**listed** 8:4 9:6,19 10:5,9
10:18 12:7 17:4,10,11
18:4 20:25 103:18,19
136:20
**listen** 8:6
**listened** 46:23 52:16
**lists** 9:15
**literally** 13:7
**literature** 121:21 123:3
**litigation** 66:2 108:4,4,21
**little** 119:8 141:9
**local** 23:8 120:11 136:12
**location** 27:11 66:25
**locations** 9:20
**lockup** 22:22
**lockups** 23:8,13,16,17
23:22 35:9 121:3
**long** 16:5 46:13 52:8
116:10 117:6 145:17
**longer** 85:14
**look** 7:18 11:18 12:15
30:19,21 38:6 39:20
42:22 49:25 55:13 57:8
57:15 58:6 60:19,21
66:10 68:9,23 77:24
129:10 140:16 144:13
**looked** 5:25 8:25 9:24
17:24 24:21,23,25 25:4
25:14,18,19 58:1,18,20

74:1
**looking** 12:14 25:15
56:12 57:7 64:14 68:11
72:22 81:9 94:20
129:13
**looks** 16:25 88:5 120:10
**lost** 90:25 102:23
**lot** 82:23,25 83:1 96:24
118:25
**loudly** 134:2
**loyal** 120:3
**LPNs** 29:14
**lunch** 53:3

### M

**M** 1:7,18 149:4,24
**machine** 58:25 142:3
**magnitudes** 118:12
**mailing** 11:12,13 12:23
**mailings** 11:14,16 13:1
**majority** 106:15 107:8
**making** 52:4 80:20 88:1
95:17 99:24 139:7
**males** 29:9
**managed** 81:10 123:16
131:20
**management** 99:19
125:8
**managers** 34:20
**managing** 74:7
**mandatory** 32:18,21 33:4
80:19 82:10,17,18
146:10
**Manila** 12:25
**manual** 30:19,21
**manuals** 19:14
**March** 1:16 80:15
**mark** 20:9 21:3,21
124:22
**marked** 5:16,18 11:24
12:4,6,22,22,24 14:19
14:21 15:15,17 20:12
20:24 21:6 124:21
129:11 135:4 139:16
**Mary** 1:11 6:9 17:18
36:16 37:22 38:13,15
38:23 39:8,22 40:13
41:7 42:25 43:9,22
44:3 45:2,8 47:13 61:3
66:3,3 92:5
**Mason** 6:10 77:5 102:2
129:2,7,17,18 143:20
144:6
**Master's** 20:7 106:25
117:17,19
**materials** 3:12 5:11,25
6:1 7:10 8:15 10:8 11:6
11:20 15:25 17:1,4
79:20,22
**math** 108:17
**matter** 6:22 7:3 15:20
19:13 76:5 118:9
123:10 147:24
**maximum** 27:8
**meal** 127:11
**mean** 55:4 60:18 106:1
106:21 110:18 127:6
132:18 137:1
**means** 104:2 140:4
**meant** 36:11

**mechanism** 50:18 51:23
128:19 147:9,16
**medical** 6:25 27:8,17,19
27:20 29:12 34:4,9
35:23 39:24 40:25
41:20 50:19,21 51:7
74:21 75:8,9,17 81:12
84:2,4,5,7,12 85:17,18
85:19,22,24 89:16,21
89:24 90:16,22,24
94:25 95:4 96:1 97:4
98:8 99:13,14,18
100:22 103:15,16,22
104:19 109:13,18,20
111:10,13,18 112:21
112:25 113:4,5 116:7
119:3,4 122:6,22 124:8
124:9,9,13,13,17
125:10,14 126:5 127:2
128:6,11 131:7,7 132:2
132:17,17 133:6,18
134:22 135:7,14 136:8
136:15 138:4,22 141:5
**medically** 74:7 125:25
133:24
**medication** 44:9,23
47:14,23 53:13 60:24
61:2,6,16,24 67:25
68:15 74:2,4 86:15
89:23 128:4
**medications** 43:22 48:9
61:15,19,20 62:7,23
67:9 74:2 89:17 131:20
**medicine** 33:23 44:4
48:2 61:13
**medium** 123:9
**meet** 16:3 33:2 66:24
79:21
**meeting** 16:8,11
**meetings** 16:17
**member** 34:14
**membership** 34:13
**memo** 96:11 137:12,21
**memory** 58:18
**mental** 59:9,23 119:5
132:2,17
**mention** 17:7
**mentioned** 15:5 28:18
37:22 74:13 104:13
109:11
**mere** 100:9
**merely** 106:18
**messed** 57:10
**messing** 131:1
**met** 16:6 73:19
**MI** 2:5
**MICHAEL** 2:13
**Michigan** 1:1 2:10,15,18
2:19 22:22,23 30:9
30:13 35:1,3,5,9 135:6
135:11,21 137:5
**middle** 40:23 91:2 131:2
**mid-1980's** 25:25
**migraine** 102:5
**military** 56:16 68:22
**million** 116:1
**mind** 26:4 39:22 97:19
**minimum** 103:25
**minor** 84:2
**minutes** 59:12 85:21

**A400B45**
**JEFF EISER   MARCH 1, 2010**

135:9
minute's 75:15
misconduct 132:5
misrepresents 138:19
missed 78:7
missing 58:25 104:4
130:24
misstates 129:21
mistake 75:5
mistakenly 101:22
mistakes 8:8
moaning 134:2
modeled 136:19
moment 71:13
Monday 29:17 127:8
129:3
monetarily 142:13
money 141:4,9
monitor 62:25 126:16
month 80:6
Moore 1:10 2:17 6:10
133:20 134:6 146:16
moose 120:3
moral 91:10 92:17 95:22
morning 16:7 44:5,5
49:4,17 55:7,9 56:1,21
63:13,25 64:15 67:23
71:20 77:1,7,8,10,11
77:16,17,22 78:1 80:1
87:11 88:6 127:8
130:10 132:6
mornings 44:10
motion 102:25
moved 46:17,19 47:2,3,5
47:6 80:15 116:20
movement 57:23
multiple 23:16
municipal 23:20
M.D 19:6

**N**

N 3:1
NAF 113:6
nail 84:9
nails 84:1
name 4:10 5:5,7,8 66:8
66:17 77:5 97:7 104:13
109:4 114:22
named 108:25 109:1
114:21
names 18:2 66:11
127:12
national 19:15,15 30:14
31:6,14,19 33:15 34:7
120:19 121:16 122:3
122:17 145:13
nature 106:20 143:19
NCC 32:4
NCCH 24:5,15,20,24
25:9,18,22,24 30:17
31:1,23 33:4 81:8,21
82:22 98:2 99:4 101:3
109:22 112:7 143:5,12
NCCHC 19:17 24:7 33:21
81:23 82:6
NCH 136:20
Neal 39:22
necessarily 72:18 103:5
110:18 144:17
need 12:7 14:2 28:21

73:22 80:21 84:7 86:3
88:22 91:4,11 92:17
93:20 117:18 118:13
125:23,25 128:6 133:5
135:7 141:6 145:24
needed 8:16,23 104:3
131:8 133:16
needs 71:23 84:5 100:21
100:21 103:23 126:11
139:2,3 140:14 145:22
negligently 100:25
negotiate 140:23
Neil 61:18,22
Neill 1:11 6:9 17:18
36:16 37:22 38:13,15
38:23 39:8 40:13,19
41:7 42:25 43:9,22
44:3 45:2,8 61:3 66:3
85:20 92:5 93:1
Neill's 47:1 13
neither 149:16
Nelson 2:14 3:5 104:10
104:12,14 114:1 115:4
122:14 123:17 125:17
126:12 142:24 143:2
144:2 146:12
never 9:3 23:2,5 24:21
25:13,19,21 30:22 31:1
33:16 35:19 37:2 52:12
55:25 65:4 71:11 74:16
108:24 122:2 133:3
141:4 143:4,6 145:21
new 14:13 20:18 23:5
37:20 91:20 94:17,18
138:11 139:20 140:21
news 59:20,22
night 44:14,18 49:4,5,8
67:8 68:8 127:6 129:14
130:9,9,18
nine 14:18 116:17
Nineteen 117:4
Ninety 33:3
Ninety-nine 108:12
nine-page 14:22
nonprofit 9:22 31:5
non-mandatory 32:23
normal 72:23,23,25,25
73:10,13 88:23
Northwestern 2:1
Notary 1:19 149:5,25
note 48:17 59:9,23 93:3
113:18 130:4,14
131:25 133:15
notebook 18:9
noted 56:15 58:5
notes 13:3,5,10 19:2,20
43:4
notice 4:8 5:9 8:8 17:1
19:11 80:14 88:25 95:2
95:24 96:10 127:25
128:10
noticed 105:8 109:6
134:23
notify 136:2 138:4
notifying 129:24
noting 57:18
November 39:21
number 3:21 7:25 13:24
17:11 23:22 24:19
26:12 102:3 124:19,20

140:4 141:20
numbers 57:8 84:21 85:3
85:10
numerous 25:19 42:1
nurse 18:8,15 27:21,22
54:12 69:16 76:19 77:1
77:4 97:24 102:1,14
126:25 129:2,24 147:2
nurse's 69:13 70:5
nursing 102:12,13 103:9
103:10,12 111:22
123:25 124:1 126:16
126:17,18 140:3,4
141:8,20,22,24 147:23

**O**

oath 6:21 78:17
object 36:18 37:4 55:19
64:1 74:23 86:25 90:1
100:2 118:19 120:17
121:21 122:14,16
123:17,18 124:4
125:17 126:12 129:19
131:9 132:13 133:10
134:9 137:18,25
objectable 37:8
objected 127:23
objecting 37:9
objection 36:23 37:2
45:25 54:23 57:3 67:14
68:5,6 88:9 90:10
98:24 100:15 102:16
103:1,2 110:20 123:4
132:9 135:17 140:25
142:4 143:23,23
objectionable 36:25
objections 131:22
obligation 72:21 74:12
88:12 128:2,7,9 133:14
137:7 144:6
observation 46:18 56:15
58:4,8 63:5 64:20,21
64:25 71:4 72:3 86:16
86:17 124:13 130:13
132:3 133:17 134:1,3
observations 64:18
86:18 111:23 135:14
observe 39:5 62:17
72:12 74:13 75:14
124:11 125:24 132:19
observed 38:7,25 52:5,8
52:8 53:10 67:10,25
130:11
observer 88:13
observing 59:3 75:7
obvious 38:8 39:2 40:8
40:10 47:23 72:24
73:21 88:24 131:6
obviously 13:14 46:4
56:3 71:22,23 83:12
108:13 118:5 124:11
127:2 138:13
occasion 11:1
occasions 107:20
occupying 130:14
occur 42:14
occurs 85:6
offer 127:20 139:18
offered 36:6 38:5 64:5
94:25 102:9

office 1:17 4:13,15,22,23
27:19,21 52:14 109:7
112:3
officer 41:16,17 54:9,12
55:12 60:13,17,18
61:18,18 67:22 68:14
68:18 69:11 70:8,21,22
71:14,15 72:16 73:3,7
74:6 88:3,4 91:15 92:2
96:20 98:23 99:5,18
105:18 125:24 126:23
130:12 133:20,24,25
134:6,16 136:5,5
officers 34:21,23 35:6
36:12 45:15 48:4,8
54:8 60:16 65:16,21
66:22,23,23 67:1 72:24
86:14 91:16 92:25
94:25 97:23 99:12
102:1 111:21,21 124:2
126:5 132:19 135:25
147:25
officer's 98:7 135:13
OFFICES 2:4
officials 90:22
off-hand 30:23,24
Oh 120:10
Ohio 1:18,20 4:16 23:9
23:17,23,25 24:4,20,23
25:9 32:13 33:8 34:23
34:24,25 100:24 101:1
101:12,17 105:4,7
137:3 141:12 142:19
147:10 149:2,6,22,25
okay 10:17 11:18 12:2,21
15:5,21 28:8 29:4 32:7
32:25 34:15 35:16
37:12 38:15 45:25 46:4
52:16 54:11 55:10
57:11 70:13 76:24 78:5
87:5 89:8 91:15 93:16
93:19 96:5 105:21
110:6 117:24 122:1
125:3 145:4 146:19
148:10
old 23:2
once 13:25 15:25 42:14
45:13 50:6 139:6
Ondrovick 1:10 2:8
41:17 66:6,15,15 93:1
Ondrovick's 66:6
ones 6:14 8:19 24:13,18
82:25,25 91:19 119:9
one-ring 11:7
one-third 107:4
onsite 29:18
on-call 80:25
on-site 27:18 124:1,10
147:23
open 29:22
opened 25:25
operated 59:21 116:5
operating 59:13
operation 83:2 100:21
115:25 116:9 147:9
operational 116:4 124:6
141:2
Operationally 26:24
operations 14:19 34:5
36:1 82:8 85:16 105:6

105:9,11,12,20 112:11
116:13,18,20,22
118:10,12 119:19
134:13
opinion 36:7,9 37:8 38:6
38:10 39:11 40:7 53:21
55:22,24 59:10 64:6,11
68:7 74:10 75:10 76:15
102:9 126:19 131:14,16
138:15,25
opinions 6:22 7:11 19:23
36:20 39:16 66:5 76:6
76:7,8 90:6,13 109:20
121:10 122:10
opposed 135:16
opposite 67:3
order 32:25 68:22 120:3
141:19 142:3,10
ordered 29:1 48:9 68:19
orders 45:15 99:19 125:6
organization 9:22 31:5
31:18 34:13 73:5
119:18 120:2,23 121:1
122:8
organizations 34:1,7,8,9
119:12
organized 14:15,16
31:18
orientation 73:17,18,20
75:16
original 17:13
Ottawa 2:19
outlined 138:9
outside 83:12,13 130:22
140:18
overall 92:20
overnight 87:17
oversee 113:1
overview 38:11 76:17,22
115:23
o'clock 54:17 55:7,16
56:1 57:19 63:13 71:10
88:6 94:21,22 132:5
148:13

**P**

padded 63:3 71:25 72:1
72:2,4,5,6,14,17 73:15
page 3:3 5:15 11:23 12:4
38:6 39:20 40:9,23
56:11 57:16,17,18,21
58:7 76:22 80:18 81:7
90:11 91:3 95:20,21
114:1 124:20
pages 14:18 15:14,18
20:11 21:5
paid 10:3
pain 102:6
papers 19:12
paragraph 38:7 39:22
40:23 58:7 91:3,7
95:22 113:23,25 114:1
paragraphs 90:21
parole 1:10 133:20 134:6
134:14,15 135:13,15
136:4,25 137:3
part 11:15 16:21 56:10
56:12 70:14 106:18
107:2 123:7 131:4,14
147:20

**ATKINSON-BAKER, INC.**                                                      **(800) 288-3376**

# A400B45
## JEFF EISER  MARCH 1, 2010

**particular** 7:18 13:9 37:17,18 38:16 39:2 50:4 51:4 58:12 65:11 66:8 68:8 69:24 89:23 91:22 96:20 97:19 98:14 100:5,11 120:7 121:14 122:13,21 136:14 140:13 147:19
**particularly** 39:20 127:15
**particulars** 97:23
**parties** 64:18 149:17
**parts** 119:9
**party** 108:23 131:11
**part-time** 102:12 147:2
**pass** 43:3 73:11 128:18 133:16
**passed** 109:5 130:25
**pass-on** 43:1,4,11,13 49:15 67:18 128:13,18 130:5 133:4,9
**pass-out** 48:18
**pat** 67:3
**paternal** 120:2
**patient** 41:18 42:6 44:10 44:18 47:7 53:8 61:12 67:24 84:16 85:22 93:3 131:19
**patients** 84:17
**patient's** 67:12 91:17
**patient-to-patient** 42:7 42:13
**Paul** 1:9 6:10 7:24 8:3 17:18 43:21 45:17 46:21 48:12,12 49:14 51:6,24 52:16,19 54:17 54:18,20 55:15,15,16 60:24 63:14 65:6 66:3 66:4 86:5 92:8 93:1 94:1 127:5,13 128:24 129:4,15 132:7,11,24
**pause** 17:2
**pay** 10:5 137:7,8
**payment** 5:2
**peer** 106:5
**pending** 87:8
**people** 28:17 30:4 37:15 47:2 66:2 85:18 93:2 118:21,24 120:3,6 124:9 145:23
**perceivable** 94:13
**perceived** 55:22 141:7
**percent** 24:20 33:3 83:16 83:20 108:12,18,18
**percentage** 33:1 84:17 84:22 85:4 106:17
**percentage-wise** 107:3
**perform** 147:4
**performance-based** 120:11
**performed** 133:18
**period** 14:3 15:6 52:8 58:17 60:5 77:2 88:25 127:19 134:3 130:10 138:24
**person** 34:4,5 36:1 55:5 64:20 70:19 72:15 73:3 74:2 84:13 85:17,17 89:2 91:20 94:13 105:20 116:5 124:12 124:14 125:24 126:24

128:11 132:16 134:13 134:18 138:3,6 141:2
**personal** 1:3 14:16 31:10 31:15,20
**personally** 34:3
**personnel** 65:20 116:6 136:15
**pertains** 138:18
**phone** 7:23,23 8:3 17:10 17:17 46:23 47:1,13 52:13 53:21 62:18,23 63:12 76:18 86:8 128:24 129:21 142:14
**physical** 67:1,2 142:10
**physician** 29:15,17,19 80:23 81:3,5,11,15,18 102:13 124:17 125:14 127:9 131:21
**physicians** 113:1
**physician's** 124:25 142:10
**place** 16:23 54:22 67:13 102:16 110:14,16,23 119:2 143:19 144:5,21 145:16,16 147:16 149:10
**placed** 134:13
**plaintiff** 1:5 2:3 90:5 108:19 127:20
**plaintiffs** 108:16
**plaintiff's** 3:20 8:12,14 96:17
**plan** 45:13 68:11 86:1,11
**platoon** 129:14
**playing** 131:2
**please** 88:16 113:25
**plenty** 46:8
**PM** 148:13
**point** 28:3,9,22 41:14 46:12 66:19 86:2,12 89:6 93:25 103:6,17 107:5 114:15 134:12 135:1 139:8 140:14
**policies** 10:15,17 17:25 25:15 70:3 98:12 100:19 101:8,25 103:13,18,21,24 104:5 110:13,16,17,23 111:19 112:3 124:15 125:15 126:2 135:6,12 140:8 144:5
**policy** 3:21 51:1,3 60:22 69:22,23,25 99:8 113:20 114:4,8 124:20 125:12 135:22,22 136:10 144:11
**political** 116:3
**population** 26:14 29:25
**portion** 147:3
**position** 73:4,16 75:5,6,7 106:3 113:13 115:18 115:19 116:21,24 138:3
**positions** 65:20 85:18
**possessed** 122:6
**possible** 58:19 99:9
**post** 109:6
**potential** 74:19
**preferable** 124:11
**preparation** 15:7 16:21

**prepare** 15:22
**prepared** 7:13,19 8:16 14:25 17:21 56:7 66:13 79:13 139:16
**Preparing** 43:13
**prescribed** 43:24 44:9 45:6 53:13 61:3
**presence** 29:15 98:14,21 99:2 100:9 142:10,11
**present** 15:19 98:18
**presentations** 106:8,9
**presently** 117:16
**pretend** 44:8
**prevalent** 123:10
**prevent** 48:2
**previous** 20:5 67:8 95:3 95:18,25 96:12,13 97:19
**previously** 22:21 129:11 135:4
**print** 51:22
**printed** 50:24
**prior** 71:12 74:4
**prison** 109:5 118:17,24 119:7 135:16
**prisoner** 137:6
**prisoners** 137:4
**prisons** 119:20 121:3
**private** 31:4,17
**pro** 9:7,13,22 10:3 109:2 48:3
**proactive** 47:9,12,14,24 48:3
**probably** 14:8 16:2,6 32:4 103:20,25 107:3 107:25 116:17 123:8 138:3
**problem** 43:16 45:10,24 69:15 85:2 103:7 141:6 141:7
**problems** 84:2 98:8 102:3 103:7
**procedure** 51:15 69:23 100:10,11,13 113:20 114:4,8 139:8 143:19 144:16,18,21,25 145:3 145:8,10,15
**procedures** 18:1 98:2 99:8,13 100:19 101:8 103:14 110:13 111:16 112:2,6 118:14,18 126:2 142:7 143:18 145:12
**process** 6:24 15:3 20:7 29:1 39:7 40:15 50:24 60:21 119:7 141:15 142:12,14
**processed** 71:5
**processes** 141:13
**produced** 15:19 20:25
**professional** 106:13 107:1,11 108:2 120:5 120:25
**professionalism** 119:19 146:1
**professionalize** 121:2
**professionalizing** 120:7
**professionals** 29:12,12 119:23
**program** 28:11 29:2 105:16 117:17

**promote** 119:18
**promulgated** 106:13
**promulgating** 106:19
**pronounced** 28:7
**proof** 101:13
**proper** 85:14 89:18 136:7
**proprietorship** 5:4
**protect** 46:15 47:6,9
**protocol** 69:25 100:11 100:12 102:13 113:21 114:4 126:22 144:16 145:9,10,16
**protocols** 101:23 102:2 102:11 103:9,13 111:16 112:6 125:1,6 125:21 126:7 143:18 144:11 146:2
**provide** 126:17
**provided** 5:12 20:1 137:15
**provider** 131:7 138:11
**proximity** 130:13
**Pro.com** 9:12
**public** 1:19 35:22 149:5 149:25
**publications** 106:4 121:9
**publish** 121:4
**published** 111:25 112:5 122:8 139:2
**pull** 77:12
**puppies** 131:2
**purpose** 48:2 99:7 120:7
**pursuant** 1:14,14 4:7 149:12
**pursuing** 138:22
**put** 11:17 14:2 21:21 22:1 64:24 70:5 72:20 73:16 75:4 77:17 89:2 90:14 95:1,24 96:10 97:16 133:3,8
**puts** 69:13
**putting** 63:3,5 88:12
**p.m** 49:3,3,6,9 63:13,24 87:13

**Q**

**qualified** 132:22 147:24 149:5
**quasi-paramilitary** 100:20
**Queensgate** 27:9,11,12 29:21,22
**question** 17:14,23 33:16 36:24 37:2,6,10 44:16 45:23 46:1,2 55:11 57:5,5 58:11 63:21 64:2 67:14,20 73:11,25 87:1,6,8 88:10,16 90:1 90:1,7 91:5,6 92:24 93:7,11,13,18 96:4,5 97:5 98:13 99:24,25 100:3,4 110:21 127:22 131:5,10,23 133:7,23 135:10 137:19 138:16 141:1,24 144:1,3,9,24 148:5
**questions** 36:4 64:16 78:8 87:2 104:8,10,16 115:5,7,9 120:21

139:12 142:25
**quiet** 131:4
**quietly** 131:2
**quote** 76:18,25 77:2 90:9 130:2
**quoted** 80:20
**quoting** 130:1,17,21

**R**

**R** 2:18 149:1
**raised** 36:5
**rate** 91:16
**rated** 101:7
**reach** 119:7
**reached** 90:13
**reactive** 47:11,12,15 48:1
**read** 6:11,14 18:3,25 41:15 54:11 66:9,10 76:1 77:19 78:14 97:20 103:5 137:17 143:6,9 144:4 146:17 148:3
**reading** 18:2 27:25 28:5 28:6,7,22 51:4 61:14 92:16 95:20 113:24
**real** 54:16 85:2
**really** 52:22 86:22 91:21 103:20 107:7 109:9 118:9 119:8
**reason** 58:13,24 59:23 102:20 145:3
**recall** 8:18 11:2 12:12 24:18 31:24 38:21 43:25 44:1,7 46:22 47:4 48:15,21 49:18 50:7,7,12 51:9 58:13 62:9,20,21 66:12,17 71:3 83:18 84:21 85:4 97:15 107:15 108:10 125:5 128:23 129:3
**receive** 10:2 18:5,13 44:23
**received** 5:17,24 6:1,12 6:17 8:19 10:13 12:9 12:23 13:1 17:8 18:23 40:3 41:25 45:3 62:7,8 67:16 90:23 91:23 146:19
**receives** 5:2 118:24
**receiving** 84:16
**recognition** 91:12 92:11 92:18,23
**recognize** 48:13 91:16 92:3 94:15 124:7
**recognized** 92:5
**recollection** 63:1
**recommendation** 138:25 146:3,7
**recommendations** 145:12 146:4
**recommended** 32:24 33:1 82:13 101:6
**record** 12:3 18:14 36:19 37:12 41:14 44:23 58:16 80:9 87:22 88:23 89:8 102:18 135:5 147:19
**recording** 57:8 60:5
**records** 6:25,25 36:15 56:13 66:10 148:4

# A400B45
## JEFF EISER   MARCH 1, 2010

recovery 101:12
rectify 147:22
redding 28:7
reduce 61:20
reduced 85:13
refer 81:8 99:13,18
126:25 132:2
reference 39:19 80:19
80:21 119:11 120:9,19
124:23 129:4,16,25
130:4 133:19
referenced 49:15 136:10
referencing 135:9
referred 14:23 128:19
referring 76:20 92:19
98:7 100:6 114:5,25
134:24 144:25
refers 69:3 145:17
reflect 37:13
reflected 130:15
regard 41:23 109:20
114:19 138:15
regarding 6:22 85:22
106:6,9 110:14,16,23
111:16 143:20
regardless 79:3
regular 50:23
regulation 31:12
relate 50:21 118:17
125:13 126:7 127:16
135:12
related 51:7 122:12
relates 17:25 121:18
124:16 128:25 135:7
135:13 136:14
relating 122:25 136:15
relative 36:4 89:22 99:4
118:1,14,15 121:5
125:7 126:9 132:8
133:4 135:15 139:25
149:16,18
relevance 122:9 135:12
relevant 138:17
relied 121:9
remainder 117:2
remains 144:15
remedies 140:17
remember 8:20 10:11,19
12:12,15 32:5 43:4,6
49:18 51:3,4 52:23
56:2 61:14 62:5 77:3
77:13 80:7 97:13
103:24 109:10
rendered 109:17
rendering 109:15 122:10
repeat 9:8 104:15
replace 116:14
report 3:13 5:18 6:2 7:14
7:20 8:17 10:24 13:6,9
13:14,16 14:23,25 15:7
17:3,21 18:8 19:6,9
36:6 39:10 43:11,13
48:18 49:15 50:1,15
51:12 53:14 56:8,11
58:6 66:14 69:13 70:5
70:6 71:10 75:14 79:13
79:21 80:18 87:21
90:12 111:22 113:17
114:2 121:25 133:19
139:15

reported 52:19
reporter 1:19 22:19
REPORTERS 1:23
reporting 50:18
reports 18:5,6,13 43:1
50:13,24 51:7
represent 36:2 66:1
91:16 108:3
Representative 1:4
request 8:25 10:21
113:12 129:1,17
requested 5:10 107:17
requests 101:21 102:17
require 100:18
required 70:10
requirement 33:9,10
34:22,25 82:18 126:23
requirements 51:4 70:15
requires 33:11 35:6 51:1
60:22 69:22,23 82:9
140:6 141:9
rescheduled 5:10 80:11
research 19:13
reserve 36:22 55:23
reserving 37:1
resolution 146:25
resources 80:22
respect 122:10 124:15
125:15 127:15 130:6
132:6 135:2 138:9
respects 149:12
respond 73:22 78:9
135:8 139:24
response 93:14,17
111:21 135:24 136:18
148:3
responsibilities 65:7
115:23 118:11
responsibility 39:4 71:4
72:21 73:7 88:20 108:2
116:2 136:6
responsible 60:13 80:23
81:3,11,15 115:24
restarted 58:23
result 110:18 149:19
retained 3:18 21:6,9 90:3
90:5
retire 115:19
retired 27:15 106:22
107:6 113:11 115:12
115:15,15,16 116:14
116:23
retirement 9:24 106:21
review 5:12 7:10 15:6
17:5 36:15 39:11 40:3
78:17 79:15,19 96:15
106:5 127:4 146:15
147:18
reviewed 3:12 6:15
15:25 20:19 22:21 30:5
54:3,19 70:3 79:23
87:15 91:19 103:18
133:17 148:8
reviewing 5:23 6:25 13:4
35:4 76:5 107:14
RE-EXAMINATION
139:13 143:1 146:23
Re-notice 1:15
Richardson 1:8 2:7 6:9
91:10 92:17 113:19

114:3
right 4:22 5:24 6:24
13:11 15:13 19:11
22:14 25:8 27:13,23
31:4,7,12,22 41:5,15
41:20 42:9,25 43:9
44:8 45:1,12 47:1,13
47:22 49:14 52:12 53:7
53:15 55:24 56:16,19
57:13 59:13,20 60:11
61:9,17 63:11 64:13
65:6 66:1 67:5 68:25
70:16 71:15 72:7 75:13
75:22 76:3,4,6,10,16
77:25 78:23 79:4 83:15
84:6,14 86:13 90:7
92:11,24 94:19 95:10
97:6 98:2,6 100:10,10
101:17 102:25 104:19
104:22 109:11,19
110:12 111:3,24
112:14 114:11 115:3
120:18 136:21 139:4
139:11 141:16 142:1
143:10,15 144:15
145:8
Rights 7:5 60:12 99:12
99:21
ring 11:15,19,19,25
12:18
rise 101:1 143:13 144:19
144:22
risk 61:21 74:19 85:13
85:15 125:7
risks 61:10 91:12 92:19
92:23
RN 29:13
Road 27:25 28:5,6
role 66:6 70:17 88:12
124:16 126:18 132:25
room 130:13
routine 16:10
routinely 65:1
rule 78:6
rules 4:8 35:8,11 78:7
runs 116:9
runs 112:13

## S

safe 62:25 63:4 128:7
safely 81:10
safety 41:1 50:20 132:18
satisfy 144:6
save 14:12,13
saw 19:8 38:18 39:18
40:19 47:15,17 48:1,16
50:5 51:25 53:24 55:25
74:12 75:14 86:22 88:3
88:4,8 94:14,21 134:19
136:8
saying 18:12 26:6 39:7
43:10 50:9 53:24 59:7
110:7 139:1
says 56:17 58:9 95:1,23
scheduled 80:4,10
schedules 49:12
school 106:24 107:2
science 109:8 117:13
screen 71:19
screened 119:3

se 109:2
second 9:11 27:9 40:9
48:20,21 80:20 86:19
86:21 89:25 94:2
Secondly 131:13
section 94:14
security 27:8 29:11
35:17 50:20 105:6
116:6,22
security-level 119:2
see 7:25 8:16 34:6 38:13
41:2 44:17 47:16 49:12
50:1 57:13,19 68:16
69:14 70:6 71:19 78:11
78:12 81:1 87:11 90:18
92:9,19 95:22 129:18
130:23 136:1 140:17
144:13 148:8
seeing 51:9
seeks 134:10
seen 5:20 78:4 103:8
129:2,17 132:16 148:4
sees 47:11 73:9 134:16
seizure 84:15,18 102:7
seizures 61:10,21
selected 9:25
self 63:4
sense 13:17
sent 8:12,13 10:10,13,15
11:4,20 12:18
sentence 56:12 81:9
90:20 91:13 95:1,23
separately 17:8
September 4:18 149:25
sergeant 51:12 65:6 67:6
67:22 73:19
sergeants 36:12 48:8
65:9,24
serious 40:25 74:21,21
75:17 84:5,6,12 85:12
85:14 90:23,23 91:12
92:3,18,23 99:13
103:22
seriously 7:1
seriousness 72:19
served 48:18,20
service 9:4 113:4 116:7
services 9:24 68:21
83:12 113:5 122:11
137:13
set 6:21 17:13 81:23 82:7
122:17 136:11 140:21
149:13,21
sets 45:13
setting 74:6 123:1 124:3
settled 95:3,11,13,18,25
96:13 106:12
setup 102:11 137:4
seven 5:10 91:16
severe 52:21
Sgt 1:9,9 39:22 40:19
43:6 46:14 49:1 53:20
61:22,22 62:6,12 67:11
76:18 85:20 96:25
133:1
share 132:20 134:17,20
sharing 53:9 60:22
Shaun 112:16
Sheriff 1:8 91:9 112:13
113:13,19 114:3,20

116:4 138:4 139:9
141:18 147:21
Sheriff's 112:3 137:22
she'd 71:11
shift 29:13 43:2,11,15
48:18,20 49:17,21 50:2
55:15 60:19 127:7,14
127:15 128:15 132:25
133:2
shifts 49:16
shocked 102:10
show 20:23 56:10 64:9
76:16 124:18,22
128:21 135:3
showed 54:5
showing 59:8 143:16
shows 63:15
sic 12:9 18:8 24:5 32:4
37:18 61:18 75:1
88:22 94:14 102:25
109:7 125:23 128:8
sick 29:22
side 105:6
SIEMION 2:9
signature 149:16
significance 133:8
significant 85:9,11
102:14
signing 141:19
signs 38:8 40:8,8,10
47:23
simple 46:2 102:19
simply 131:1
sinus 102:6
sir 4:12 5:6 7:15 8:1,5
15:1,20 17:16 19:3,10
19:22 21:11 22:23
30:10,12 33:10 57:14
58:3 66:17 67:20 77:16
78:20 80:17 81:2,17
83:8,14 87:9 89:24
90:11,19 91:18 95:21
96:8 97:17,25 104:9,21
107:13 109:21 111:9
112:9 119:14 139:19
140:2 142:8 146:21
sit 35:4 66:13
site 9:7
situation 37:16,17 63:17
63:20 68:24 133:13
136:3,4 147:7,12
situations 46:5 136:16
six 14:8 29:8
Sixty 108:17
six-week 15:6
size 26:3 27:1 116:9
118:2,9
sizes 123:11
skelation 102:24
skipping 80:24
small 11:14,16 123:9
smaller 82:24 83:2
Smith 1:3,3,4 21:1 36:9
38:8 39:25 90:15,21
122:13 127:9,16 129:1
129:18 130:6,14,16
133:5,21 134:7
Smith's 51:8 127:18
130:10 132:8
sole 5:3

A400B45
JEFF EISER   MARCH 1, 2010

solutions 140:19
solve 142:14
somebody 64:25 72:20
    73:11 75:5,7 77:5 95:8
    126:16 132:16 134:21
someone's 99:12
somewhat 144:16
sophisticated 82:21
sorry 17:11,12 18:16
    22:11 28:4 32:10 35:17
    42:20 47:20 49:7 66:4
    75:10 90:25 110:15
    116:19 117:22 130:24
    138:13
sounds 9:13
source 23:21
SOUTHERN 1:2
Southfield 2:5,10
space 87:2
speak 62:1
SPECIALLY 2:14
specific 43:23 46:6,8
    98:13 139:5
specifically 10:20 37:22
    39:15 43:6 62:10 66:15
specifics 139:1
spectrum 42:10
spell 109:4 112:17,18
spelled 28:6
spend 15:21 29:19
spent 26:22 107:8
spoken 67:8
spring 117:19
Square 2:10
SS 149:2
staff 36:7,11 37:17 38:7
    38:20 39:16,18 46:17
    46:19,20 51:13 53:19
    53:19 58:10 59:6 65:19
    65:19,19,20 91:11,25
    92:18,23 98:12 100:20
    100:21,22 101:9
    103:15,15 104:2
    111:19,20,22,25 116:1
    124:2,7 125:1,21 126:5
    126:16,17,18,25
staffed 29:10,11
staffing 49:13 139:25
    140:1
stamp 57:17
stand 80:16
standard 80:19,19 81:8
    98:9,11,18,21 99:2,3,4
    99:7,20 101:13,15,16
    122:21 135:23 146:8,9
standards 19:15 32:18
    32:20,22 33:1,22 34:6
    34:17,18,19 81:22,23
    81:24 82:12 98:7 100:6
    100:18,25 101:2,3,6
    102:20,21 106:19
    109:22,24 112:6
    119:22,24 120:11,20
    121:5,17,18 122:4,8,18
    122:21,25 136:11,20
    136:20 145:13 146:5
standing 125:6
star 21:22
stars 22:1
start 107:14,17

started 15:4 53:18 56:11
    57:18 106:23 107:16
    116:12 119:18
starting 91:7
starts 55:7 90:20
state 1:20 23:9 24:20
    31:13 32:13 33:8,11
    34:22 35:5,9 39:21
    82:9,11,18 100:24
    101:12,19 105:3 109:5
    118:16 134:4 137:2,3,4
    137:5,6,6 149:2,6,25
stated 36:5 39:16 76:19
    77:1 111:6 114:2 128:9
    136:5 146:4,9
statement 12:11 15:9
    38:12 39:14 62:20,21
    95:5,7,17 99:24 100:4
statements 62:15 139:7
states 1:1 32:16 33:14
    33:18,19,19 135:22
stating 133:11
stationed 130:12
statistics 23:21
status 136:24
statute 31:9
stay 68:22 115:16
Ste 2:5
Steenrod 6:9 114:15
    115:1 135:5 137:11,21
    138:10 139:1 146:16
Steenrod's 96:11
step 63:7,8 140:14,18
STEPHENSON 2:13
Stickney 1:11 2:12 7:24
    17:18,19 37:25 39:23
    41:7 43:24 45:3 46:15
    46:24 52:1,4,17 60:24
    62:17,22 76:19,25
    78:13 81:4,19 90:4
    94:2,5 102:2 104:15
    109:16 122:2 125:5
    126:1 127:5,16 128:24
    129:5 130:1,5 143:4
Stickney's 60:23 78:18
    128:25 129:17 143:6
Stigney 143:17
stipulations 149:12
stopped 58:23
stranger 73:25
street 27:12 118:22
strike 18:6 110:15 127:3
    128:21 135:3
structure 114:10
student 107:1,7
stuff 109:10
subdivisions 10:8
subject 102:24 108:20
    120:21
submitted 8:20 149:15
subpoena 15:12
subsequent 11:13 18:23
subsequently 63:22
substance 28:14 128:23
substantial 83:19
suddenly 42:4
Sue 1:3,4 51:8
sued 108:21
Suetta 1:3
suffer 42:23

suffering 67:7
suggest 14:6 130:5
suit 97:11,12
Suite 2:10,15
suits 95:10,12,14 96:3
summarize 90:12
summary 6:17 60:9
Sunday 127:6
supervise 124:25 125:21
    137:8
supervising 38:20
supervision 23:25 39:17
    81:12 134:18,21,24,25
supervisor 39:6 40:5
    64:19 88:14 105:5
    128:18 133:14
supervisors 65:18
supervisory 46:20
supervisor-to-supervi...
    43:5
support 65:18
supposed 73:4,9 96:25
sure 8:23 17:23 24:12
    25:12 38:15 39:8 57:2
    57:6 68:13 72:21 73:8
    74:25 82:4 85:17 88:21
    95:12 99:1,15,23 111:5
    112:23 113:6,17
    134:19 136:2,21 137:4
    140:8 145:12
surveillance 54:25 58:9
    60:6
surveyed 22:24
sweat 130:23
sworn 4:3 149:8
symptom 84:11
symptoms 42:10 45:4
    48:14 68:17 81:10 88:4
    90:18 125:8 131:6
syndromes 41:24
system 51:21,21 59:16
    59:18 118:4 119:10
    126:20,20 134:16
    135:16
systems 82:21

| T |
| --- |

T 149:1,1
table 57:15
take 6:24 7:7 13:3,5 21:3
    40:24 41:4,10 44:11
    68:2 73:1 78:25 79:3
    81:11 82:25 84:4 88:8
    93:14,15,17 104:23,23
    105:12,17 113:22
    119:1 128:10 129:10
    131:22 136:1 138:21
    140:10 145:24 146:25
taken 1:13 37:20 41:23
    58:2 66:2,16 119:6
    140:14 149:11,14
takes 79:10 107:3 116:8
    140:20
talk 73:19 140:23
talked 10:12 122:20 59:25
    62:3 88:11 114:5
talking 38:19 48:23,24
    53:12 55:6,8 68:25
    90:2 93:23 101:2
    136:17 142:13

talks 135:23
tape 8:6
tape-recording 8:3
teach 107:1
teacher 107:10
technically 137:3
Tecum 1:15 20:13
telephone 129:4
television 109:9
tell 14:10 22:17 25:17
    36:14 40:18 68:1 84:10
    92:25 96:2 120:24
    121:15 134:5 147:11
telling 46:5 79:18
Ten 32:3
tend 136:3
term 50:14,17 110:6
    114:24
terms 64:15 92:11 98:17
    109:23 111:20 118:1
    126:9 128:14 137:5
    144:11
test 105:3,11,17,17
testified 4:4 22:7 78:3
    108:9 109:13,22 122:2
    125:5 126:1 143:4,5
testifying 106:15 111:7
testimony 6:18,21 21:19
    21:22 54:12 64:4
    109:15 120:17 125:11
    139:16
tests 104:24
Thank 139:12
Thanks 112:20
thesis 117:18
thing 12:16 60:19 92:22
    100:1 118:8
things 10:12,12,23 27:14
    86:6 103:15 106:19
    128:18 136:22 142:15
    143:18
think 7:17 8:16 10:21
    14:7 20:5 23:11,19
    25:25 43:7 58:11 59:2
    73:22 77:5 93:21 96:20
    103:21 105:15,18
    108:11 113:16 114:22
    114:22 119:12 120:10
    135:9 136:4 145:22
thinking 66:14
third 19:20 27:24 39:22
    40:23 91:3
thirty 117:9,10
Thomas 1:10 2:17 6:10
    133:20 134:6
thorough 7:9,10 36:15
    39:11 79:15
thought 16:9 25:21
    54:10 58:1 64:12 86:5
    136:9
thousand 26:16 32:3
    78:22
thousands 22:7
threatening 145:2 147:8
three 20:11 21:5 26:16
    47:2 60:17 79:10 89:4
    147:2
three-and-a-half 79:11
time 6:21 13:13,19 15:22
    19:8,19 22:19 29:19

41:9 43:20 44:24 46:4
    46:6,12 51:23 52:8
    55:15,23 56:5,16 58:12
    58:17,25 59:3,8,22
    60:5,14 64:9,12 65:10
    74:11 76:9 80:17 86:4
    87:6 88:8,25 90:16
    91:22 94:2,12 106:13,17,22,23,25
    107:8 109:2 114:16,23
    121:13 127:9,19
    131:21 134:3,8 135:8
    135:24 136:18 139:18
    140:20,23 141:3,8
    146:20 149:10
timeline 57:7
times 5:10 13:12,18,18
    42:1 57:10,19 62:7
    81:13 108:9,15
tirelessly 123:20
title 13:7 14:13,14
    105:10
today 11:10 78:16 80:2
    106:14 121:9 139:17
    146:18,20
today's 5:19 15:17 80:11
told 39:19 48:16 62:4,6
    68:15 72:16 73:8 75:13
    75:21 79:14 96:17
    133:23 139:17
Tom 146:16
tomorrow 77:9,10
    145:23
tonsillitis 102:6
top 19:4 114:3
topic 123:20,22
topics 91:25
total 26:12
touch 7:11 17:5
tour 30:6
toured 25:6,8
Towne 2:10
tract 14:5
train 92:22 95:4 96:1
    147:24
trained 42:22 55:4 72:22
    123:20,23 124:7
training 41:25 42:2,18
    73:17 84:20 91:9,11,21
    91:23,24 92:1,12,18
    99:9,20 101:9 111:10
    111:19 116:6 123:19
    126:6 132:1,15
transcribed 78:19 143:8
    149:14
transcript 7:23 17:9,17
    77:12,14,15 78:12
    80:17 127:21 143:6
    144:3
transcription 8:9
transcripts 17:7 79:25
transfer 28:20
transferred 80:24 134:5
transient 42:11
transport 83:12 126:24
transported 124:12
treat 132:19
treated 53:19 84:19
    119:4
treaters 98:8

**A400B45**
**JEFF EISER   MARCH 1, 2010**

treating 111:11
treatment 28:1,2,11,12
28:17,21 29:2 45:14
68:11,12 83:13 84:1,16
85:6,14,25 86:11,15
90:17 99:14 109:16
tremens 41:24 42:11
121:19 123:1,15 126:8
trial 20:15 21:19,22,25
78:23,25 108:10,12
139:18
tried 66:4 93:18 146:1
troubles 93:23
true 6:22,23 7:11 13:1
32:19 47:24 54:20
55:16 79:16,17 80:14
84:2 85:23 89:11,15
98:4,5,10,17 100:14
truth 149:8,8,9
try 20:21 104:15
trying 12:21 13:17 14:7
17:15,23 37:15 52:23
60:9 91:5 130:17,18
turn 59:15
turned 59:21
Turning 28:2,9,22
two 9:19 13:18 17:8
19:14 20:18,25 21:24
22:7 26:16 28:13,16
36:4 38:2 40:1,6,17
44:9 51:7 57:8 58:20
74:2 79:11 90:20 96:16
96:18 103:20 108:11
113:12 115:17 131:19
type 7:17 27:2 89:18
109:10 110:25 123:7
147:16
types 36:4 74:2 102:3

**U**

Uh-huh 71:17
Um-hum 16:25 70:20
undergoing 28:11
underlying 17:25
undersigned 149:4
understand 25:3 31:5
42:3 53:22 60:11 61:9
61:17 76:3 83:24 94:2
110:21 126:6
understanding 51:24
60:10 118:2 120:23
121:16 127:18 144:12
understood 6:20 26:2
38:12 61:18 64:16
86:14
under-Sheriff 147:21
unfair 77:20,22
unique 106:3,3
unit 73:20
United 1:1 32:16
units 27:8
University 117:14,20
untoward 110:18
untrained 133:24,24
untreated 84:24
unusual 71:22
unwritten 145:12 146:2
update 37:20
updated 20:3,16
upset 130:20

urban 118:4
use 22:19 33:6 110:10
121:21 123:2 128:5
uses 4:9 82:16 110:4
122:18

**V**

v 1:6
vague 46:1 90:2,8 100:4
144:9,17,25
van 134:5
Vanderpool 1:9 2:7 6:8
41:16 54:10,13,15
55:12 130:11 134:4
verbal 8:21,23 94:23
verbalize 60:9
video 55:6,8,13,25 56:2
56:15,20,20,23,25 58:7
58:9,16,19 59:4,24
60:6 64:14 71:20 72:11
72:13 86:23 87:11 88:5
94:20
videos 55:1
view 56:3,4 126:9
viewed 55:1 56:5
viewpoint 124:6
violate 100:25
violation 101:13,14
violator 136:25
violence 28:12
violent 52:23
visit 29:21
Vitae 3:17 20:1,2,11
vital 124:7 147:8
voice 52:17
volume 83:1
voluntary 82:14
volunteer 9:19,21
volunteering 10:20

**W**

W 2:9,13,19
Wait 89:25
waiting 139:10
waive 37:7
wall 53:5 109:9 130:19
want 10:25 13:22 38:23
48:7,25 49:5 66:5 67:5
67:21 71:7,7 76:16
80:16 93:11 102:4
103:17 111:5 113:17
wanted 44:25 130:22
wasn't 11:4 17:12 32:5
51:23 55:9,17 56:22
57:1 58:14,15,16 59:7
waste 80:16
watch 71:18
watched 56:25
watching 56:19 74:8
Waterstone 1:17
way 13:8 45:1 65:12
69:15,20 70:11 91:6
102:18 110:7 124:10
128:14 136:11 145:14
145:17
website 9:13
week 6:13 79:24 147:2
weekends 124:1 147:4,6
147:24 148:1
weighty 7:3

Wendy 1:9 6:8 41:16
54:10 55:11 130:11
134:4
went 26:4 46:13 49:17
55:15 109:4 113:16
weren't 8:2 25:9,18 59:2
Westgate 1:11 6:8 67:18
75:23 93:2 132:24
133:3,9
Westgate's 76:1
we'll 20:9 21:3 78:11
124:18,22
we're 22:18 42:22 95:21
we've 12:22
WHEREOF 149:21
Where'd 77:2
WILLINGHAM 2:13
Wilmer 18:10
Wilson 18:8,17
Wilton 18:15,20,21
window 135:8
withdraw 57:4 96:6,7
withdrawal 38:9 40:7,11
41:24 42:10,24 45:4
47:24 48:13 49:15
52:20 61:10,20 68:10
68:17 73:14 74:19
84:18,25 85:13 90:18
91:17 92:20 101:23
102:7 103:11 106:6,10
110:15,17,24 111:12
111:17 119:5 121:19
122:25 123:15 125:8,9
126:8 127:13 143:20
withdrawals 84:15
withdrawing 57:5
witness 3:2,19 4:2 5:23
21:6 78:21 87:5 106:16
106:24 107:9 108:15
112:19 120:16 149:15
149:21
word 4:16 13:6,11 15:2
31:7 33:6 77:16 87:18
93:24
words 12:15 47:4 60:9
77:13 80:24 82:17
90:21 91:7
work 13:19 59:1 71:8,10
106:15,19,21 107:4
108:16,16 119:9
130:20
worked 14:3 39:8,13
49:1,6 65:14 71:11
74:16 113:8,12
working 13:15 19:16
22:5 38:16,17 39:9
113:2 116:6 126:3
128:5 130:18,24
works 59:18 122:19
135:22 147:11
worse 40:12 41:18
worsen 55:14
wouldn't 4:2 48:7 49:20
49:25 61:24 83:14
126:6 145:19
write 14:2 42:25 43:10
49:14 51:3 69:25
writes 69:12
writing 98:14,15,17
99:11 100:9

written 5:18 19:20,23
69:12 101:25 102:22
103:21 106:4 129:14
145:9,13,16,22
wrong 49:7 76:6,7,7
77:25 98:9
wrote 39:10 49:20 50:6
105:3,5,17
www.depo.com 1:24
w/attachment 3:16

**X**

x 3:1 103:19
Xerographic 5:15 12:4
14:18 15:14 20:11 21:5
124:20
X-ray 142:3

**Y**

yeah 13:17 14:6 17:15
25:1 35:21 36:22 37:11
37:14 38:23 42:14
44:21 46:21 55:25
57:10,24 58:5 63:11
70:12 83:10 92:8 99:4
105:1 107:24 125:18
year 22:10 30:18 83:17
107:15 115:14
years 3:19 13:9 21:6,10
22:3,12 35:20 42:1
107:22,23 109:2
113:12 115:17 116:16
116:17,23 117:3,4,9,10
119:18 120:8 122:5
125:10
yesterday 15:25 16:23

**Z**

zero 126:5

**$**

$1200 79:2,8
$200 79:6
$40 116:1
$40,000,000 26:19,21

**0**

07 39:23
09 56:16

**1**

1 1:16 114:1,1
1st 80:15 138:12
1.5 16:20
1/5/10 3:16 15:14
10 13:8 23:20 24:20
57:18 67:8 116:16,17
122:5 125:10
10,000 32:4
10:00 44:4,5 94:21
104 3:5
11 57:17
11:30 1:16
115 3:6
12 3:14 14:8 57:21 74:3
120 2:5
12122 4:15
124 3:21

**1280** 27:6
**139** 3:4
**14** 3:13
**1400** 2:10
**143** 3:5
**146** 3,6,7
**15** 3:15
**15th** 149:22
**150** 16:18
**150-bed** 27:25
**16** 85:20 107:23
**17** 10:18 149:25
**17a** 103:19
**18.5** 147:3
**1870** 120:13
**19** 56:16
**1958** 4:18
**1980** 117:8,14
**1990** 116:13,19,20
**1994** 22:10 107:16,19
108:7

**2**

**2** 38:6 39:21 56:11 76:22
**2nd** 137:13
**2:09-cv-10648** 1:6
**2:15** 148:13
**20** 3:17 7:16,19 10:8 18:3
117:3 120:8
**20B** 8:4
**2004** 83:6
**2005** 83:6
**2006** 83:7 113:12 115:16
**2007** 38:9 50:25 95:11,19
97:14 122:12 127:7
129:14 133:22 137:13
137:22 138:12
**2009** 5:21 7:14 8:17
14:22 36:6 106:22
107:7 113:10,15
**2010** 1:16 18:23 149:22
**2012** 149:25
**21** 3:18
**22nd** 117:8
**2300** 26:15
**24** 27:22 80:25 100:23
**24-hour** 102:12
**27** 39:23
**27th** 61:3 71:9
**28** 29:9
**28th** 44:5 49:4
**288-3376** 1:23
**29** 21:12 35:19 38:9
**29th** 18:23 38:14 40:9,11
40:20 44:6 45:18,19
46:10 49:5,5,8,9 127:6
129:14 130:9
**29566** 2:5

**3**

**3** 40:23 58:7 129:11
**3th** 67:23 95:11
**3:00** 49:6,9 54:17 55:16
56:1 63:13,25 127:7
132:5,24
**30** 1:14 21:13 29:9
107:25 120:8
**30th** 49:5,9 55:9 70:23
71:11,13 95:19 127:8
130:10 132:25 133:22

A400B45
JEFF EISER   MARCH 1, 2010

**300** 26:8 118:6
**31** 59:12
**333** 2:15

---
**4**
---
**4** 3:4,19 21:6 80:18
**4d-24** 136:14
**4th** 2:19
**4.5.1.1** 3:21 124:20,23
**4/27/09** 37:25
**40** 108:1,5,7,18
**422** 65:16
**45** 33:18
**450,000** 30:4
**45211** 4:16
**45249** 1:18
**48034** 2:5
**48076-5068** 2:10
**48823** 2:15
**48913** 2:19

---
**5**
---
**5** 3:12 7:25 17:10,11
**50** 33:18
**500** 2:15
**525** 2:19

---
**6**
---
**6** 39:20 135:4
**60** 28:3 138:11 139:10
**60-bed** 28:10
**60-day** 138:24
**600** 65:15
**600-plus** 116:1

---
**7**
---
**7** 137:22
**7th** 4:18
**7:00** 49:3,3,4,6,8,9 55:7,8
   57:19 67:22 71:10,13
   94:21
**7:30** 88:6

---
**8**
---
**8** 14:22 36:6 90:11 91:3
   95:21
**8th** 5:20
**8:00** 88:6 133:1
**80** 23:10
**800** 1:23
**822** 27:16
**84** 23:11
**85** 23:11,11
**88** 23:10

---
**9**
---
**9,000.000** 26:25
**9:00** 63:24 87:10,12,13
   94:21
**9:13** 127:6
**9:14** 63:13
**9:18** 46:7
**9:19** 56:20,23 57:1,20
   58:2,5,8
**9:20** 133:22
**9:50** 56:23 57:25 58:2,5
   58:10
**9435** 1:17