UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUETTA SMITH, as Personal
Representative of the Estate of
BRENDA SUE SMITH, Deceased,

                                                        Case No. 09-10648

             Plaintiff,                    Honorable David M. Lawson

COUNTY OF LENAWEE, SHERIFF
LAWRENCE RICHARDSON, JR.,
SERGEANT PAUL DYE, SERGEANT
J. CRAIG, OFFICER WENDY
VANDERPOOL, BERNICE BAKER,
MARY LOUISE NEILL, OFFICER ADAM
ONDROVICK, ERIC WESTGATE,
and JEFFREY STICKNEY, D.O.,

             Defendants,

_____/

**OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT BY
DEFENDANTS MARY NEILL AND LAWRENCE RICHARDSON, DENYING
MOTIONS FOR SUMMARY JUDGMENT BY DEFENDANTS LENAWEE COUNTY,
ERIC WESTGATE, JAMES CRAIG, BERNICE BAKER, ADAM ONDROVICK,
WENDY VANDERPOOL, AND JEFFREY STICKNEY, D.O., DENYING
PLAINTIFF'S MOTION TO STRIKE, AND SCHEDULING STATUS CONFERENCE**

       Thirty-seven-year-old Brenda Sue Smith was taken into custody and lodged in the Lenawee

County Jail on Friday afternoon, April 27, 2007, at approximately 5 p.m. Smith was an alcoholic

who exhibited signs of alcohol withdrawal when she arrived at the jail. Those symptoms matured

into *delirium tremens* over the weekend and her condition steadily deteriorated. She was never seen

by any medical personnel until she was found in respiratory arrest in her cell on Monday morning,

April 30, 2007 at 10:15 a.m. and paramedics were called. Smith died that morning. Her estate has

filed the present action against Lenawee County, its sheriff, several jail officers, and the physician

who had contracted to provide medical services for the jail alleging violations of the Eighth and

Fourteenth Amendments and state law. All of the defendants have moved for summary judgment,

arguing that the plaintiff has not proven her federal claims, they are entitled to qualified immunity from liability for the federal claims and governmental immunity for the state law claims, and the plaintiff has failed to prove causation on the state law claims. The Court conducted oral argument on June 2, 2010. The Court now concludes that fact issues preclude summary judgment on the federal claims against all the defendants save Mary Neill and Lawrence Richardson, whose motion will be granted, the remaining defendants are not entitled to qualified immunity, and there are fact issues precluding summary judgment as to the state law claims of the remaining defendants.

## I. Facts

### A. April 27 through 30, 2007

Brenda Sue Smith apparently violated her parole from a previous prison sentence and was arrested for a parole violation on April 27, 2007. She was taken to the Lenawee County jail and lodged on a parole detainer at approximately 5:15 p.m. that Friday.

At the booking, intake officer Adam Ondrovick filled out a medical history form, noting that Smith took blood pressure medication. Although Ondrovick listed "unknown" in response to "Appears to be under the influence of alcohol," it soon became apparent that Smith was suffering from alcohol withdrawal. When daytime shift supervisor Sergeant Mary Neill frisked Smith, she detected an odor of alcohol and noticed Smith "shaking slightly." In response to questions, Smith apparently stated that she "drinks every day" and "she's an alcoholic." *See* Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. N, Neill dep. at 45-46; Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 13, Tr. of Telephone Conversation Between Neill and Stickney at 2. That evening, Neill telephoned the jail medical director, Jeffrey Stickney, DO, and informed him of Smith's condition. The conversation, which was recorded, proceeded as follows:

-2-

| | |
|---|---|
| Neill: | We have a gal that we just booked.  Evidently she's — you can smell alcohol on her.  She says she drinks everyday, she's an alcoholic.  Um, she's shaking really bad.  She's going to be here at least for the weekend.  Um, she does take medication for, um, she takes Dilantin and high blood pressure medication. |
| Stickney: | Do you have those available to you? |
| Neill: | Yes, we do.  We do have those but I didn't know if we should see about getting something for her because I see she's starting to shake pretty good at this point. |
| Stickney: | Yeah, um, the Dilantin's a good idea.  I mean, um — er name? |
| Neill: | Last name is Smith, first is Brenda and she's 37 years old. |
| Stickney: | Okay, I'll order some stuff tomorrow. |
| Neill: | Thank you very much. |
| Stickney: | Okay, thank you. |

Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 13, Tr. of Telephone Conversation Between Neill and Stickney at 2.

Smith had been taking blood pressure medication and Dilantin, an anti-epileptic drug used to control seizures.  Smith began having seizures six or seven months earlier.  Over the telephone, Dr. Stickney prescribed Chlordiazepoxide (Librium), two 5 mg capsules twice a day, and Smith received her first dose at 9:35 that evening.  On a pass-on sheet, Neill recorded: "Smith, Brenda – Meds ordered for alcohol withdrawal."  Stickney's Mot. for Summ. J. [dkt. #92], Ex. A, Apr. 27, 2007 Pass-on Sheet.

Paul Dye was the Jail Shift Commander during the shift from 7 p.m. to 7 a.m. on the nights of April 27-28 and 29-30, 2007.  The only notation Dye made during the April 27-28 shift was an entry in a pass-on sheet that Smith was placed in Isolation Cell 1, located across from the booking desk where the intake officer sits, and she was suffering from "DTs."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. B, Jail Records for Brenda Smith (Pass-on Sheet) at Bates 31.  It also appears that on that evening, Smith contacted her mother Suetta Smith and said that she told jail personnel she was an alcoholic, was "shaking life a leaf," and was hoping that she would receive

-3-

medical attention because she was afraid she would suffer a seizure.  Pl.'s Resp. to Mots. for Summ.

J. [dkt. #106], Ex. 19,  Tr. of Apr. 27, 2007 Telephone Call Between Brenda Smith and Suetta Smith

at 7-8.

Sergeant Neill relieved Sergeant Dye at 7 a.m. on April 28.  At the end of her shift, Neill

made only two entries regarding Brenda Smith in a pass-on sheet: "Smith, Brenda I1 – Alcohol

DT.s" and "Smith, B. I1 shower."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. B, Jail Records

for Brenda Smith (Pass-on Sheet) at Bates 32.

Smith's condition began to deteriorate during the night of April 28 on Sergeant Dye's watch.

At 3:30 a.m., Dye wrote the following incident report:

> During the night of 4-28-07 and the morning of 4-29-07 Smith began to experience
> paranoid behavior and irrational actions.  She would tell officers about hering [sic]
> singing, pounding on the walls, and identify visiting officers and relitives [sic].  She
> appeared to be in good spirits and functioning well physically, Howerve [sic] her
> mental state was becoming more irrational as the night progressed.

Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. B, Jail Records for Brenda Smith (Sergeant Dye's

Apr. 29, 2007 Incident Report) at Bates 15.  Dye recalls that on that night, Smith "was confused

about where she was and who the people were around her, and she was even speaking to people that

weren't there."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. P, Dye dep. at 36.

During the first part of the day on Sunday, April 29, Smith made three phone calls to her

relatives.  She spoke with her mother and her sons, Robert and Brendan, ages 16 and 8, who at the

time were in her mother's custody.  Toward the end of the day, however, her condition deteriorated

further.  Defendant Adam Ondrovick, an intake officer on the April 29 day shift, testified that on that

day he first saw Smith talk to people who did not exist.  Ondrovick was replaced by Wendy

Vanderpool as the intake officer in charge at 7 p.m.  Vanderpool noted late that night that Smith was

"[p]acing, moving around a lot, coming to the door, frustrated with not being able to, like any person would be, you know, out of that cell."   Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 33, Vanderpool dep. at 48.   Vanderpool described Smith as "agitated, talking about things in her life as if she was there and then she was back, you know, in the jail."   *Id.* at 47-48.

Sergeant Dye took over after Sergeant Neill at 7 p.m. on April 29 and stayed there until 3 a.m. on April 30.   Shortly before 9 p.m. on that night, he moved Smith from the isolation cell to the padded observation cell, concerned  that "she may harm herself accidentally, either accidentally in her manner on either the steel commode and sink or the phone or the steel bump that protruded from the wall."   Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. P, Dye dep. at 60.   Apparently, Smith skinned up her knuckles on the door.   At 9:26 p.m. Dye called Dr. Stickney again.   The two had the following conversation:

| | |
|---|---|
| Dye: | . . . And then next is, um, Brenda Smith.  She came in on Friday, the 27th.  Um, I don't know if Bonnie talked to you about her, possibility of going through DTs.  She came in with, um, Lopressor and Dilantin.  And on the 27th, it was Friday, she was started on — I can't pronounce it but it's equivalent to Librium five milligrams two tablets twice a day.  Um, she is to the point of really bad hallucinations right now.  Um, she's getting kind of violent about wanting to get out of her cell, you know. |
| Stickney: | Having withdrawal? |
| Dye: | Yes, badly. |
| Stickney: | Is she agitated, is she — |
| . . . | |
| Dye: | She is very agitated. . . . |
| . . . | |
| Dye: | She didn't eat lunch, she ate breakfast.  She did not eat lunch, did not eat dinner.  Um, she did take her medication for 'em today and that was at 10 and at four.  Um, we haven't done the evening meds yet. |
| Stickney: | Did she take a Lopressor and how many? |
| Dye: | She did take, um — she had 25 milligrams at, at 4:05 today, this afternoon.  Um, her Dilantin and her Librium were at 10 p.m. — or, no, Librium's at 10 and 10 and her Dilantin's at 10 a.m. |

| | |
|---|---|
| Stickney: | Uh-huh.  What kind of things is she doing to make you think she's agitated? |
| Dye: | She's banging on the cell.  She's yelling at us, calling us names.  Um, we moved her into the, um, observation room, the padded cell.  Um, and she – it took three of us to move her.  Um, she came out real nice but wouldn't go back in so we, um, gently pushed her in there.  We didn't have to, you know, throw her in or fight with her but we did have to physically, um, guide her.  Um, she's yelling now.  She keeps talking to several different individuals about different things and yelling at them and yelling at us. |

. . .

| | |
|---|---|
| Stickney: | Well, there's more to her obviously than just simple alcoholism – inaudible. |
| Dye: | Uh-huh. |
| Stickney: | Inaudible — alcoholic can get some more drugs. |
| Dye: | Okay. |
| Stickney: | Um, how long did — just keep her protected and safe. |
| Dye: | Okay. |
| Stickney | And she's on good medicine.  We'll, um, see if Bonnie comes tomorrow and maybe this week. |
| Dye: | Okay, good. |
| Stickney: | All right. |
| Dye: | All righty. |
| Stickney: | We can be agitated ourselves and just confused. |
| Dye: | Oh, yeah, no, no, we're — |
| Stickney: | Sitting in the jail will do her some good. |
| Dye: | Yeah, hopefully.  We're keeping her hydrated.  She is drinking and she enjoyed — we're giving her some ice for ice water so — |
| Stickney: | Uh-huh. |
| Dye: | — she is doing well there. |
| Stickney: | Right. |
| Dye: | Yeah. |

Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 16, Tr. of Apr. 29, 2007 Telephone Call Between

Dye and Stickney at 2-4.

Dr. Stickney disputes the accuracy and completeness of the telephone conversation

transcript.  He insists that he instructed Dye to have the part-time jail nurse examine Smith the

morning of April 30.  According to Dr. Stickney, his plan for treating Smith was "to make sure she

was taking medicines and we did that and make sure she's protected and I think we did that, and to

-6-

make sure that we got a medical opinion through Bonnie [the nurse] in the morning."  Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 37, Stickney dep. at 66.  However, Nurse Bonnie Mason, the sole nurse at the facility, worked only three days per week, and her shift on Monday did not start until 1 p.m., after Smith had expired.

Sergeant Dye summarized his conversation with Dr. Stickney in the following incident report: "Sgt. Dye called Dr. Stickney and advised him of Smith's behavior and condition.  He stated that it sounded like she was on good medication and to keep her safe and watch her."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. B, Jail Records for Brenda Smith (Apr. 30, 2007 Incident Report) at Bates 16.  Sergeant Dye also noted in a pass-on report, "Brenda Smith is very ill w/ DT an[d] W/D symptoms.  Dr. Strickney was called. . . .  B. Smith did not eat or drink a.m. meal."  *Id.* (Pass-on Sheet) at Bates 33.  In his written notes, Dye mentioned nothing about the need for the nurse to see Smith the following day.

Officer Wendy Vanderpool was on duty from 7 p.m. on April 29 until Smith expired around 10 a.m. on April 30.  She observed Smith "pacing, talking out loud, not loudly but just talking." Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 33, Vanderpool dep. at 53.  At some point, Smith started "holding the walls up," and "talking to other family members that weren't there."  *Ibid.* Vanderpool recalled the following:

> A.    She was sweaty from holding that wall up.  She literally was working hard to keep that wall up.
> Q.    What do you mean by that, she was working hard to keep the wall up, was the wall falling down?
> A.    I think she thought so.
> Q.    Okay.  That was the conclusion you drew by looking – by observing her; is that right?
> A.    Yes.
> Q.    And what exactly was she doing that drew you – that you drew the conclusion that she was working hard to hold the wall up?

-7-

> A.     She had her hand on the wall and she kept moving and she would tell her
>         family to help her.  That was my understanding of what she was. . .
> Q.     And she was getting sweaty in the process?
> A.     Yes.

*Id.* at 55-56.

In her written statement of September 15, 2007, Officer Vanderpool repeated that Smith was "working hard through the night trying to keep the wall up and getting her family and friends to help, getting upset because they didn't work [as] hard [as] her.  Her friends and family was just outside and wanted to go see them.  Her being covered in sweat from working so hard."  Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 14, Suppl. Info. of Officer Vanderpool.  Vanderpool stated in the death investigation report, "We wanted to know if Inmate SMITH needed to go to the hospital.  Dr. Stickney advised, 'No, just observe her.  The Meds. she was on should be enough.'"   Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. C, Death Investigation Report at 6.

Eric Westgate acted as the jail shift commander for four hours from 3 a.m. to 7 a.m. on Monday, April 30, 2007 when Dye's shift ended.  At 5:12 on that morning, Westgate passed food trays in the cells in the booking area and noticed that Smith did not eat.  At 5:48 a.m., Westgate prepared the following incident report:

> During morning feeding inmate Smith did not eat or drink.  R/O then gave inmate
> Smith a glass of water and had inmate drink that.  It should be noted that inmate
> Smith did not sleep and was yelling at her relatives all night and morning.
> . . .
> Follow up required: medical personal [sic].

Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. B, Jail Records for Brenda Smith (Apr. 30, 2007 Incident Report) at Bates 17.

According to Vanderpool, by 5 a.m., Smith became "more settled."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. C, Death Investigation Report at 5.  Vanderpool stated that Smith "was

up all night.  She had to be exhausted.  She was on the floor playing with puppy dogs and playing

with bugs.  She'd reach down and pick them up.  She is talking to family members.  She's grabbing

for them.  There were no bugs, or puppies, or family members.  She laid her head on the bench.  She

is still talking, but she was definitely slowing down." *Ibid*.

At 7 a.m. on April 30, Sergeant James Craig took over as a shift commander.  Craig was off

the entire weekend, so he read the pass-on notes and incident reports to become current.  Craig told

Vanderpool to monitor Smith every fifteen minutes.  When Vanderpool told Craig that Smith was

holding onto her empty cup, Craig went into the cell, gave her some water, and talked to her around

9:10 a.m.

Officer Bernice Baker's first day on the job at the Lenawee County Jail was Monday, April

30, 2007.  Vanderpool asked Baker to assist her in monitoring Smith, which she did for

approximately thirty minutes until Craig asked Baker to come into his office to conduct orientation.

During that time, both Vanderpool and Baker listened to Smith's breathing, which Vanderpool

characterized as "raspy sounding," Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. C, Death

Investigation Report at 6, and Baker as "heavy," *id.* 7.  Baker subsequently recalled the events of

that morning as follows:

> When I came to work at 7:00 a.m. this morning, Monday, 4/30/07, I/O Vanderpool
> told me Inmate Smith was going through DT's.  I was told this is the quietest Inmate
> Smith had been all night.  I observed Inmate Smith on the monitor.  It looked like
> sometimes she was trying to hold the wall up.  At times she was crawling around on
> the floor.  She was calling out family members names.  She was trying to feed a
> puppy.  She was on her back kicking her feet up.  All the while talking to herself.
> At one point she was sitting cross-legged on the floor.  She was picking things up off
> the floor and handing them to someone.  There was nothing to pick up and no one
> in the cell with her.  During this time, she was very loud.  About 15 minutes she was
> bent over the bench.  She was rubbing her arms and hands, She was talking to
> herself.  I opened up the microphone.  I could hear heavy breathing.  Then she lifted
> her leg up like ballerinas do.  She stayed in that position I'd say 1½ minutes.  Then

-9-

she put her foot down.  Her right leg and foot started to tremble.  At this point, I went
to Sgt. Craig's office [for orientation].

*Ibid.*

At around 9 a.m. on Monday, April 30, 2007, parole officer Thomas Moore visited Smith
to serve her with a parole violation notice.  Vanderpool warned Moore that Smith was "incoherent,"
"out of it," and "didn't know who she was."  Upon seeing Smith, Moore quickly confirmed these
accounts of Smith's condition, observing Smith lying face down on the bench and "loudly moaning."
*Ibid.*  Moore describes his observations during the five- to ten-minute period during which he was
watching Smith in an observation cell:

> I arrived in the booking area and requested to speak with Ms. Smith.  The Correction
> Officers told me that she was hallucinating, did not know herself and was going
> through the "DT's."  I then observed her through the glass window face down on the
> ground and moaning.  She was located in the booking area in an observation cell.
> I was unable to serve her charges at that time and left the jail informing Supervisor
> Olsen to cancel the transport.

Moore's Mot. for Summ. J. [dkt. #10], Ex. 1, Moore Aff. ¶ 4.

According to the videotape of activity in the jail cell, Smith last moved at approximately 9:19
a.m. that morning.  The next entry in the jail journal following Moore's visit is at 10:15 a.m. by
Vanderpool: "Checked inmate Smith and was not breathing called 911."  Defs.' App. for Mots. for
Summ. J. [dkt. #90], Ex. E, Activity Log at 6.  At that point, Vanderpool called 911, and officers
Lippens, Iott, and Sergeant Craig hooked up an automatic external defibrillator to Smith and started
to perform CPR.  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. C, Death Investigation Report
at 7.  The recorded event times in the activity log and the Death Report differ.  However, it appears
that paramedics arrived between 9:55 and 10:18 a.m., and the ambulance left the jail with Smith
between 10:13 and 10:27 a.m.  Smith was pronounced dead at 11:22 a.m. at the Bixby Medical

-10-

Center in Adrian, Michigan.  The death certificate stated the cause of death as seizure disorder due to chronic alcohol abuse with withdrawal.

Following Smith's death, Detective David Seeburger was responsible for investigating whether Smith's death was "criminal or a natural death or a suicide."  Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 27, Seeburger dep. at 13.  As a part of the investigation, Seeburger reviewed the video recording of Smith's cell on the morning of April 30 and compiled the following time line:

| | |
|---|---|
| 07:02:27 | BRENDA is sitting on the bench with her head on the wall. |
| 07:03:08 | BRENDA gets up on her feet, looks like she is picking something off the wall.  She is also pushing against the wall.  She is pacing.  She is standing on the bench. |
| 07:22:05 | BRENDA falls on her back. |
| 07:22:17 | She gets back up. |
| 07:22:46 | She falls on bench.  Just sits there. |
| 07:31:30 | BRENDA is back on her feet. |
| 07:36:38 | She falls on floor. |
| 07:36:48 | She attempts to get up, but ends up sprawled across the bench. |
| 07:36:52 | BRENDA gets into a sitting position.  She is holding her head in her hands. |
| 07:39:16 | She gets off the bench on her knees and goes into a sitting position.  It appears she is reaching for things on the floor and wall. |
| 07:40:08 | BRENDA is back on her feet.  She is wobbly and unsteady. |
| | *Note: This is the last time she is on her feet.* |
| 07:40:16 | BRENDA falls back against the wall.  She slides down the wall to a sitting position. |
| 07:41:55 | She is up on her knees.  She appears to be talking and reaching out for things.  Crawling on floor and at times, laying on floor. |
| 08:00:56 | She is up on her knees.  Appears to be reaching for things on the wall. |
| 08:01:28 | Looks like she rolls back on her buttocks. |
| 08:01:48 | She is sitting back on her buttocks and knees.  Then she is crawling on the floor. |
| 08:21:52 | BRENDA is sitting.  She falls over.  She gets back to a sitting position. |
| 08:30:19 | BRENDA sprawls across the bench.  Her left leg is outstretched.  Her left foot is quivering. |
| 08:31:11 | BRENDA is sitting on her knees, leaning on the bench. |

-11-

| | |
|---|---|
| 08:46:36 | BRENDA is on her buttocks and knees. Her upper body is on the bench. It looks like her head is on her arm, like she might be sleeping. Sgt. Craig comes in and gets her cup. He looks at her. |
| 08:47:23 | Sgt. Craig brings cup of water in and sits it down in front of BRENDA. |
| 08:47:34 | Sgt. Craig looks at BRENDA and leaves. BRENDA doesn't reach for the water. She is still moving her hands and feet and head occasionally. |
| ***09:19:30*** | ***Last movement by BRENDA.*** |
| 09:50:21 | C/O LIPPENS comes into BRENDA's cell. He checks her. He summons help. C/O IOTT comes in. Sgt. Craig comes in with the AFD. |
| 09:55:25 | Paramedics arrive. |
| 10:13:08 | BRENDA is taken out of cell and to hospital. |

Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 1, Death Investigation Report at 10-12 (emphasis added).

### B. Jail medical service

Dr. Stickney is an independent contractor who had been providing off-site medical services to the Lenawee County Jail on a contractual basis since 1998. Although Dr. Stickney held the title of the Medical Director of the Lenawee County Jail continuously from 1998 through 2007, he never maintained an on-site office at the jail. In fact, he had not treated an inmate at the jail for at least three years before Brenda Smith's death. Rather, the custom was for the nurse or correctional officers to contact Dr. Stickney by telephone for a consultation; he was supposed to be available twenty-four hours a day. Early in his tenure, Dr. Stickney would see an inmate at his family practice office in Tecumseh on occasion; later, he abandoned that practice altogether.

In addition to Dr. Stickney, the Lenawee County jail had one part-time nurse, Bonnie Mason, R.N., who worked on Mondays from 1:00 to 4:30 p.m., Wednesdays from 8:00 a.m. to 3:30 p.m., and Fridays from 1:00 to 4:30 p.m., for a total of 14.5 hours per week. The jail had no on-site nursing care or health-trained correctional staff on weekends.

### C. Other incidents of failed medical care at the Lenawee County Jail

-12-

The plaintiff has offered evidence of three other incidents of botched medical care at the Lenawee County jail within the four months preceding Brenda Smith's death. One incident resulted in an inmate death in December 2006. Yolanda Flores, a heroin addict and a diabetic with a heart condition who allegedly was denied insulin while in custody of the Lenawee County, died on December 13, 2006 after spending three days at the jail. After an internal investigation into Flores's death, Undersheriff Gail Dotson recommended that Sergeant Dye and Sergeant James Whiteman be placed "on a three-month retraining order, and Administrator Steenrod will see that they are retrained in time management, refresh their supervisory and administrative skills, how to communicate with the other Sergeants, and discuss document medical issues." Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 17, Interoffice Memo re: Inmate Flores/Dye Discipline, Mar. 2, 2007, at 2. However, Sheriff Richardson rejected Dotson's recommendation, stating: "'Absolutely not. Sergeant Whiteman, Sergeant Dye, have 25-plus years. If they do not know policies and procedures by now —' and that they were part of writing these policies and procedures." Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 40, Dotson dep. at 39. Instead, Sheriff Richardson placed Dye on a ten-day suspension and terminated Sergeant Whiteman. Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 18, Dye Discipline Form (Mar. 16, 2007 Lenawee County Interoffice Memo) at 2. The reason for Sergeant Dye's discipline was his failure to leave "written documentation that Inmate Yolanda Flores would need to be seen by Nurse Mason on 12/13/06. Nurse Mason did not know the inmate was in our jail until she was called downstairs due to the inmate's death." *Id.* at 1.

Another incident occurred on Sunday, February 11, 2007 involving Lenawee County jail inmate Douglas Strech. He was incarcerated on a child support order and alleged that he informed intake officer Wendy Vanderpool and Jail Shift Commander May Neill of his history of heart

-13-

problems, including his recent heart surgery for installation of an implantable cardioverter defibrilator (ICD) into his heart.  Strech contends that, despite his warnings, Vanderpool and Neill refused to administer his heart medication that he brought with him.  As a result, he "began to experience multiple sudden and debilitating ICD misfirings resulting in transfer by emergency medical services to Bixby Hospital with subsequent hospitalization."  Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 5, Strech Aff. ¶ 4.

A third incident involved inmate Aaron Borck, who was incarcerated in the Lenawee County jail in January 2007.  He alleged that he suffered a ruptured appendix and had to be taken to Bixby Hospital for an emergency appendicitis surgery.  His says that Nurse Bonnie Mason discounted the seriousness of his condition and that various officers on duty denied his repeated requests to see a jail nurse or a physician.

Sometime after Yolanda Flores died but before Smith's death, Sheriff Lawrence Richardson ordered a review of jail healthcare services "[t]o get more bang for the buck."  Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 35, Richardson dep. at 67.  Richardson testified that he wanted to "maximize the County dollars" because the jail was "going over budget every year.  So, these seminars I have gone to, they showed how we could get the same or more services for less money." *Ibid.*  On April 2, 2007, Jail Commander Dennis Steenrod issued an interoffice memorandum addressed to Undersheriff Gail Dotson dealing with the state of health care services at the jail.  *See* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 6, Apr. 2, 2007 Interoffice Memorandum from Steenrod to Dotson.  The memorandum read:

> At your request I have reviewed and evaluated our current inmate health care system.  I have determined that we currently provide inadequate health care to inmates and at an exceptionally high cost.  In an effort to provide inmate health care we have two options:

-14-

2:09-cv-10648-DML-MJH   Doc # 139   Filed 03/28/11   Pg 15 of 50   Pg ID 3165

    1.  Continue with our current health care program or
    2.  Contract with a Correctional Health Care Provider.
. . .

  Inmate medical services currently provided are a Blue Cross/Blue Shield policy for each inmate, part-time nursing care (18.5 hours of contracted nursing care a week 2.6 hours a day), and off-site doctor visits to the physician's office. Additionally, the contracted physician is also available for after hour's [sic] telephone consultations. For these services we paid $515,000.00 in 2006. We have exceeded our budget for inmate health care the past three years.

  Typically inmates coming into the correctional system have more serious health issues than are found in the community, (drug and alcohol abuse, uncontrolled diabetes and hypertension, mental health issues, compromised immune systems, untreated heart disease, and a myriad of other chronic and debilitating diseases). Often these health issues have been left untreated because the inmate lacked health insurance or was indifferent to his/her medical needs.

  The Sheriff is required by law to provide adequate and reasonable health care to all inmates in his custody. We are exposing Lenawee County, the Board of Commissioners, and the Sheriff to a tremendous amount of liability if we do not make improvements to the current inmate health care system.

  Inmate health care and the access to health care issues are being litigated at an alarming rate. I am undertaking this endeavor to reduce the liability to Lenawee County and it's [sic] taxpayers. After my evaluation of our current inmate health care system I have discovered the following inadequacies:

- Inadequate nursing hours, 2.6 hours a day.
- Absence of an on-site physician (inmates needing physician services are transported to his/her office, after a telephone consultation). In addition to the hard dollar cost of each medical transport outside the facility, there is a soft dollar cost associated with each medical transport. Each transport outside the facility requires at least one patrol deputy to transport the inmate. This strips patrol or in dire cases the medical transport requires overtime.
- Medically untrained corrections officers forced to make medical judgments 21.4 hours a day.
- Untrained corrections officers administering and dispensing medications in addition to a corrections officer duties.
- A Certified Nursing Assistant (CNA) with limited assessment skills performing health appraisals.
- Reactive medical decisions opposed to proactive medical decisions.

  In an effort to reduce our exposure and provide an acceptable level of health care to inmates we need to do the following:

- Increase on-site nursing (L.P.N. or R.N.) to at least 16 hours a day (preferably 24 Hours a day.
- Provide an on-site Physician at least 3 hours a week.
- Provide trained medical personnel to make all medical decisions.

-15-

- •    Provide trained medical personnel to administer and dispense medication to inmates.
- •    Eliminate a C.N.A. from performing State mandated health appraisals.
- •    Professionally manage correctional health care in a proactive rather than a reactive manner, containing costs and providing acceptable levels of health care.

   If we do nothing, inmates will continue to receive inadequate health care, we will not have any control over skyrocketing medical costs, and expose the County to a high level of liability involving medical issues.  The attached proposals will provide an acceptable level of health care for inmates, will contain our costs, and will reduce the County's exposure to liability involving medical issues.

*Id.*

In the process of preparing the memo, Steenrod secured three proposals from three correctional health care providers, and recommended that the county hire Health Professionals LTD. On April 10, 2007, the Lenawee County Board of Commissioenrs' Ways and Means Committee approved the proposal to hire Health Professionals LTD beginning June 1, 2007.   Health Professionals LTD provided 16 hours of nursing care per day, an on-site physician three hours a week, and certain diagnostic imaging services on-site.  These measures were not in place on April 27 through 30, 2007.

### D.  Proceedings

The plaintiff filed a complaint in this Court on February 20, 2009 alleging violations of the Eighth and Fourteenth Amendments via 42 U.S.C. § 1983 and gross negligence under state law.  She later filed an amended complaint naming as defendants the County of Lenawee; Sheriff Lawrence Richardson; jail sergeants Paul Dye, James Craig, and Mary Neill; intake officers Wendy Vanderpool and Bernice Baker; corrections officers Eric Westgate and Adam Ondrovick; state

parole officer Thomas Moore; and jail physician Jeffrey Stickney, D.O.  Parole officer Moore filed

a motion for summary judgment before discovery commenced, and the plaintiff was not able to offer

a sufficient affidavit under Federal Rule of Civil Procedure 56(f).  The Court granted the motion on

the section 1983 claim and deferred ruling on the state law claim.  Moore appealed, and the Sixth

Circuit ordered the state law claim dismissed as well.  *See Smith v. County of Lenawee*, 600 F.3d

686, 691-92 (6th Cir. 2010).

      After discovery was complete, the remaining defendants filed their dispositive motions.

Defendants Westgate, Craig, Baker, Ondrovick, and Vanderpool styled their motions in the

alternative as motions to dismiss or for summary judgment.  The rest of the defendants have moved

for summary judgment.

## II.  Discussion

### A.  Motion Standards

      Consideration of a motion to dismiss under Rule 12(b)(6) is confined to the pleadings.  "[A]

court may accept 'matters outside the pleadings,' but in doing so it generally must treat the motion

'as one for summary judgment under Rule 56.'"  *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th

Cir. 2008) (citing Fed. R. Civ. P. 12(d)).  It appears that those defendants seeking dismissal under

Rule 12(b)(6) have limited their arguments under that rule to the gross negligence count.

Nonetheless, all parties have attached to their motion papers affidavits and documentary evidence

that are not part of the pleadings.  Because the parties have had notice and an opportunity to present

their materials in support of their positions, the Court will decide the motions under Rule 56.  *See*

Fed. R. Civ. P. 12(d) (stating that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside

the pleadings are presented to and not excluded by the court, the motion must be treated as one for

-17-

summary judgment under Rule 56."); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 571 (6th Cir. 2001) (stating that Rule 12(b) "empowers a district court to grant summary judgment *sua sponte* where the court is presented with materials outside the pleadings. . . . depend[ing] on the facts and circumstances of each case").

The standards for evaluating a motion for summary judgment are well known but bear repeating here. As the Sixth Circuit recently explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. However, "[t]he submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial." *Alexander*, 576 F.3d at 558 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.")). Rather, "the party opposing summary judgment must show

-18-

that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Ibid.* If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

When "'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. . . . Thus, the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.'" *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citations omitted)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Ref., LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

The plaintiff has filed a motion to strike affidavits of corrections officer Eric Westgate, jail commander Dennis Steenrod, Sheriff Lawrence Richardson, Jr. under the "sham affidavit" rule. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (holding that if an affidavit filed on summary judgment directly contradicts the affiant's prior deposition testimony, it should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction). That rule is usually invoked against parties opposing summary judgment on the ground that the affidavit cannot revive a factual issue that a party resisting summary judgment has eliminated by deposition testimony. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997). It has little application, however, when raised against a party moving for summary judgment.

If an affidavit conflicts with the deposition testimony of a summary judgment movant, the opposite party receives the benefit of the conflict under the requirement that evidence is construed in the light most favorable to the non-moving party. The plaintiff's motion to strike the affidavits, therefore, will be denied.

### B. Deliberate indifference claims

Count 1 of the complaint alleges claims against all the defendants under 42 U.S.C. § 1983. "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The parties do not dispute that the defendants were acting under color of law. Dr. Stickney was a contract employee of the jail; however, it is well settled that a private physician under contract to provide medical services to jail inmates acts under color of law and is subject to suit under section 1983. *See Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (citing *West v. Atkins*, 487 U.S. 42 (1988)).

The constitutional deprivation alleged by the plaintiff is the right to be free of cruel and unusual punishment under the Eighth Amendment, which resulted when Brenda Smith was denied medical care. A state's failure to provide necessary medical care to prisoners can establish a cause of action under section 1983. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1986). Smith was in custody on a parole detainer awaiting a parole violation hearing, and therefore she was not actually serving a sentence at the time. Her status was that of a pretrial detainee, to which the Eighth Amendment does not apply. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) ("The Eighth

Amendment does not apply to pretrial detainees."). However, "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that . . . are enjoyed by convicted prisoners," *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), and the Fourteenth Amendment confers upon pretrial detainees a right to adequate medical treatment that is "analogous to the Eighth Amendment rights of prisoners." *Watkins*, 273 F.3d at 686; *see also Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001).

The plaintiff's main contention is that jail personnel, including the sheriff and the jail doctor, violated Brenda Smith's constitutional rights by failing to respond properly to her obvious and painful alcohol withdrawal, and instead simply watched her deteriorate with indifference without interceding until she stopped breathing. The Eighth Amendment secures protection against deliberate indifference to serious medical needs of convicted persons. *Farmer v. Brennan*, 511 U.S. 825 (1994). Under both that amendment and the Due Process Clause of the Fourteenth Amendment, "[t]he test to determine whether [a defendant] acted with 'deliberate indifference' has an objective and subjective component." *Napier*, 238 F.3d at 742.

"Deliberate indifference is not mere negligence," *Watkins*, 273 F.3d at 686, and mere allegations of malpractice are insufficient to state a claim. *Estelle*, 429 U.S. at 106. To succeed on a claim of deliberate indifference, the plaintiff must offer evidence on both elements: the serious medical need, and the defendant's deliberate indifference to it. *Farmer*, 511 U.S. at 834. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). "To satisfy the subjective component,

the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 707 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

With respect to the objective component, the Sixth Circuit has held, albeit in an unpublished opinion, that unlike general alcohol withdrawal, *delirium tremens* is a serious medical condition, because it is "a well-recognized manifestation of alcohol withdrawal" that requires immediate hospitalization and "is often fatal" if left untreated. *Speers v. County of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006); *see also Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009) (recognizing that "delirium tremens constitutes a serious medical need"); *cf. French v. Daviess Cnty.*, No. 09-5983, 2010 WL 1780252, at *2 (6th Cir. May 5, 2010) (assuming that withdrawal from the highly addictive drug Xanax, which can cause seizures and delirium if discontinued abruptly, is a serious medical condition); *Kelley v. County of Wayne*, 325 F. Supp. 2d 788, 791-92 (E.D. Mich. 2004) (holding that "[h]eroin withdrawal is a serious medical condition"). The jail records are replete with acknowledgments that Brenda Smith was suffering from "DTs", or *delirium tremens*.

Deliberate indifference is the "equivalent of recklessly disregarding [a substantial risk of serious harm to a prisoner]." *Dominguez*, 555 F.3d at 550 (quoting *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 540 (6th Cir. 2008)). However, the Sixth Circuit also held that "less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002). In particular, the Sixth Circuit endorsed the standard of "grossly inadequate medical care," under which medical treatment is "'so grossly

incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)). Applying that standard, the court concluded that several doctors' actions could constitute deliberate indifference to the decedent's serious medical needs "because a jury could possibly decide that a reasonable doctor [in the defendant's position] would have concluded a substantial risk of serious harm to the decedent existed." *Id.* at 845. In that case, the claim arose from the death of an involuntarily committed patient at a state psychiatric hospital who died from heat stroke after the defendants, despite having knowledge of his hypertension and heart condition, placed him on medication increasing chances of heat stroke and allowed him to go outdoors and engage in a weight-training session on a very hot day. The Sixth Circuit was careful to emphasize that *Terrance*'s "grossly inadequate care" standard satisfies only the objective part of the test. *Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006).

The subjective component requires some measure of proof of intentionality. However, whether a person had subjective knowledge of and then disregarded a serious medical need is "'a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Terrance*, 286 F.3d at 843 (quoting *Farmer*, 511 U.S. at 842). Therefore, "where a plaintiff's claims arise from an injury or illness so obvious that even a layperson would easily recognize the necessity of a doctor's attention . . . it is sufficient to show that [the prisoner] actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Blackmore*, 390 F.3d at 899-900 (citation and quotation marks omitted). "Acknowledging, but yet ignoring, the obviously debilitated state of a prisoner in need

-23-

of medical attention is conduct that would alert a reasonable person to the likelihood of personal liability." *Taylor v. Franklin Cnty.*, 104 F. App'x 531, 543 (6th Cir. 2004). Where an officer was briefed that an inmate was going through heroin withdrawal, observed the inmate vomiting and suffering from diarrhea, and noticed an inmate lying down on the floor of the "fish bowl," the Sixth Circuit found that summary judgment on the subjective component of deliberate indifference should be denied. *Preyor v. City of Ferndale*, 248 F. App'x 636, 643-44 (6th Cir. 2007).

### C.  Qualified immunity

Each of the individual defendants in this case argues that he of she is entitled to qualified immunity because they acted reasonably under the circumstances and their actions did not violate a constitutional right of the plaintiff that was clearly established at the time. "To overcome a qualified-immunity defense in the setting of a constitutional tort, a plaintiff must establish (1) that the defendant violated a 'constitutional right' and (2) that the right 'was clearly established.'" *Leary v. Livingston Cnty.*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Qualified immunity is an affirmative defense that protects state officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The Supreme Court has held that a claim of qualified immunity must be examined in two stages, *Saucier*, 533 U.S. at 200, although the Sixth Circuit sometimes expands the inquiry into a three-step sequential analysis. *See Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004). Generally, "a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that:

-24-

(1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, --- F.3d ---, ---, 2011 WL 291951, at \*4 (6th Cir. Feb. 1, 2011) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). The Supreme Court continues to use the two-step approach, *see Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam), and that seems most useful here. "It is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 198 (internal quotes and citation omitted).

Once the qualified immunity defense is raised, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 970 (6th Cir. 2004). "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [she] is doing violates that right.'" *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)).


The qualified immunity issue in this case is fact-bound. Consideration of it "must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." *Saucier*, 533 U.S. at 201. Moreover, the Court must "evaluate the liability of each Deputy individually." *Bishop*, 2011 WL 291951, at \*6. Nonetheless, in cases alleging deliberate indifference, the Sixth Circuit has concluded that "'acknowledging, but yet ignoring, the obviously debilitated state of a prisoner in need of medical attention is conduct that would alert a reasonable person to the likelihood of personal liability.'" *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at \*8 (6th Cir. Feb. 2, 2009) (quoting *Taylor*, 104 F. App'x at 543);

-25-

*see also Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) (holding that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process" (quotation marks omitted)).

### D.  Individual defendants

#### 1.  Eric Westgate

Defendant Westgate argues that he was not deliberately indifferent and is entitled to qualified immunity because there is no evidence establishing his knowledge that *delirium tremens* when treated with medicine could be a serious and life-threatening condition.  He alleged in his affidavit that he "had seen other inmates being treated for withdrawal in the past get better after they went through withdrawal."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. II, Westgate Aff. ¶ 9.  He cites other evidence in the record suggesting he was concerned with the decedent's refusal to eat rather than with her DTs.  Finally, he relies on the testimony of the plaintiff's expert Dr. Joseph Goldenson that putting the Incident Report into the nurse's mailbox does not objectively amount to deliberate indifference to whether medical care actually would be forthcoming.

Westgate's only interaction with Smith occurred during his four-hour shift as the Jail Shift Commander from 3 a.m. through 7 a.m. on Monday, April 30.  But that encounter provided him with an ample opportunity to observe Smith's suffering during her last hours.  When Westgate took over after Sergeant Dye, he knew from Dye's last report that Smith was "very ill w/ DT an[d] W/D symptoms."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. B, Jail Records for Brenda Smith (Pass-on Sheet) at Bates 33; *see also* Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. L, Westgate dep. at 48.  Early on during his shift, he had an opportunity to confirm the diagnosis firsthand.

That morning, Westgate saw that Smith refused to eat or drink for the second time in a row. At 5:48 a.m., he prepared the incident report in which he recounted Smith's refusal to eat. Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. B, Jail Records for Brenda Smith (Apr. 30, 2007 Incident Report) at Bates 17. In the same incident report, Westgate noted that "inmate Smith did not sleep and was yelling at her relatives all night and morning," and stated, "FOLLOW UP REQUIRED: MEDICAL PERSONAL [sic]." *Ibid*. At his deposition, he candidly acknowledged that he had seen the symptoms exhibited by Smith in other inmates going through alcohol withdrawal and *delirium tremens*, and at the time he authored the report, "it was obvious to [him] that [Smith] needed to be seen by a doctor." Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. L, Westgate dep. at 51-52. But Westgate summoned no doctor and called no emergency medical personnel.

Moreover, Westgate appreciated that DT could be a serious condition and could be lethal. *Id.* at 16-17. It was also within his undisputed authority to contact emergency personnel. *Id*. at 15. Nevertheless, he chose to leave Smith as a problem for later shifts. Although he opined that his act of giving Smith water was "[j]ust the kindness" expected of one human being toward another, *id*. at 62 ("I mean she hasn't eaten or drink, you at least need to drink something."), he stated at the same time that there was not "anything more [he] could have done for this particular person at the time that [he] authored [his] report . . . other than providing her with a glass of water." *Id*. at 63-64. A jury could conclude that Westgate's delay in providing medical care to Smith under the circumstances could constitute deliberate indifference. *See Dominguez*, 555 F.3d at 551 (citing *Terrance*, 286 F.3d at 843). His conscious disregard of Smith's obvious distress defeats his claim of qualified immunity.

-27-

## 2. Mary Neill

Mary Neill contends she is entitled to qualified immunity because there is no showing that any individual county officer knowingly violated the law. She was on duty when Smith was booked, at which time she contacted Dr. Stickney for medication because she "felt that [Smith] might be going to experience going through alcohol withdrawal while she was there." Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. N, Neill dep. at 48-49. She was also on duty from 7 a.m. through 7 p.m. on Saturday, April 28, and Sunday, April 29. Although Smith exhibited some irrational behavior during the night from Saturday to Sunday, which was reflected in Sergeant Dye's incident report, judging from her conversation with the relatives, Smith was relatively lucid on Sunday morning and in the early part of the afternoon. Neill never observed Smith's delirium and never saw her unable to stand or move. Neill knew that Smith took a shower on April 28, and "was able to wash and take care of herself, her hygiene." *Id.* at 66. She also knew that Smith ate her lunch on Sunday afternoon, although she recorded in the pass-on sheet that Smith did not want her evening meal and she gave her ice instead. However, there is no evidence that Neill drew the link between Smith's refusal to eat and her worsening condition. She testified:

> Q.    Was there any significance to you that she did not eat her evening meal that night?
> A.    No, I don't recall.
> Q.    It was significant enough for you to make a note of it, though, correct?
> A.    That's correct.
> Q.    You would agree that her condition was getting worse by virtue of the fact that she was not — she did not eat . . . her evening meal and was apparently eating ice instead?
> A.    No.
> Q.    Why not?
> A.    I'm not indicating she's eating ice. I probably gave her ice for her water to make it cooler 'cause she's drinking fluids. And sometimes I will say they don't eat meals, they'll say they're not hungry.
> Q.    Okay. Well, did she tell you she was not hungry?

-28-

      A.      I don't recall.

      Q.      So you didn't think that was in any way related to her alcohol DTs, her not having eaten an evening meal?

      A.      Not necessarily, no.

*Id.* at 68-69.

The defendant's expert witness Michael F. Boyle III, D.O. opined that "Brenda Smith's symptoms of alcohol withdrawal worsened into delirium tremens on the evening of April 29, 2007." Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. FF, Boyle Aff. ¶ 3(e). Neill did not witness the turn for the worse, and the plaintiff came forward with no evidence suggesting Neill's subjective awareness of Smith's serious medical condition. Therefore, the Court will grant Neill's motion for summary judgment.

### 3.  Paul Dye

Sergeant Dye makes a similar argument as Neill, but the evidence requires a different result. The record amply demonstrates that Dye was subjectively aware of Smith's serious medical condition during his shift on April 29-30. Sergeant Dye wrote in the pass-on report at the end of his shift at 3 a.m. on April 30, "Brenda Smith is very ill w/ DT an[d] W/D symptoms. Dr. Strickney was called. B. Smith did not eat or drink a.m. meal." Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. B, Jail Records for Brenda Smith (Pass-on Sheet) at Bates 33. Further, in his deposition Sergeant Dye admitted his understanding of Smith's serious condition:

      Q.      So, you drew the conclusion by virtue of your observations of Brenda Smith during the course of the evening beginning 7:00 p.m., April . . . 29th, through the end of the shift on April 30th at 3:00 a.m., that Brenda Smith was, indeed, very ill with delirium tremens and withdrawal symptoms, correct?

      A.      That was my opinion, yes, sir.

      . . .

      Q.      You understood by way of that note that her condition had, in fact, deteriorated since your last note the night before, correct?

      A.      That was my belief, sir.

. . .
Q.   You were aware at the time that you made the phone call that there were obvious signs of illness with regard to Brenda Smith and her need to see a doctor, correct?
. . .
A.   I was aware of signs of illness, yes.

Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. P, Dye dep. at 58-60.

Sergeant Dye's conversation with Dr. Stickney on the evening of April 29 likewise confirms Dye's understanding of Smith's condition.  Dye reported to Dr. Stickney that Smith "is to the point of really bad hallucinations right now"; "she's getting kind of violent about wanting to get out of her cell"; she is "very agitated"; she is "yelling at us, calling us names"; she did not eat either lunch or dinner; and she is having withdrawal "badly."  Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 16, Tr. of Apr. 29, 2007 Telephone Call Between Dye and Stickney at 2-3.  Finally, Sergeant Dye's move of Smith to a padded cell on April 29 demonstrates his realization that "her condition had deteriorated to the extent that her physical condition was worse."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. P, Dye dep. at 61.

Moreover, Dye knew the difference between alcohol withdrawal and the more serious condition of *delirium tremens*.  He knew that the symptoms included sweating, nausea, hallucinations, and delirium, that a person with DTs can deteriorate over time, and that *delirium tremens* could cause death.  *Id.* at 21-22, 28.  It was on Sergeant Dye's watch that Smith's DTs took a harsh turn for the worse.  The defendants' expert witness, Michael F. Boyle III, D.O., opined that "Brenda Smith's symptoms of alcohol withdrawal worsened into delirium tremens on the evening of April 29, 2007."  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. FF, Boyle Aff. ¶ 3(e).  Although Dye attempts to downplay the extent of his authority, stating that his only alternative was to call Dr. Stickney, Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. P, Dye dep. at 69 ("Our

-30-

procedure was to call the doctor, and if the doctor felt that it was necessary to call for emergency service, then we would have done so."), the record suggests otherwise.  Lenawee County Jail Policy 4.1.1 states that "[i]f at any time during contact with an Offender Inmate an employee identifies an injury or need for medical attention, the Jail Shift Commander will be notified and medical treatment will be provided.  Emergency treatment will be provided at Bixby Hospital."  *See* Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. D, Lenawee County Jail Policy at 29; *see also* Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. AA, Richardson dep. at 105, 111 (confirming existence of such policy and revealing hope that an employee witnessing an inmate lying face down on a bench, incoherent, and loudly moaning would bring it to the attention of emergency medical personnel). As an individual with emergency medical training, Dye certainly had the capacity to notice and to respond to the trouble signs exhibited by Smith.  *See* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 28, Craig dep. at 23 (stating that Dye was a former EMT).

Dye argues that he merely deferred to Dr. Stickney's recommendations regarding treatment. However, drawing all reasonable inferences in favor of the plaintiff, a jury could conclude that Dye failed to address Smith's risk of death from severe alcohol withdrawal and was deliberately indifferent to it.  The evidence supports a conclusion that Dye violated Smith's clearly established constitutional rights by disregarding a known risk of serious harm to Smith and taking no action to contact emergency medical services on April 29, 2007.

### 4.  James Craig

Jail sergeant James Craig argues that he was subjectively unaware of the seriousness of Smith's condition.  He points out that April 30 was the first day back after his weekend off work.

-31-

At the beginning of his shift at 7 a.m., he was informed that Dr. Stickney put Smith on "good" DT medications and instructed that she be watched. Craig ordered two intake officers, Vanderpool and Baker, to observe Smith. Craig said he gave Smith water and talked to her. Craig believed that Nurse Mason would examine Smith the same day.

The evidence shows that Craig's only contact with Smith was during the last three hours of her life. He knew that Smith "was going through DTs and that the doctor had been contacted." *Id.* at 38. He acknowledged that it was his routine practice to review the pass-on book and incident reports for all the days he was off, from which Craig would have learned about Smith's worsening condition.

Sergeant Craig's first and only personal encounter with the decedent occurred around 8:46 a.m. After Officer Vanderpool told Craig that Smith was holding onto her empty cup, Craig went into the cell, took her cup, filled it with water, and brought it back a minute later. He found Smith "on her knees and maybe on her elbows" on the floor by the bench-type elevation. *Id.* at 48. Although Craig testified that he "asked her how she was doing," in response to which she "did say something that was inaudible," *ibid.*, the video recording of the cell suggests otherwise. Smith is seen sprawled out on the floor by the elevated bench and not reacting to Craig's presence. Although the video does not contain a sound track, Craig is seen getting in and out of Smith's cell both times very quickly, briskly putting the cup with water by Smith's body the second time, and not checking Smith's vital signs or focusing his eyes on her. By the time of his visit, Smith could only slightly twitch her hands. At that point, Smith was a mere half an hour away from her last movement.

Craig's testimony suggest that he appreciated extent of Smith's suffering:

A.      As I recall, I took her glass and filled it with water and gave it back to her.

-32-

> Q.      When you indicate that what she said was 'inaudible,' was that because she was talking quietly or because she was saying something that didn't make sense.
>
> A.      Both quietly and something that didn't make sense; kind of a mumble.
>
> Q.      It was your understanding that she had been up the entire night before, isn't it?
>
> A.      Yes.
>
> Q.      It was your understanding that she had been hallucinating badly and in a very agitated state the whole night, correct?
>
> A.      Yes.
>
> Q.      And she was sweating profusely?
>
> A.      I don't know about that one, specifically. The other ones that you mentioned, I do remember that being discussed.
>
> Q.      It was your impression that she had been suffering throughout the night from the delirium tremens, correct?
>
> A.      Yes.
>
> Q.      And you would agree with me that she was suffering at the time that you saw her at about 9:00 in the morning, as well, correct?
>
> A.      Correct.

*Id.* at 48-49.

Craig also testified that he understood what alcohol withdrawal and *delirium tremens* were, knew their symptoms, and knew that DTs is a serious medical condition that may lead to death. Nevertheless, Craig chose not to address any of these issues, preferring to focus his attention on training Bernice Baker instead. The Court finds that there exists a genuine issue of fact as to whether Craig's conduct amounted to deliberate indifference towards Smith's serious medical need. The qualified immunity defense likewise requires resolution of that fact issue.

### 5. Bernice Baker

Intake office Bernice Baker also argues that she was not subjectively aware of the seriousness of Smith's condition and had no understanding that a person could die from *delirium tremens*. She said she was merely following her supervisor's instructions and observed Smith on

-33-

a camera for about 30 minutes, reporting results of her observations to Sergeant Craig.  She also listened to Smith through a microphone, reporting heavy breathing.  She testified that she did not appreciate the extent of Smith's suffering at that time because she lacked the requisite medical knowledge to appreciate that.

Baker presents a close case.  April 30, 2007 was her first day on the job.  However, at her deposition she was able to recite the symptoms of both alcohol withdrawal and *delirium tremens* in some detail and admitted that she had been advised about lethality of *delirium tremens* within her first hour on the job.  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. Z, Baker dep. at 22-23. Baker's summary of her observations of Smith during her 30 minutes on duty were quoted earlier. That summary can be found to describe an inmate in obvious trouble and in need of medical attention.

Baker also recalls that Smith's yelling was "[l]oud[] enough that [she] did not have to have on volume to hear," "[she] could hear her through a closed door."  *Id.* at 28.  She remembers that Smith's foot was trembling in an "unprovoked" manner, as if "it was not being done, that she was not doing it herself."  *Id*. at 33.  She also recalls Smith "crawling on the floor" and "laying face down on – with her head down on the bench moaning loudly," *id*. at 39, and later "in a sitting position holding her head in her hands," *id*. at 40.  Review of the video recording of Smith from 7 through 7:30 a.m. on April 30 also shows Smith's attempt to stand up and fall on her back.

A jury could conclude that the obviousness of Smith's condition would have alerted any layperson without specific background in *delirium tremens* to the seriousness of her condition. Having that knowledge and doing nothing could be found to be deliberate indifference and a violation of Smith's clearly established right to medical treatment.

-34-

### 6.  Adam Ondrovick

Corrections officer Ondrovick says that he was only able to observe Smith experience a less than life-threatening condition of alcohol withdrawal, not *delirium tremens*.  He cites the plaintiff's expert Dr. Goldenson, who admitted that inmates going through alcohol withdrawal can be treated in a jail setting and do not require hospitalization.  During the day shifts on April 28 and 29, 2007, Ondrovick did not observe Smith become agitated; the decedent became agitated only during the evening hours of April 29.  Ondrovick testified that he believed Smith was placed on good medication and would get better shortly.  He argues that his authority did not extend to filling out incident reports or pass-on sheets, having physical contact with inmates, or initiating telephone calls to the off-premise jail nurse or medical director.

Ondrovick booked Smith on the evening of April 27, and he saw her during his day shifts from 7 a.m. to 7 p.m. on Saturday, April 28 and Sunday, April 29, 2007.  During that time, the isolation cell housing Smith was located directly in front of Ondrovick's duty station, and he was aware that Smith was going through alcohol withdrawal at the time.  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. O, Ondrovick dep. at 28-29.

Ondrovick was a certified emergency medical technician, and he knew the symptoms of alcohol withdrawal and *delirium tremens* and understood that DTs could be fatal.  *Id.* at 15-17.  Unlike defendant Mary Neill, who never saw Smith exhibit any irrational behavior, Ondrovick observed Smith's hallucinations on Sunday, April 29.  He testified at his deposition:

> Q.    Okay.  So what was your observation of her on the 29th?
> . . .
> A.    . . . The only thing I can recall is I do remember her talking to other people that weren't there.  I do remember that Sunday.
> Q.    Okay.  And do you recall anything else?
> A.    Hm-mm.  No.  Sorry.  I'm sorry.  No.

> Q.      So when you say you recall her talking to people who weren't there, you're talking about her engaging in some irrational or abnormal behavior?
>
> A.      I would say yes and no because working in the jail, people talk to people that aren't there more than — I mean I wouldn't know whether or not that was normal or not normal, I guess you'd say.
>
> Q.      Okay. . . . Was it your impression that she was experiencing alcohol withdrawal when you observed her talking to people who weren't there on April 29th?
>
> A.      I guess I'd say yes.

*Id.* at 30.

As with Bernice Baker, Ondrovick's involvement presents a close case. However, the Court concludes that by failing to report Smith's obviously irrational behavior to a supervisor, Ondrovick "acknowledg[ed], but yet ignor[ed], the obviously debilitated state of a prisoner in need of medical attention." *Taylor v. Franklin Cnty., KY*, 104 F. App'x 531, 542 (6th Cir. 2004). Ondrovick, who, upon booking Smith, did not notice anything wrong with the decedent, could easily discern a sharp turn for the worse by observing Smith's delirium two days later. Although he denies subjectively appreciating a serious risk, a jury could conclude that Smith's hallucinations, which Ondrovick acknowledged, support an inference that he knew and disregarded an excessive risk to inmate health or safety. Such deliberate indifference also would remove the case from the realm of qualified immunity.

### 7. Wendy Vanderpool

Intake officer Vanderpool likewise argues that she was not deliberately indifferent to Smith's serious medical need and is entitled to qualified immunity. According to Vanderpool, she knew that Smith was on proper medications and was "going to go through some of those DTs even with the medications." Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. J, Vanderpool dep., Jan. 15, 2010,

at 82.  She said she relied on Dr. Stickney's statement made around 9 p.m. on April 29, 2007, that Smith did not need to go to the hospital but should be fine with the prescribed medication.  That morning, she and defendant Baker monitored Smith every fifteen minutes "making sure that . . . airway, breathing, circulatory. . . the basic things were still going on, that she was okay."  *Id.* at 58. Although she did not believe Smith was in a condition to be transported for arraignment by Parole Officer Moore, she says she did not perceive that Smith needed to be hospitalized or immediately see the doctor.

However, of all defendants, Vanderpool monitored Smith closely for the longest time: from 7 p.m. on Sunday, April 29, through Smith's final minutes at the jail around 10 a.m. on Monday, April 30.  She also had training that would have alerted her to Smith's dire straits.

For fourteen years, Vanderpool worked as an emergency medical technician.  She knew the signs of alcohol withdrawal and *delirium tremens*, understood that *delirium tremens* is an advanced state of alcohol withdrawal, and appreciated that either of these conditions could result in death.  Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. J, Vanderpool dep., Dec. 11, 2009, at 12-13.  Throughout Smith's last night, Vanderpool closely monitored Smith in intervals of approximately fifteen minutes.    During this time, Vanderpool observed Smith's condition deteriorate.  As she later summarized in her September 15, 2007 statement:

> E Westgate getting water for her and she wanting and trying to get out the door.  Her working hard through the night trying to keep the wall up and getting her family and friends to help, getting upset because they didn't work [as] hard as her.  Her friends and family was just outside and wanted to go see them.  Her being covered in sweat from working so hard. . . . 4:30-5:00 am.  Then in the morning around 6:00-7:00 AM she finally set down in the middle of floor and was playing quietly w/ puppies.  She laid her head on the edge of the bed area and was quiet for the most part, had the monitor and speaker turned on her almost the whole evening.  With the speaker on I could hear her. . . . When Tom Moore was here to pick her up I had him observe

her for a few minutes to show him she was in no state to be transferred by van any where [sic]. This all happened between 7:00-9:18 am on the morning of the 30th.

Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 14, Suppl. Info. of Officer Vanderpool; *see also* Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. J, Vanderpool dep., Jan. 15, 2010, at 53 (describing Smith as "pacing, talking out loud, not loudly but just talking" and estimating that Smith started "holding the walls up, talking to other family members that weren't there" sometime after midnight). Vanderpool recalls how Smith "had her hand on the wall and she kept moving and she would tell her family to help her," and "she was getting sweaty in that process." Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. J, Vanderpool dep., Jan. 15, 2010, at 56. She acknowledged that Smith was exhibiting classic symptoms of DTs. *Id*. at 54. Although Vanderpool states that by 5 a.m., Smith "was getting more settled" and notes that at that time Smith was "still talking, but she was definitely slowing down," Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. C, Death Investigation Report at 5, she admits that by the time Parole Officer Moore came down to transport her for arraignment, Smith "was [not] in any condition be taken anywhere,"Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. J, Vanderpool dep., Jan. 15, 2010, at 75. Officer Moore himself confirmed that at the time he observed the decedent around 9:15 a.m. on April 30, he "could see she had her face down on the bench" and "[s]he was loudly moaning." Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. C, Death Investigation Report at 7; *see also* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 41, Moore dep. at 60. To add to the picture, Vanderpool recalls that during last hours of her life, Smith's breathing sounded "raspy." Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. C, Death Investigation Report at 6.

Although Vanderpool denies that she had realized that Smith needed to see a doctor, she was "aware of facts from which the inference could be drawn that a substantial risk of serious harm

-38-

exist[ed]," *Farmer*, 511 U.S. at 837, and a jury could conclude that she in fact drew that inference. For example, Vanderpool realized that Smith "needed to have fluid in-take," Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. J, Vanderpool dep., Jan. 15, 2010, at 86, and even recruited Officer Baker to help her monitor Smith, *id*. at 87.  Add to this situation Vanderpool's failure to check on Smith for a forty-minute period between Moore's visit and the discovery that Smith did not breathe — in violation of Policy No. 4.1.1 requiring physical monitoring of special needs inmates at least once every fifteen minutes, *see* Defs.' App. for Mots. for Summ. J. [dkt. #90], Ex. D, Lenawee County Jail Policy at 30 — and a jury could find that Vanderpool was deliberately indifferent to Smith's serious medical condition.

### 8.  Jeffrey Stickney, D.O.

The case with Dr. Stickney is perhaps the clearest of all.  There is no doubt that Dr. Stickney appreciated the seriousness of *delirium tremens* as a medical condition and was aware of the high possibility of lethal outcome associated with that condition.  *See* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 37, Stickney dep. at 26-28.  There is likewise little doubt that Dr. Stickney's refusal to alter the course of Smith's treatment on the evening of April 29, when all classic signs were present that Smith was getting worse and developed *delirium tremens*, evince Dr. Stickney's disregard of an excessive risk to Smith's health.  Stickney never examined Smith, he did not order a prompt examination by a medical provider (the nurse would not be on duty until Monday afternoon), and he did not order transport to a hospital where Smith could be examined.  Rather than take Sergeant Dye at his word and prescribe adequate treatment, Dr. Stickney chose to doubt the accuracy of Dye's report.  *Id*. at 63 ("I have to take the things that [Dye and Neill] say, being non-medical people, and be very open minded about it."), at 67 ("Q.  You didn't tell [Dye] what to look

for in order to determine if her condition worsened, correct? A. Again how am I going to tell a non-medical person in some succinct matter what to tell me. That's training that they don't have."), at 84 ("I've got often people that just graduated from high school without any training in what they're trying to convey."). His plan for Smith's treatment was "to make sure she was taking medicines . . . and make sure she's protected . . . and to make sure that we got a medical opinion through Bonnie in the morning." *Id*. at 66. But Bonnie Mason was not scheduled to work "in the morning."

It appears that Dr. Stickney, the jail medical director, did not check to see whether the nurse would be present in the morning, and of course, she was not. He advise Dye to call back if Smith's condition worsened. Despite the availability of several trained EMTs on jail staff, Dye dismissed the possibility of someone checking Smith's vital signs out of hand. Dr. Stickney never defined what keeping Smith "protected" would involve and did not give any directions for Sergeant Dye to follow. Dr. Stickney failed to convey the gravity of *delirium tremens* or the urgency called for. Instead, he remarked, "We can be agitated ourselves and just confused," and quipped, "Sitting in the jail will do her some good." Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 16, Tr. of Apr. 29, 2007 Telephone Call Between Dye and Stickney at 4.

The plaintiff's expert witness, Dr. Joe Goldenson, concluded that Dr. Stickney's failure to prescribe adequate dosage of Librium, his failure to order continuing monitoring of Smith, and his failure to have Smith transferred to an emergency room amounted to "care [that] was so grossly inadequate that it amounts to no care at all." Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 21, Goldenson Report at 11. A jury could conclude from these facts that Dr. Stickney's conduct transcends medical malpractice and falls within the boundaries of deliberate indifference. The facts

-40-

also support a conclusion that Dr. Stickney violated Smith's clearly established constitutional rights.

### 9.   Lawrence Richardson

Sheriff Richardson argues that the complaint fails to state a claim for individual liability against him because there are no allegations that he had any personal involvement with Smith until after her death. That argument is accurate. The plaintiff cannot state a claim of supervisory liability because there is no evidence that defendant Richardson "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). Moreover, "[a] supervisor is not liable under § 1983 for failing to train unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Ibid.* (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). In other words, "[s]upervisor liability attaches when a supervisor encourages or condones a constitutional violation." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 314 (6th Cir. 2005). To hold an individual supervisor liable "under a failure-to-train theory, the [plaintiff] must point to a specific action of each individual supervisor to defeat a qualified immunity claim." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008).

There is no evidence to support supervisory liability against Sheriff Richardson. Therefore, the plaintiff's claims against defendant Richardson in his personal capacity fail.

### E.   Municipality liability

Lenawee County and Sheriff Richardson in his official capacity argue that the plaintiff failed to show an underlying constitutional deprivation or a policy or custom that was the moving force behind the alleged deprivation of the decedent's rights. The plaintiff's theory of municipal liability is based on a custom, not a written policy or other law, but, the county contends, she cannot show

-41-

a clear and persistent pattern of violating federal rights or a history of widespread abuse necessary to sustain an unwritten policy claim. The county argues that Jail Administrator Dennis Steenrod's memo does not furnish that proof. Finally, Lenawee County argues that the plaintiff has not established a failure-to-train claim, primarily because there is no evidence of close causal connection between the alleged failure to retrain Sergeant Dye and the alleged constitutional violation.

"A municipality is liable for a constitutional violation when execution of the municipality's policy or custom inflicts the alleged injury." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). The Sixth Circuit explained that "[t]he official policy or custom 'must be the moving force of the constitutional violation' to establish the liability of a government body." *Ibid.* (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)).

The absence of a written policy endorsing the constitutional violation is not fatal to a claim. "Section 1983 'authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."'" *Cash v. Hamilton Cnty. Dep't of Adult Probation*, 388 F.3d 539, 542-43 (6th Cir. 2004) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). To sustain municipal liability under that theory, a plaintiff must "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* at 543 (citation and quotation marks omitted).

A municipality may be held liable for an Eighth Amendment violation for failure to train its employees if (a) "the failure to train amounts to deliberate indifference to the rights of persons with

whom the police [or other municipal employees] come into contact"; and (b) "the deficiency in training actually caused the police officers' [or other municipal employees'] indifference to [the plaintiff's] medical needs." *City of Canton v. Harris*, 489 U.S. 378, 388, 391 (1989); *see also Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (2006) (explaining that, to succeed on a failure-to-train claim, the plaintiff must prove "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury"). "In resolving the issue of [the municipality's] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91. Failure to train encompasses claims dealing with failure to adopt policies. *See Blackmore*, 390 F.3d at 900; *Howard v. Calhoun Cnty.*, 148 F. Supp. 2d 883, 891 (W.D. Mich. 2001).

The record before the Court establishes a genuine issue of material fact as to Lenawee County's liability for deliberate indifference. Despite the contractual requirement that Dr. Stickney assist in developing policies for handling medical emergencies, *see* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 10, Dr. Stickney's Contract ¶ 5(b), and the Lenawee County Policy No. 4.5.1.1 requiring the county physician to "develop and supervise emergency care protocols for use by Jail Staff," *see* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 9, Lenawee County Jail Policies (Policy No. 4.5.1.1) at Bates 46, such protocols were never developed. Lenawee County failed to introduce any formal written policy on how to deal with inmates' illnesses in case they escalate and

-43-

failed otherwise to train its employees on the common medical problems of the detainees. *See* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 45, Lenawee County Answer to Req. for Admission No. 18. The absence of any direction as to how the jail officials should conduct themselves when encountering certain medical conditions effectively delegated that responsibility to jail employees themselves. Yet, as Dr. Stickney observed, many of the county employees are "untrained people" who "often . . . just graduated from high school without any training in what they're trying to convey," which inhibited Stickney's communication with them. *See* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 37, Stickney dep. at 83-84. In fact, in his memo to Undersheriff Gail Dotson, Dennis Steenrod identified among many inadequacies in the Lenawee County Jail health care system the fact that "[m]edically untrained corrections officers [are] forced to make medical judgments 21.4 hours a day." Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 6, Apr. 2, 2007 Interoffice Memorandum from Steenrod to Dotson at 2.

Steenrod also acknowledged that on average, inmates at the Lenawee County jail suffered from more serious health issues than the general population. *Id.* at 1. It is no coincidence, therefore, that during just five months preceding Smith's death, the jail arguably failed timely to address medical emergencies of three separate individuals. What is more, the upper management of the jail was apprised of the inadequacies in the inmate health care system and knew of Steenrod's recommendation that the jail "[p]rovide trained medical personnel to make all medical decisions . . . [and] to administer and dispense medication to inmates." *Id.* at 2. The plaintiff's expert witness, Jeff Eiser, opined that "[t]he policy and practice of the Lenawee County Jail and Sheriff Lawrence Richardson, Jr. of using untrained corrections officers to make initial medical assessments and referrals on inmates violates clearly established corrections industry standards and practices," and

-44-

the jail's administration "acted with deliberate indifference to the safety of inmate Brenda Smith by failing to take corrective action after it became obvious that her serious medical condition was deteriorating." *See* Pl.'s Resp. to Mots. for Summ. J. [dkt. #106], Ex. 23, Eiser Report ¶¶ 3, 5.

The evidence can be viewed to support Mr. Eiser's conclusion. There is a genuine issue of material fact as to the deliberate indifference of the county. *See Blackmore*, 390 F.3d at 900 (denying a motion for summary judgment to a county that lacked a formal written policy on how to deal with prisoner illnesses and where the jail's policy was not to provide a substitute nurse if the on-duty nurse calls in sick); *see also Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (describing the second category of deliberate indifference in which a city fails to act in response to repeated complaints of constitutional violations by its officers). The plaintiff presented sufficient evidence to show that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

The plaintiff presented sufficient evidence of causation. Under *Monell*, the municipality's policy, tradition, or custom (or lack thereof) must be "closely related to or actually caused the injury." *Ellis*, 455 F.3d at 700; *see also City of Canton*, 489 U.S. at 388 (requiring that the policy be a "moving force [behind] the constitutional violation"). There is testimony in the record that, had the jail policy required employees to contact medical staff upon seeing, for example, hallucinations, they would have followed that policy. There is also testimony indicating confusion among employees about who was and was not authorized to contact medical personnel, and whether they could have called for emergency services directly. Several defendants testified that they did not

-45-

quite know the difference between alcohol withdrawal and *delirium tremens*, which made their reading of the symptoms less trustworthy.  Dr. Stickney testified that he was reluctant to trust the untrained individuals' description of the symptoms and preferred to wait for the nurse to examine the inmate.  However, the nurse was on site for only parts of three days each week.  Taken together, these factors support the conclusion that Smith's death could have been avoided if the city had implemented remedial policies to improve healthcare at the Lenawee County sooner than June 1, *see City of Canton*, 489 U.S. at 391 (identifying as the relevant inquiry the question whether "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect"), and that the training was not adequate to address the reasonably foreseeable tasks jail personnel would be called upon to perform.  Those shortcomings in turn establish a jury-submissible claim for deliberate indifference.

## F.  State law claims

In Count 2 of the complaint, the plaintiff alleges that the defendants were grossly negligent in their care of Brenda Smith, and their conduct caused her death.  The jail defendants contend that this state law claim cannot proceed because the plaintiff maintains that Dr. Stickney's conduct is the most immediate cause of Smith's death, and state law allows but one proximate cause.  Dr. Stickney argues that this count is nothing more than a medical malpractice claim in disguise, which must be dismissed because the plaintiff has not followed the state's procedural rules concerning pre-suit affidavits of merit and expert witness qualifications.

Michigan's governmental tort immunity statute allows suits against state and local government employees acting within the scope of their employment only for gross negligence "that is *the* proximate cause of the injury or damage.  Mich. Comp. Laws § 691.1407(2)(c) (emphasis

-46-

added).  "Gross negligence" means "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  *Id.* at 691.1407(7)(a)  "*The* proximate cause" has been defined by the Michigan Supreme Court to mean "the one most immediate, efficient, and direct cause of the [plaintiff]s' injuries." *Robinson v. City of Detroit*, 462 Mich. 439, 445-46, 613 N.W.2d 307, 311 (2000).  As the opinion in the prior appeal in this case made clear, the phrase cannot "mean anything other than the sole proximate cause." *Smith v. County of Lenawee*, 600 F.3d at 691.

Where jail personnel act with deliberate indifference to an inmate's serious medical need, the Court has little trouble concluding that the conduct "demonstrate[s] a substantial lack of concern for whether an injury results."  The defendants do not argue otherwise.  The question presented by the motions, however, is whether the fact that multiple individuals failed to provide adequate medical care requires the Court to chose as a matter of law the one whose conduct was the "most immediate, efficient, and direct cause" of Smith's death.

That is not a task the Court must undertake.  The plaintiff is entitled to plead in the alternative. *See Croskey v. BMW of North America, Inc.*, 532 F.3d 511, 515 (6th Cir. 2008).  If there is evidence that tends to show that more than one defendant's gross negligence may have been "the" proximate cause of Smith's death, the plaintiff may present that case to a jury.  Involvement of other possible agencies of injury is not fatal to a claim that a prison official was grossly negligent in failing to furnish adequate medical care when there is evidence that the defendants "had multiple opportunities to provide adequate medical care and to, in all likelihood, prevent [the decedent]'s injuries." *Dominguez*, 555 F.3d at 553.  As noted earlier, there is evidence that each of the defendants had the ability to intervene to help Brenda Smith in the last hours of her life.  That

-47-

evidence is sufficient to create a jury question on the causation element of the plaintiff's gross negligence claim.

Dr. Stickney's argument that the plaintiff is required to comply with the state's medical malpractice procedural requirements does not carry the day. It is true that under Michigan law, a medical malpractice plaintiff is subject to certain procedural and standard of proof requirements not applicable to other actions, including filing of a notice of intent to sue, filing of an affidavit of merit, and complying with state requirements regarding expert witness qualifications. *See* Mich. Comp. Laws §§ 600.2912b, .2912d, .2169; *but see Long v. Adams*, 411 F. Supp. 2d 701 (E.D. Mich. 2006) (holding that Michigan requirement that malpractice plaintiff file affidavit of merit was inapplicable in federal action governed by Fed. R. Civ. P. 8). However, a medical malpractice claim cannot arise unless it "occur[s] in the course of a professional relationship, and . . . the claim . . . pose[s] questions of medical judgment outside the realm of common knowledge and experience." *Potter v. McLeary*, 484 Mich. 397, 414, 774 N.W.2d 1, 10 (2009).

It is arguable whether Dr. Stickney established a professional relationship with Brenda Smith, since he never saw her and his treatment consisted of advising the jail employees what they should do with her. On the other hand, Dr. Stickney had a contractual obligation to furnish medical services to Lenawee County jail inmates. Nonetheless, the majority of the federal courts that confronted prisoners' Eighth Amendment claims under the state governmental tort liability law have not required the plaintiffs to abide by the requirements of the medical malpractice statutes. *See, e.g., Hagopian v. Smith*, No. 05-74025, 2008 WL 3539256, at *5 (E.D. Mich. Aug. 12, 2008) (refusing to characterize the plaintiff's claims as the ones sounding in medical malpractice and casting them as alleging violations of constitutional rights); *Beedle v. Doane*, No. 05-70430, 2005 WL 1345527,

-48-

at *4-5 (E.D. Mich. May 12, 2005) (distinguishing medical malpractice claim from a claim under the governmental tort liability law and observing that "[t]here is nothing in the language of either the GTLA or § 600.2169 *et seq.* providing that the notice of intent to sue and affidavit of merit requirements of the latter apply to a gross negligence claim brought under the former by an inmate"). The Court adopts the reasoning of those cases.

## III.  Conclusion

The Court finds that fact issues preclude summary judgment on both counts of the complaint as to all defendants except Mary Neill and Lawrence Richardson in is individual capacity.  It is not clear whether the plaintiff asserts a claim against Sheriff Richardson in his official capacity. However, such a claim is tantamount to a claim against the County itself.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[W]hile an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."). Maintaining the sheriff as an official-capacity defendant therefore is a redundancy.  A suit against a public official in his official capacity is merely "another way of pleading an action against an entity of which an officer is an agent."  *Monell*, 436 U.S. at 690 n.55; *see also Everson*, 556 F.3d at 493 n.3.  The Court will dismiss the case against defendant Richardson in its entirety.

Accordingly, it is **ORDERED** that the motions for summary judgment by defendants Mary Neill and Lawrence Richardson [dkt. # 86, 87] are **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the motions for summary judgment by defendants County of Lenawee and Paul Dye [dkt. # 86, 87] are **DENIED**.

It is further **ORDERED** that the motions for summary judgment by defendants Eric Westgate [dkt. #85], James Craig, Bernice Baker [dkt #88], Adam Ondrovick, Wendy Vanderpool [dkt. #89], and Jeffrey Stickney, D.O. [dkt. #92] are **DENIED**.

It is further **ORDERED** that the plaintiff's motion to strike affidavits [dkt. #117] is **DENIED**.

It is further **ORDERED** that counsel for the parties appear before the Court on **April 18, 2011 at 11:00 a.m.** to discuss further case management deadlines and schedule the matter for trial.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 28, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 28, 2011.

s/Deborah R. Tofil
DEBORAH R. TOFIL

---